## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* SHIRE LITIGATION PARTNERSHIP LLP and on behalf of the STATES of CALIFORNIA, COLORADO, CONNECTICUT, DELAWARE, FLORIDA, GEORGIA, HAWAII, ILLINOIS, INDIANA, IOWA, LOUISIANA, MARYLAND, MICHIGAN, MINNESOTA, MONTANA, NEVADA, NEW JERSEY, NEW MEXICO, NEW YORK, NORTH CAROLINA, OKLAHOMA, RHODE ISLAND, TENNESSEE, TEXAS, VERMONT, WASHINGTON, the Commonwealth of MASSACHUSETTS, the Commonwealth of VIRGINIA, the DISTRICT OF COLUMBIA, the PEOPLE OF CALIFORNIA, and the PEOPLE OF ILLINOIS,<br><br>    **Plaintiff-Relator,**<br><br>v.<br><br>TAKEDA PHARMACEUTICAL COMPANY, LTD, TAKEDA PHARMACEUTICALS U.S.A., INC., SHIRE NORTH AMERICAN GROUP, INC., SHIRE PHARMACEUTICALS, LLC, SHIRE U.S., INC., SHIRE HUMAN GENETIC THERAPIES, INC., SHIRE VIROPHARMA, INC., and SHIRE PLC,<br><br>    **Defendants.** | Civ. Action No. 19-cv-10041<br><br>FILED UNDER SEAL<br>Pursuant to <u>31 U.S.C. § 3730(b)(2)</u><br><br>(Plaintiff-Relator demands a trial by jury on all counts) |

## <u>THIRD AMENDED COMPLAINT  FOR FALSE CLAIMS ACT VIOLATIONS UNDER  31 U.S.C. §§ 3729 *ET SEQ.* AND STATE LAW COUNTERPARTS</u>

# TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................. 2

II.     PERFECTION OF FILING AND STANDING ................................................. 8

III.    PARTIES ............................................................................................................ 9

    A.      Plaintiff/Relator ....................................................................................... 9

    B.      Defendants ............................................................................................. 10

IV.     JURISDICTION AND VENUE ....................................................................... 12

V.      NATURE OF ACTION .................................................................................... 13

    A.      The False Claims Act ............................................................................ 13

    B.      The Anti-Kickback Statute ................................................................... 14

    C.      Government Health Care Programs ....................................................... 19

    D.      Copayment Assistance Programs .......................................................... 25

    E.      Drug Manufacturer cGMP and Post-Marketing Surveillance Obligations and Related Certifications ........................................................................... 32

VI.     FACTUAL ALLEGATIONS ........................................................................... 36

    A.      Shire's Rare Disease Business ............................................................... 36

    B.      Sales of the Shire Drugs ........................................................................ 38

    C.      Shire PAMs' Direct Interactions with Charitable Foundations ........... 39

    D.      Shire's Staggering RBM Bonus Structure ........................................... 41

    E.      Shire Uses Symphony Health to Track Down Rare Disease "Leads" with a Frightening Level of Precision ....................................................... 43

    F.      Payment of Kickbacks to Induce Patients to Promote the Shire Drugs ............... 45

    G.      Cinryze, Firazyr, and Takhzyro: Shire's HAE Drugs .......................... 52

        1.      Background on HAE ................................................................... 52

        2.      Shire's Promotion of Cinryze, Firazyr, and Takhzyro .............. 53

            a)      Cinryze ........................................................................... 53

            b)      Firazyr ........................................................................... 59

            c)      Takhzyro ........................................................................ 59

            d)      Lowering the Bar on Compliance .................................. 61

            e)      The Shire Charitable Foundation Money Was Housed in the Patient Services Unit on the Commercial Side of the Company .. 63

        3.      Shire's Fraudulent Funding of Charitable Foundations Receiving HAE Monies ......................................................................... 64

            a)      Shire Used Patient Services CMs to Ensure Patients Get Access to HAE Drugs ................................................... 64

b)     The Shire Patient Services Unit Knew When a PAP Was out of HAE Funds.................................................. 65

c)     Shire's Illegal HAE Contributions to Charitable Foundations to Fund Copayments ........................................................... 67

d)     Shire's Charitable Copayment Contributions for HAE Patients Were Kickbacks .................................................... 68

H.     Elaprase: Shire's Hunter Syndrome Drug.......................................... 73

    1.    Background on Hunter Syndrome ........................................... 73

    2.    Shire's Promotion of Elaprase ................................................. 74

    3.    Shire's Charitable Copayment Contributions for Hunter Syndrome Patients Were Kickbacks ................................................. 75

I.     VPRIV: Shire's Gaucher Disease Drug............................................. 77

    1.    Background on Gaucher Disease ("GD")................................. 77

    2.    Shire's Promotion of VPRIV Through Paid Patient Ambassadors .......... 77

    3.    Shire's Charitable Copayment Funding for GD Patients Was a Kickback .................................................................................. 78

    4.    Shire's Fraudulent Funding of the Aubrey Rose Foundation ................... 80

J.     Natpara: Shire's Hypoparathyroidism Drug ...................................... 87

    1.    Background on Hypoparathyroidism ("HPT") ......................... 87

    2.    Natpara and Its OTC Competition ........................................... 88

    3.    Once Enrolled in OnePath, Shire Pressures Patients and Physicians to Commence Natpara Therapy ............................................ 92

    4.    Shire's Charitable Copayment Assistance Payments for HPT Patients Were Kickbacks ......................................................... 96

    5.    Shire Promotes, Markets, and Sells Natpara in the United States Despite Its Knowledge for Years of a Safety Issue That Would Later Become the Basis for an FDA Safety Recall ............................ 109

VII.    SHIRE CAUSED THE PRESENTATION OF FALSE CLAIMS TO THE FEDERAL AND STATE GOVERNMENTS ........................................................ 121

A.     Government Reimbursement for Cinryze, Elaprase, Firazyr, Natpara, Takhzyro and VPRIV.......................................................... 121

B.     Shire Induced Medicare, Medicaid, and the Government Health Care Programs to Pay for Thousands of Prescriptions Tainted by Kickbacks ................................ 122

VIII.   SHIRE CAUSED GOVERNMENT HEALTH CARE PROGRAM PROVIDERS TO FALSELY CERTIFY COMPLIANCE WITH THE LAW ........................................... 128

IX.    RETALIATION.............................................................................. 130

X.    SHIRE VIOLATED THE CIFPA............................................................. 131

A.     The California Insurance Frauds Prevention Act.................................. 132

B.      Insurers and Cost-Containment Strategies.............................................................. 135

C.      Shire's Use of Kickbacks to Defraud California Insurers .................................... 135

D.      Competitive Choice as a Cost-Containment Strategy............................................ 136

E.      California Insurers' Provider Agreements and Manuals ...................................... 136

F.      Shire Caused False Claims to Be Submitted to California Insurers ................... 139

XI.     SHIRE VIOLATED THE IICFPA ..................................................................................... 139

A.      The Illinois Insurance Claims Frauds Prevention Act ......................................... 140

B.      Insurers and Cost-Containment Strategies.............................................................. 143

C.      Shire's Use of Kickbacks to Defraud Illinois Insurers ......................................... 143

D.      Competitive Choice as a Cost-Containment Strategy............................................ 144

E.      Illinois Insurers' Provider Agreements and Manuals ........................................... 144

F.      Shire Caused False Claims to Be Submitted to Illinois Insurers ........................ 146

XII.    COUNTS...................................................................................................................................... 147

COUNT I (Violation of False Claims Act, 31 U.S.C. § 3729(a)(1); 31 U.S.C. § 3729(a)(1)(A))................................................................................................................................ 147

COUNT II (Violation of False Claims Act, 31 U.S.C. § 3729(a)(2); 31 U.S.C. § 3729(a)(1)(B))................................................................................................................................ 147

COUNT III (Violation of False Claims Act, 31 U.S.C. § 3729(a)(3); 31 U.S.C. § 3729(a)(1)(C))................................................................................................................................ 148

COUNT IV........................................................................................................................................... 149

COUNT V (Violation of California False Claims Act)................................................... 149

COUNT VI (Violation of Colorado Medicaid False Claims Act)................................. 150

COUNT VII (Violation of Connecticut False Claims Act for Medical Assistance Programs)............................................................................................................................................. 151

COUNT VIII (Violation of Delaware False Claims and Reporting Act) ...................... 152

COUNT IX (Violation of District of Columbia False Claims Act)............................... 153

COUNT X (Violation of Florida False Claims Act)......................................................... 154

COUNT XI (Violation of Georgia False Medicaid Claims Act)................................... 155

COUNT XII (Violation of Hawaii False Claims Act) ..................................................... 156

COUNT XIII (Violation of Illinois False Claims Act)..................................................... 157

COUNT XIV (Violation of Indiana False Claims and Whistleblower Protection Act) . 158

COUNT XV (Violation of Iowa False Claims Act) .......................................................... 159

COUNT XVI (Violation of Louisiana Medical Assistance Programs Integrity Law) ... 159

COUNT XVII (Violation of Maryland False Health Claims Act) ................................. 160

COUNT XVIII (Violation of Massachusetts False Claims Act) ..................................... 161

COUNT XIX (Violation of Michigan Medicaid False Claims Act).............................. 162

COUNT XX (Violation of Minnesota False Claims Act) ............................................. 164

COUNT XXI (Violation of Montana False Claims Act)............................................... 165

COUNT XXII (Violation of Nevada False Claims Act) ............................................... 166

COUNT XXIII (Violation of New Jersey False Claims Act)........................................ 167

COUNT XXIV (Violation of New Mexico Medicaid False Claims Act) ...................... 168

COUNT XXV (Violation of New York False Claims Act)........................................... 169

COUNT XXVI (Violation of North Carolina False Claims Act).................................. 170

COUNT XXVII (Violation of Oklahoma Medicaid False Claims Act)........................ 170

COUNT XXVIII (Violation of Rhode Island False Claims Act) ................................. 171

COUNT XXIX (Violation of Tennessee Medicaid False Claims Act) ......................... 172

COUNT XXX (Violation of Texas Medicaid Fraud Prevention Act)........................... 173

COUNT XXXI (Violation of Vermont False Claims Act)............................................ 175

COUNT XXXII (Violation of Virginia Fraud Against Taxpayers Act)........................ 176

COUNT XXXIII (Violation of Washington Medicaid False Claims Act) ..................... 177

COUNT XXXIV (Violation of the California Insurance Frauds Protection Act).......... 178

COUNT XXXV ........................................................................................................... 179

(Violation of the Illinois Insurance Claims Fraud Protection Act)................................ 179

Filed Under Seal

## THIRD AMENDED COMPLAINT FOR FALSE CLAIMS ACT VIOLATIONS UNDER 31 U.S.C. §§ 3729 *ET SEQ.* AND STATE LAW COUNTERPARTS

On behalf of the United States of America ("United States"), twenty-eight States and the District of Columbia (collectively, the "States"), the People of California and the People of Illinois, Plaintiff-Relator Shire Litigation Partnership LLP ("Relator") hereby files this Third Amended Complaint against Defendants Takeda Pharmaceutical Company, Ltd. and Takeda Pharmaceuticals U.S.A., Inc. ("Takeda"); Shire North American Group, Inc.; Shire Pharmaceuticals, LLC; Shire U.S., Inc.; Shire Human Genetic Therapies, Inc.; Shire ViroPharma, Inc., and Shire Plc (collectively, "Shire"), pursuant to the *qui tam* provisions of the Federal False Claims Act, 31 U.S.C. §§ 3729 *et seq.* ("FCA"); the California False Claims Act, Cal. Gov't Code §§ 12650 *et seq.*; the Colorado Medicaid False Claims Act, Colo. Rev. Stat. §§ 25.5-4-304 *et seq.*; the Connecticut False Claims Act, Conn. Gen. Stat. tit. 4 Ch. 55e §§ 4-274 *et seq.*; the Delaware False Claims and Reporting Act, Del. Code tit. 6, §§ 1201 *et seq.*; the District of Columbia False Claims Act, D.C. Code §§ 2-308.13 *et seq.*; the Florida False Claims Act, Fla. Stat. tit. 6, §§ 68.081 *et seq.*; the Georgia False Medicaid Claims Act, Ga. Code Ann. §§ 49-4-168 *et seq.*; the Hawaii False Claims Act, Haw. Rev. Stat. §§ 661-21 *et seq.*; the Illinois False Claims Act, 740 Ill. Comp. Stat. 175/1 *et seq.*; the Indiana Medicaid False Claims and Whistleblower Protection Act, Ind. Code §§ 5-11-5.7 *et seq.*; the Iowa False Claims Act, Iowa, tit. 15 §§ 685.1 *et seq.*; the Louisiana Medical Assistance Programs Integrity Law, La. Rev. Stat. §§ 46:437.1 *et seq.*; the Maryland False Health Claims Act, Md. Code, Health-Gen. §§ 2-601 *et seq.*; the Massachusetts False Claims Act, Mass. Gen. Laws ch. 12, §§ 5A *et seq.*; the Michigan Medicaid False Claims Act, Mich. Comp. Laws §§ 400.601 *et seq.*; the Minnesota False Claims Act, Minn. Stat. §§ 15C.01 *et seq.*; the Montana False Claims Act, Mont. Code §§ 17-8-401 *et seq.*; the Nevada False Claims Act, Nev. Rev. Stat. §§ 357.010 *et seq.*; the New Jersey False Claims Act, N.J. Stat. A§§ 2A:32C-1 *et seq.*;

Filed Under Seal

1

the New Mexico Medicaid False Claims Act, N.M. Stat. §§ 27-14-1 *et seq.*; the New York False

Claims Act, N.Y. State Fin. Law §§ 187 *et seq.*; the North Carolina False Claims Act, N.C. Gen.

Stat. §§ 1-605 *et seq.*; the Oklahoma Medicaid False Claims Act, Okla. Stat. tit. 63, §§ 5053 *et*

*seq.*; the Rhode Island False Claims Act, R.I. Gen. Laws §§ 9-1.1-1 *et seq.*; the Tennessee

Medicaid False Claims Act, Tenn. Code §§ 71-5-181 *et seq.*; the Texas Medicaid Fraud Prevention

Act, Tex. Hum. Res. Code Ann. §§ 36.001 *et seq.*; the Vermont False Claims Act, Vt. Stat. tit. 32

§§ 631 *et seq.*; the Virginia Fraud Against Taxpayers Act, Va. Code §§ 8.01-216.1 *et seq.*; the

Washington State Medicaid False Claims Act, Wash. Rev. Code. §§ 74.66.005 *et seq.* (state law

claims referred to collectively as the "state whistleblower statutes" or "Whistleblower States");

pursuant to the California Insurance Frauds Prevention Act ("CIFPA"), Cal. Ins. Code § 1871.7;

and pursuant to the Illinois Insurance Claims Fraud Prevention Act, 740 Ill. Comp. Stat. 92/1 *et*

*seq.* ("IICFPA").

## I.      INTRODUCTION

1.      Relator brings this action on behalf of the United States, the Whistleblower States,

the People of California, and the People of Illinois to recover damages and civil penalties under

the FCA, state false claims acts, the CIFPA, and the IICFPA against Shire[1] for causing the

submission of false or fraudulent claims; for making, using, or causing to be made or used false

records or statements material to false or fraudulent claims; and for conspiring to do all of the

same.

---

[1] As alleged below, on or about January 8, 2019, Defendant Takeda purchased 100% of the outstanding shares of Defendant Shire plc, which itself wholly owned the other named Shire defendants. The Third Amended Complaint refers to Takeda and the Shire entities together as "Shire."

2.      This action concerns tens of millions of dollars of false and fraudulent claims that Shire caused to be submitted to federal and state health care programs through a scheme involving, among other things, laundering of kickbacks to patients relating to Shire's drugs CINRYZE®, ELAPRASE®, FIRAZYR®, NATPARA®, TAKHZYRO® and VPRIV® (collectively, the "Shire Drugs").[2]

3.      Commencing in or about 2009, and continuing into the present, Shire has been defrauding federal and state health care programs (collectively, "Government Health Care Programs") by: (1) paying kickbacks to charitable patient assistance programs ("PAPs" or "Charitable Foundations") to induce and facilitate the use of the Shire Drugs among Government Health Care Programs; (2) paying "Patient Ambassadors" bribes to promote the Shire Drugs; and (3) promoting and selling Natpara despite knowing that Natpara suffered from a dangerous manufacturing defect that would later become the basis of an FDA safety recall of the drug, and did not meet Shire's current good manufacturing practices ("cGMP") obligations regarding product quality complaint reporting and/or investigation.

4.      Shire has made enormous payments to Charitable Foundations while exercising significant control over how the foundations used this money, directing that Shire's contributions be used to to pay patients' cost-sharing obligations for the Shire Drugs.  For example, between Q1 2011 and Q3 2019, Shire (including ViroPharma, which it acquired in a stock purchase in 2014, and NPS, which it acquired in a stock purchase in 2015) paid Charitable Foundations some $129,030,136 to fund copayments for the Shire Drugs, the majority of whose cost was borne largely by Government Health Care Programs.

---

[2] For the remainder of the Complaint and for readability, Relator will uncapitalize the names of the Shire Drugs and omit reference to registered trademarks.

Filed Under Seal

3

5.      For hereditary angioedema ("HAE") alone, between Q1 2011 and Q3 2018, Shire (including ViroPharma) paid Charitable Foundations (*i.e.*, The Assistance Fund, HAE Association, and Patient Services, Inc.) some $67,193,221 to fund copayments for its drugs Cinryze and Firazyr, the majority of whose cost was borne largely by Government Health Care Programs.

6.      After another even more expensive Shire HAE drug, Takhzyro, was approved by the FDA in November 2018, at an annual cost of therapy of around $722,000,[3] Shire continued pouring money into its preferred Charitable Foundations at an even higher rate than before.  In just four (4) quarters between Q4 2018 through Q3 2019, Shire paid in excess of $20 million to just four Charitable Foundations, all of it earmarked for its HAE drugs.

7.      Shire's increased "donation" activity to its favorite Charitable Foundations has continued despite Shire's knowledge that it is being investigated for that very activity.  In its 2019 20-F filing dated June 27, 2019, Takeda disclosed that it had been served with a subpoena in June 2019 by the U.S. Attorney's Office for the District of Massachusetts, and that the subpoena "seeks information about Shire's interactions with 501(c)(3) organizations that provide financial assistance to Medicare patients taking Shire drugs, including the hereditary angioedema medications Firazyr and Cinryze."

8.      These payments were actually illegal kickbacks using the Charitable Foundations as a conduit to induce Government Health Care Program patients to use more of the Shire Drugs.

9.      As part of Shire's efforts to launder copayment funds through Charitable Foundations, Shire instructed its sales force and patient assistance personnel to aggressively hunt

---

[3] Patricia Inacio, *Costs Unsustainable for New Angioedema Preventive Therapies in US, Real-world Data Show*, Angioedema News (May 13, 2020), https://angioedemanews.com/2020/05/13/takhzyro-haegarda-prophylactics-costs-unsustainable-preventive-hae-attacks-us-real-world-data/.

patient "leads," including through HIPAA-violating behaviors, cajoling patients with claims that their steep copayments would be covered completely by the company. Shire then pressured and even required these prospective patients to sign up for Shire's OnePath program to facilitate Shire's illegal conduct.

10.     Although the Shire Drugs are typically covered by insurance, the Shire Drugs are among the most expensive sold in the United States. For example, the average annual cost for Cinryze is $529,680 and the annual cost of Takhzyro is $722,000. Many patients are thus unable to afford the copayment amount—typically 20% of the total price of the drug under Medicare Part B and up to $6,350 under Medicare Part D due to the coverage gap (also known as the "donut hole")—without the subsidies Shire provided. When covered under Medicare Part D (as are, for example, Shire's HAE drugs), the government not only spends more, but the Shire Drugs are so expensive that patients usually reach the coverage gap in their first month of being on therapy, thus requiring financial assistance so they can afford the enormous copayments for these drugs.

11.     Charitable Foundations assist these patients by covering part or all of their copayments, permitting the patients access to prescriptions that they would otherwise be unable to afford. Thus, it is in Shire's financial interest to provide massive grants to these Charitable Foundations. Although these grants are a substantial up-front investment, Shire reaps a considerable return on investment ("ROI") in the form of, at minimum, 80% of the cost of the drug for which the Government Health Care Programs are responsible, or an even greater share for Part D drugs where the government's spending is even higher.

12.     Due to the astronomical annual treatment cost of the Shire Drugs (often used for the life of the patient), once a patient is placed on drug, Shire stands to receive hundreds of thousands—or even millions or tens of millions—of dollars over the course of even a single patient's lifetime. Shire thus considers individual patients using the Shire Drugs as extremely

valuable, and employs "lead lists" to identify them and do whatever it takes to convert these "leads" to patients on therapy with the Shire Drugs.

13.     The final ingredient in Shire's fraudulent PAP scheme has been its unique unlimited incentive compensation packages, which have rewarded Regional Business Managers ("RBMs") and Patient Access Managers ("PAMs") with huge bonuses for each new patient "Start Form" (*i.e.*, enrollment in Shire's OnePath program) and/or "Patient Addition" (commencement of therapy). On top of these bonuses, sales representatives also have earned bonuses based on each product's performance objectives. For many RBMs, the bonuses alone could be as much as $400,000 per year. These RBM bonuses have been effectively uncapped, and have created substantial incentives for Shire's sales force to target patients for the Shire Drugs, frequently in situations where patients could have been prescribed cheaper, alternative drugs or where such use was unwarranted.

14.     Beginning as early as 2009, Shire (along with ViroPharma) willfully flouted government guidance, which warned pharmaceutical companies against using charitable foundations as a conduit for payments to patients, instead channeling copayment money to insulate patients from the wildly high prices that it had set for the Shire Drugs. Nothing about Shire's extraordinary payments has been "charitable." As Shire's own ROI calculations have shown, the scheme has been designed so that Shire would effectively pay itself a handsome rate of return whenever it covered patients' copayments for the Shire Drugs. American taxpayers have been left holding the bag for the ever-increasing cost of those extremely expensive drugs—what one reporter called drugs that "cost more than your house."[4]

---

[4] Louisa Strauss, *The Drugs That Cost More Than Your House*, Vanity Fair (Dec. 19, 2013), *available at* https://perma.cc/44FB-HAQM.

15. Shire has paid the Charitable Foundations tens of millions of dollars each year because it knew that the foundations would use its money to cover Shire Drug copayments, thus increasing the Drugs' sales and enriching Shire in amounts that far exceeded its payments to the foundations. Ostensibly, the Charitable Foundations operated disease funds that covered copayments for any of the drugs on the market available to treat each a particular disease state. In practice, however, Shire conspired with the foundations so that they operated their disease funds to maximize the proportion of patients who benefited whenever Shire made a payment to the foundations.

16. For commercially insured patients in California and Illinois, the scheme has been similar, but worked through an in-house fund, OnePath, through which Shire funded "charitable" copayments for the Shire Drugs. As with the Charitable Foundation scheme, there has been nothing charitable about Shire's scheme. Instead, the scheme has been designed so that Shire would effectively pay itself a handsome rate of return whenever it covered these patients' copayments for the Shire Drugs.

17. Separately, Shire has actively concealed serious safety issues related to Natpara. Natpara was the subject of a nationwide recall announced by the FDA on September 5, 2019, due to an "issue related to rubber particulates originating from the rubber septum of the NATPARA cartridge." However, Shire has been aware of this issue ever since Shire began marketing Natpara, and actually lied to patients and providers, telling them that it was "normal" for such rubber particulates to be present in the liquid dose of the drug. Shire's lies created a substantial health risk, not only of underdosing due to injector blockages, but also due to injecting such particles into the patient's body. Shire also failed to meet its cGMP obligations set by the FDA, specifically 21 CFR § 211.198, by failing to fully report and/or investigate Natpara quality complaints.

18. The United States, the *Qui Tam* States, the People of California, and the People of Illinois have suffered substantial harm as a result of Shire's illegal conduct.

19. Shire has violated the federal AKS and state analogues, as well as the federal FCA, the state false claims acts, CIFPA, and IICFPA, and in so doing, has deceived the federal government, the *Qui Tam* States, California insurers, and Illinois insurers into paying hundreds of millions of dollars in claims for the Shire Drugs that were not eligible for reimbursement.

20. Shire also retaliated against Partner B for Partner B's whistleblowing activity.

21. The aforementioned conduct is ongoing.

## II. PERFECTION OF FILING AND STANDING

22. This Third Amended Complaint was properly filed in camera and under seal, as required by the FCA, the state *Qui Tam* statutes, CIFPA, and IICFPA, and shall remain under seal for at least sixty days as required by said provisions.

23. In advance of filing of the Third Amended Complaint, Plaintiff properly served a copy of the Third Amended Complaint and written disclosure of substantially all material evidence and information upon the United States, the *Qui Tam* States, the Sacramento District Attorney, the California Insurance Commissioner, the Cook County District Attorney, and the Illinois Attorney General.

24. Plaintiff/Relator is not aware of any "public disclosure," as that term is used in the FCA, the state *Qui Tam* statutes, the CIFPA, or in the IICFPA, of the allegations forming the core elements of the Counts against Shire.

25. In the event there is found to be any such public disclosure, Plaintiff/Relator is an "original source," as that term is used in the FCA, the state *Qui Tam* Statutes, the CIFPA, and the IICFPA, of the allegations or transactions forming the core elements of the cause(s) of action against Shire. In particular, Plaintiff/Relator has direct and independent knowledge of the

Filed Under Seal

8

information on which the allegations are based, and voluntarily provided the information to the federal and state governments before filing this action. Furthermore, and consistent with the meaning of "original source" under the federal FCA, Plaintiff/Relator "voluntarily disclosed to the Government the information on which allegations or transactions in a claim are based" prior to any public disclosure under subsection (e)(4)(A), and has "knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions and voluntarily provided the information to the Government before filing" this action.

## III. PARTIES

### A. <u>Plaintiff/Relator</u>

26. Plaintiff/Relator SHIRE LITIGATION PARTNERSHIP, LLP (hereinafter "Relator"), a Delaware limited liability partnership, brings this action on behalf of itself, the United States of America, the Whistleblower States, the People of California, and the People of Illinois. The registered office of Relator is located at 1925 Lovering Avenue, Wilmington, Delaware 19806, and the name of the registered agent at such address is The First State Registered Agent Company.

27. Pursuant to Section 15-201(a) of the Delaware Revised Uniform Partnership Act, Relator is not distinct from its partners, who, by virtue of their former employment with Shire, at all times material hereto have had firsthand, personal knowledge of the false claims, statements, and concealments alleged herein. The two partners/owners of the partnership are "Partner A" and "Partner B."

28. Partner A was employed as a Patient Access Manager by Shire from 2006 until 2015 and has extensive personal knowledge and experience regarding Shire's scheme related to the Shire Drugs, including personal contact with the employees and executives who have

committed violations of law alleged herein. Partner A has observed numerous instances of illegal conduct by Shire.

29.     Partner B was employed as a Regional Business Manager by Shire from 2017 until 2018 and has extensive personal knowledge and experience regarding Shire's scheme related to the Shire Drugs, including personal contact with the employees and executives who have committed violations of law alleged herein. Partner B has observed numerous instances of illegal conduct by Shire.

30.     Relator and its partners have direct knowledge of the conduct alleged in this Third Amended Complaint and conducted an independent investigation (including interviewing number confidential informants) to uncover false claims submitted to the United States, the Whistleblower States, California insurers, and Illinois insurers. Accordingly, Relator is an "original source" of the non-public information alleged in this Third Amended Complaint within the meaning of the federal FCA, state false claims acts, CIFPA, and IICFPA.

**B.      Defendants**

31.     Defendant TAKEDA PHARMACEUTICAL COMPANY LTD. ("Takeda") is a foreign corporation with its principal offices headquartered in 1-1, Nihonbashi-Honcho 2-Chome Chuo-ku, Tokyo 103-8668, Japan. Defendant Takeda acquired 100% of the outstanding shares of Shire plc for approximately $80 billion in an acquisition that closed on or about January 8, 2019. Defendant Takeda assumed all of Shire's debts and liabilities.

32.     Defendant TAKEDA PHARMACEUTICALS U.S.A., INC. ("Takeda USA"), is a Delaware corporation with its principal place of business located at One Takeda Parkway, Deerfield, Illinois 60015. Takeda USA is the wholly-owned U.S. business unit of Takeda. Takeda USA is currently in the process of moving its U.S. headquarters to Boston, Massachusetts.

33. Defendant SHIRE U.S., INC. ("Shire US") is a New Jersey corporation with its principal place of business and headquarters at 300 Shire Way, Lexington, Massachusetts 02421.

34. Defendant SHIRE NORTH AMERICAN GROUP, INC. ("Shire NA") is a Delaware corporation with its principal place of business and headquarters at 300 Shire Way, Lexington, Massachusetts 02421. Shire NA is a signatory to a September 12, 2014 Corporate Integrity Agreement ("Shire CIA") between Shire NA and the Office of the Inspector General of the Department of Health and Human Services ("OIG").

35. Defendant SHIRE PHARMACEUTICALS, LLC ("Shire Pharmaceuticals") is a Delaware limited liability company with its principal place of business and headquarters at 300 Shire Way, Lexington, Massachusetts 02421. Shire Pharmaceuticals is a party to the Shire CIA between Shire and OIG-HHS.

36. Defendant SHIRE HUMAN GENETICS THERAPIES, INC. ("Shire HGT") is a specialty biopharmaceutical corporation organized under the laws of Delaware with its principal place of business located at 300 Shire Way, Lexington, Massachusetts 02421. Shire HGT manufactures, advertises, and sells drugs to customers throughout the United States.

37. Defendant SHIRE VIROPHARMA INC. (successor to ViroPharma, Inc.) is a specialty biopharmaceutical corporation organized under the laws of Delaware with its principal offices located at 300 Shire Way, Lexington, Massachusetts 02421. ViroPharma was acquired in a stock purchase by Shire in 2014 and became a division of Shire named "Shire Viropharma Inc." Shire Viropharma manufactures, advertises, and sells some or all of the Shire Drugs to customers throughout the United States.

38. Defendant SHIRE PLC ("Shire plc") is a company organized and existing under the laws of Jersey, Channel Islands, United Kingdom. Shire plc is a global specialty biopharmaceutical company and has its principal place of business in Hampshire, England, United

Kingdom. Shire plc is the corporate parent of Shire US, Shire NA, Shire Pharmaceuticals, and Shire Viropharma.

39. A substantial percentage of the Shire Drugs sold in the United States was paid for and/or reimbursed by various Government Health Care Programs, including health benefit carriers offering benefits under the Federal Employees Health Benefits Program ("FEHBP") under a prime contract with the Blue Cross Blue Shield Association; the Health Insurance Program for the Elderly and Disabled, more commonly referred to as the Medicare Program, 42 U.S.C. §§ 1395 *et seq.*; Medicare Part B; Medicare Part C (also known as Medicare+Choice); Medicare Advantage; Medicare Part D; the Indian Health Service; Medicaid; the Mail Handler's Health Benefit Plan; the U.S. Secret Service Employees Health Association Health Benefit Plan; and TRICARE and the Veteran's Health Administration ("VHA"); as well as various state health benefit plans (collectively, the "Government Health Care Programs"). Likewise, a substantial percentage of the Shire Drugs sold in the United States was paid for and/or reimbursed by California and Illinois insurers.

## IV. JURISDICTION AND VENUE

40. Pursuant to 28 U.S.C. § 1331, this District Court has original jurisdiction over the subject matter of this civil action since it arises under the laws of the United States—in particular, the FCA.[5] In addition, the FCA specifically confers jurisdiction upon the United States District Court.[6]

41. Pursuant to 28 U.S.C. § 1367, this District Court has supplemental jurisdiction over the subject matter of the claims brought pursuant to state law on the grounds that the claims are so

---

[5] 31 U.S.C. §§ 3729 *et seq.*
[6] 31 U.S.C. § 3732(b).

related to the claims within this Court's original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

42.     This District Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a) because the FCA authorizes nationwide service of process and Shire and Takeda have sufficient minimum contacts with the United States of America and this judicial district.

43.     Venue is proper in this district pursuant to 31 U.S.C. § 3732(a) because Shire's U.S. corporate headquarters are located in this judicial district and Shire and Takeda transact business in this District on a daily basis.

## V.     NATURE OF ACTION

### A.     The False Claims Act

44.     The False Claims Act prohibits:

"knowingly" presenting or causing to be presented to the United States any false or fraudulent claim for payment or approval;

"knowingly" making, using, or causing to be used or made, a false record or statement material to a false or fraudulent claim; and

conspiring to commit a violation of the FCA.[7]

45.     The FCA defines a "claim" to include any request or demand, whether under a contract or otherwise, for money or property which is made to a contractor, grantee, or other recipient, if the United States Government provides any portion of the money or property which is requested or demanded, or if the Government will reimburse such contractor, grantee, or other recipient.[8]   Any claim submitted by a Medicare or a Medicaid provider for a payment constitutes

---

[7] 31 U.S.C § 3729(a)(1)(A)-(C).

[8] *Id.* § 3729(b)(2).

a claim under the FCA. Any claim submitted by a provider for payment by a federal insurance plan, such as Tricare, is also a claim for purposes of the FCA.

### B. The Anti-Kickback Statute

46.     The Medicare and Medicaid Patient Protection Act, also known as the Anti-Kickback Statute ("AKS"),[9] arose out of congressional concern that the remuneration and gifts given to those who can influence health care decisions corrupt medical decision-making and can result in the provision of goods and services that are more expensive and/or medically unnecessary or even harmful to a vulnerable patient population. To protect the integrity of the Government Health Care Programs, Congress enacted a prohibition against the payment of kickbacks in any form. The AKS was enacted in 1972 "to provide penalties for certain practices which have long been regarded by professional organizations as unethical, as well as unlawful . . . and which contribute appreciably to the cost of the Medicare and Medicaid programs."[10]

47.     In 1977, Congress amended the AKS to prohibit receiving or paying "any remuneration" to induce referrals and increased the crime's severity from a misdemeanor to a felony, with a penalty of $25,000 and/or five years in jail.[11] In so doing, Congress noted that the purpose of the AKS was to combat fraud and abuse in medical settings that "cheats taxpayers who must ultimately bear the financial burden of misuse of funds[,] . . . diverts from those most in need, the nation's elderly and poor, scarce program dollars that were intended to provide vitally needed quality health services[,] . . . [and] erodes the financial stability of those state and local

---

[9] 42 U.S.C. § 1320a-7b(b).

[10] H.R. Rep. No. 92-231, at 107 (1971), *reprinted in* 1972 U.S.C.C.A.N. 4989, 5093; Social Security Amendments of 1972, Pub. L. No. 92-603, § 242(b)-(c), 86 Stat. 1329, 1419-20 (1972) (currently codified at 42 U.S.C. § 1320a-7b(b)).

[11] *See* Medicare-Medicaid Antifraud and Abuse Amendments, Pub. L. No. 95-142, 91 Stat. 1175 (1977).

Filed Under Seal

14

governments whose budgets are already overextended and who must commit an ever-increasing portion of their financial resources to fulfill the obligations of their medical assistance programs."[12]

48.    In 1987, Congress again strengthened the AKS to ensure that kickbacks masquerading as legitimate transactions did not evade its reach.[13]

49.    In 1996, Congress expanded the AKS to reach claims involving all "[f]ederal health care programs," defined as "any plan or program that provides health benefits, whether directly, through insurance, or otherwise, which is funded directly, in whole or in part, by the United States Government (other than the health insurance program under chapter 89 of title 5, United States Code)."[14]

50.    In 2010, Congress clarified two important issues regarding the application of the AKS. *First*, Congress clarified that any "claim that includes items or services resulting from a violation of this section constitutes a false or fraudulent claim for purposes of" the FCA.[15] *Second*, Congress clarified that, "[w]ith respect to violations of this section, a person need not have actual knowledge of this section or specific intent to commit a violation of this section."[16]

51.    The AKS prohibits any person or entity from knowingly and willfully offering to pay or paying any remuneration to another person to induce that person to purchase, order, or recommend any good or item for which payment may be made in whole or in part by a Federal

---

[12] H.R. Rep. No. 95-393(II), at 44 (1977), *reprinted in* 1977 U.S.C.C.A.N. 3039, 3047.

[13] *See* Medicare and Medicaid Patient and Program Protection Act of 1987, Pub. L. No. 100-93, 101 Stat. 680 (1987).

[14] Health Insurance Portability and Accountability Act of 1996, Pub. L. No. 104-191, § 204(a)(7), 110 Stat. 1936, 1999-2000 (adding 42 U.S.C § 1320a-7b(f)).

[15] Patient Protection and Affordable Care Act ("PPACA"), Pub. L. No. 111-148, § 6402(f)(1), 124 Stat. 119, 759 (2010) (adding 42 U.S.C. § 1320a-7b(g)).

[16] *Id*. § 6402(f)(2), 124 Stat. at 759 (adding 42 U.S.C. § 1320a-7b(h)).

Health Care Program, which includes any state health program or health program funded in part by the federal government.[17]

52.  The statute provides, in pertinent part:

Whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person –

(A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or

(B) to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,

shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.[18]

53.  In addition to criminal penalties, a violation of the AKS can also subject the perpetrator to exclusion from participation in Government Health Care Programs, civil monetary penalties of $50,000 per violation, and penalties in the amount of three times the amount of remuneration paid, regardless of whether any part of the remuneration is for a legitimate purpose.[19]

54.  The AKS not only prohibits outright bribes and rebate schemes, but also prohibits any payment or other remuneration by a company to a physician or other person which has as one of its purposes the inducement of the physician to prescribe the company's products or the inducement of the physician to influence or recommend the prescribing of the product.[20]

---

[17] 42 U.S.C. § 1320a-7b(b), (f).

[18] 42 U.S.C. § 1320a-7b(b).

[19] 42 U.S.C. §§ 1320a-7(b)(7) 1320a-7a(a)

[20] *See U.S. ex rel. Freedman v. Suarez-Hoyos*, 781 F. Supp. 2d 1270, 1281 (M.D. Fla. 2011) (citing *U.S. ex rel. Westmoreland v. Amgen, Inc.*, 738 F. Supp. 2d 267 (D. Mass. 2010)); *see also* Medicare and State Health Care Programs: Anti-Kickback Provisions, 56 Fed. Reg. 35952-01, 35958 (July

55.     Remuneration includes the provision of "services for free or for other than fair market value."[21]

56.     Compliance with the AKS is a precondition to participation as a health care provider under Government Health Care Programs, including Medicare and the State Medicaid programs.[22]

57.     Moreover, compliance with the AKS is a precondition to payment for claims administered by physicians for which Medicare or Medicaid reimbursement is sought. Violation of the preconditions in statutes, regulations, and provider agreements for payment from or participation in Government Health Care Programs may form the basis for an FCA claim where there is an underlying course of fraudulent conduct.[23]

58.     A Medicare claim must be for reasonable and necessary services only. Under 42 U.S.C. § 1395y(a)(1)(A), "no payment may be made [under the Medicare statute] for any expenses incurred for items or services . . . which . . . are not reasonable and necessary for the diagnosis or treatment of illness or injury."

59.     Therefore, every Medicare claim is an implicit certification that the underlying services were reasonable and necessary.[24]

---

29, 1991) ("Congress's intent in placing the term 'remuneration' in the statute in 1977 was to cover the transferring of anything of value in any form or manner whatsoever.").

[21] 42 U.S.C. § 1320a-7a(i)(6).

[22] *See, e.g.*, *U.S. ex rel. Wilkins v. United Health Grp., Inc.*, 659 F.3d 295, 312 (3d Cir. 2011) (citing 42 C.F.R. § 413.24(f)(4)(iv)).

[23] *See U.S. ex rel. Hutcheson v. Blackstone Med., Inc.*, 647 F.3d 377 (1st Cir. 2011); *New York v. Amgen Inc.*, 652 F.3d 103 (1st Cir. 2011); *see also U.S. ex rel. Westmoreland v. Amgen, Inc.*, 812 F. Supp. 2d 39, 54 (D. Mass. 2011) (collecting cases).

[24] *See, e.g.*, *U.S. ex rel. Mikes v. Straus*, 274 F.3d 687, 701 (2d Cir. 2001) ("Since § 1395y(a)(1)(A) expressly prohibits payment if a provider fails to comply with its terms, defendants' submission of the claim forms implicitly certifies compliance with its provision."); *see also Ebeid ex rel. U.S.*

60. Kickbacks are, by definition, not reasonable or necessary for the diagnosis or treatment of illness or injury, which is a prerequisite for payment of any claim by Medicare and other governmental health programs.

61. Further, federal law makes clear that violation of the AKS is a per se violation of the FCA.[25]

62. Many of the named Plaintiff States also have anti-kickback laws similar to the AKS, which apply to medical providers and entities participating in their Medicaid programs.[26]

63. Violations of the federal or state AKS laws can subject the perpetrator to liability under the federal and state FCAs, for example, for causing the submission of false or fraudulent

---

*v. Lungwitz*, 616 F.3d 993, 996 (9th Cir. 2010); *U.S. ex rel. Smith v. Yale Univ.*, 415 F. Supp. 2d 58, 98 (D. Conn. 2006); *In re Cardiac Devices Qui Tam Litig.*, 221 F.R.D. 318. 335, 345-47 (D. Conn. 2004); *U.S. ex rel. Kneepkins v. Gambro Healthcare, Inc.*, 115 F. Supp. 2d 35, 41-42 (D. Mass. 2000); *U.S. ex rel. Kappenman v. Compassionate Care Hospice of the Midwest, L.L.C.*, No. CIV. 09-4039-KES, 2012 WL 602315 (D.S.D. Feb. 23, 2012).

[25] *See* 42 U.S.C. § 1320a-7b(g) ("[A] claim that includes items or services resulting from a violation of this section constitutes a false or fraudulent claim for purposes of [the FCA]."); *see also Guilfoile v. Shields*, 913 F.3d 1789, 190 (1st Cir. 2019) (a violation of the AKS that results in a federal healthcare payment is a "per se false claim under the FCA"); *Wilkins*, 659 F.3d at 313 (reversing dismissal because the "amended complaint meets the implied false certification standards for liability as [appellants] alleged that appellees received payment from the federal health insurance programs despite their knowing violation of the AKS"); *Hutcheson*, 647 F.3d at 392-94; *Amgen*, 652 F.3d at 113 ("[C]laims are not entitled to Medicaid payment if they are affected by kickbacks like those alleged here.") (analyzing state FCA analogues); *U.S. ex rel. McNutt v. Haleyville Med. Supplies, Inc.*, 423 F.3d 1256, 1259 (11th Cir. 2005) ("When a violator of government regulations is ineligible to participate in a government program and that violator persists in presenting claims for payment that the violator knows the government does not owe, that violator is liable, under the Act, for its submission of those false claims.").

[26] *See, e.g.*, Cal. Welf. & Inst. Code § 14107.2; Del. Code. Ann. tit. 31, § 1005; Fla. Stat. § 409.920(2)(a)(5); 305 Ill. Comp. Stat. 5/SA-3; La. Rev. Stat. § 46:438.2; Mass. Gen. Laws ch. 118E, § 41; Mich. Comp. Laws § 400.604; N.Y. Soc. Serv. Law § 366-d; Va. Code § 32.1-315.

claims or for making a false or fraudulent statement or record material to a false or fraudulent claim.[27]

64.     A transaction may violate the AKS even when a payer's unlawful intent is not its exclusive intent.  It is enough that "any one purpose of the remuneration may be to induce or reward the referral or recommendation of business payable in whole or in part by a federal health care program."[28]  In other words, even "a lawful purpose will not legitimize a payment that also has an unlawful purpose."[29]

### C.     Government Health Care Programs

65.     The Health Insurance for the Aged and Disabled Program, popularly known as the Medicare program, Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395 *et seq.* (referred to herein as "Medicare"), is a health insurance program administered by the Government of the United States that is funded by taxpayer revenue.  Medicare is overseen by the United States Department of Health and Human Services ("HHS") through its Center for Medicare and Medicaid Services ("CMS").

66.     Medicare was designed to be a health insurance program and to provide for the payment of hospital services, medical services, prescription drugs, and durable medical equipment to persons over sixty-five (65) years of age, and for certain others that qualify under the terms and conditions of the Medicare program.

---

[27] *See* 42 U.S.C. § 1320a-7b(g)-(h) (items or services resulting from a violation of the AKS constitute false or fraudulent claims and no actual knowledge of this section or specific intent to commit a violation of this section is required).

[28] OIG Compliance Program Guidance for Pharmaceutical Manufacturers, 68 Fed. Reg. 23731-01, 23734 (May 5, 2003).

[29] *Id.*

67.     Payments made under the Medicare program include payment for certain prescription drugs used during treatment at an appropriate medical facility and otherwise, as well as certain injectable drugs.

68.     Reimbursement for Medicare claims is made by the United States through CMS, which contracts with private insurance carriers, currently referred to as Medicare Administrative Contractors ("MACs"), to administer and pay claims from the Medicare Trust Fund.[30]   In this capacity, the carriers act on behalf of CMS.

69.     The Medicaid program, Title XIX of the Social Security Act, 42 U.S.C. §§ 1 396-1396v (referred to herein as "Medicaid"), is a health insurance program administered by the Government of the United States and the various individual states and is funded by state and federal taxpayer revenue.  Medicaid is overseen by HHS and CMS.

70.     Medicaid was designed to assist participating states in providing medical services, durable medical equipment, and prescription drugs to, among others, financially needy individuals that qualify for Medicaid.  The states directly pay providers, with the states obtaining the federal share of the payment from accounts that draw on the United States Treasury.[31]

71.     The TRICARE program, 10 U.S.C. §§ 1071-1106, provides benefits for health care services furnished by civilian providers, physicians, and suppliers to members of the Uniformed Services and to spouses and children of active duty, retired, and deceased members.  The program is administered by the Department of Defense and funded by the federal government.  TRICARE pays for, among other items and services, prescription drugs for its beneficiaries.  The federal government, through its Departments of Defense and Veterans Affairs, maintains and operates

---

[30] 42 U.S.C. § 1395u.

[31] 42 C.F.R. §§ 430.0-430.30.

medical facilities including hospitals, and receives and uses federal funds to purchase prescription drugs for patients treated at such facilities and otherwise. In addition, under the Public Health Service Act, the Section 340B Drug Pricing Program, and the Veterans Health Care Act of 1992, the federal government directly or indirectly provides funds to certain other federal agencies and to state and local facilities and programs, including to non-profit disproportionate share hospitals ("DSH").[32]

72.     The FEHBP provides health care benefits for qualified federal employees and their dependents. It pays for, among other items and services, prescription drugs for its beneficiaries.

73.     Reimbursement practices under all Government Health Care Programs closely align with the rules and regulations governing Medicare reimbursement. The most basic requirement for reimbursement eligibility under Medicare, Medicaid, and other Government Health Care Programs is that the service provided must be reasonable and medically necessary.[33] Medical providers are not permitted to bill the government for medically unnecessary services or procedures performed solely for the profit of the provider. For example, the requisite level of medical necessity may not be met where a party contends that a particular procedure was deleterious or performed solely for profit.[34] Health care providers are obligated to assure that services or items ordered or provided to patients will be provided "economically and only when, and to the extent, medically necessary" and "will be of a quality which meets professionally

---

[32] *See generally* 38 U.S.C. § 8126.

[33] *See, e.g.*, 42 U.S.C. § 1395y(a)(1)(A); 42 U.S.C. §§ 1396-1396d; 42 C.F.R. §§ 410.50(a), 411.15, 411.406(a); *United States v. Rutgard*, 116 F.3d 1270, 1275 (9th Cir. 1997) (holding that TRICARE and the Railroad Retirement Health Insurance Program plan follow the same rules and regulations as Medicare) (citing, *e.g.*, 32 C.F.R. § 199.4(a)(1)(i)).

[34] *Kneepkins*, 115 F. Supp. 2d at 41-42 (holding that procedures chosen solely for defendants' economic gain are not "medically necessary" as required by claim submission form).

recognized standards of health care," and "will be supported by evidence of medical necessity and quality."[35]

74.    Each Government Health Care Program requires every provider who seeks payment from the program to promise and ensure compliance with the provisions of the AKS and with other federal laws governing the provision of health care services in the United States. That agreement represents an ongoing obligation, and the provider must notify the government of any change in information or certifications provided.

75.    In other words, if a provider tells CMS or its agent that it provided goods or services that (1) were in violation of the AKS, (2) were not medically unnecessary, (3) were performed solely for the profit of the provider, and/or (4) violated another relevant law, CMS will not pay the claim.

76.    CMS also will not pay a claim relating to reimbursement for goods or services that were not actually provided.

77.    Physicians and hospitals enter into Provider Agreements with CMS in order to establish their eligibility to seek reimbursement from Medicare. As part of those agreements, without which the hospitals and physicians may not seek reimbursement from Federal Health Care Programs, the provider must sign the following certification:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to [me]. The Medicare laws, regulations, and program instructions are available through the Medicare contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal Anti-Kickback statute and the Stark law), and

---

[35] 42 U.S.C. § 1320c-5(a)(1)-(3).

on the provider's compliance with all applicable conditions of participation in Medicare.[36]

78.    The "Certification Statement" that the physicians and non-physician practitioners must sign also contains, *inter alia*,  the following certain provisions and requirements for "initial and continuous enrollment in the Medicare program," and instructs that by signing the Certification Statement, the provider "agree[s] to adhere to all of the requirements listed therein":

> 1. I have read the contents of this application, and the information contained herein is true, correct, and complete. If I become aware that any information in this application is not true, correct, or complete, I agree to notify the Medicare [program] in accordance with the time frames established in 42 CFR § 424.516.
>
> \*      \*      \*
>
> 3. I have read and understand the Penalties for Falsifying Information . . . .  I understand that any deliberate omission, misrepresentation, or falsification of any information contained in this application or contained in any communication supplying information to Medicare . . . may be punished by criminal, civil, or administrative penalties including, but not limited to, the denial or revocation of Medicare billing privileges, and/or imposition of fines, civil damages, and/or imprisonment.
>
> \*      \*      \*
>
> 8. I will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare, and will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity.[37]

---

[36] Dep't of Health & Human Servs., *Medicare Enrollment Application: Institutional Providers* ("Form CMS-855A") 48 (July 2011), *available at* https://perma.cc/8XMF-MMRD; Dep't of Health & Human Servs., *Medicare Enrollment Application: Physicians and Non-Physician Practitioners* ("Form CMS-855I") 25 (July 2011), *available at* https://perma.cc/3U8A-P6WW.

[37] Form CMS-855I at 25.

79.     In signing the agreement, the medical provider is "attesting to meeting and maintaining the Medicare requirements" stated above.[38]

80.     The certifications made by the medical provider in the Provider Agreement, which are mandatory for Medicare enrollment, expressly create a continuing duty to comply with the conditions of participation in and payment by the Medicare program.  In particular:

> Prior to signing the Agreement, the provider is advised of the criminal, civil, and administrative penalties "for deliberately furnishing false information in this application to gain or maintain enrollment in the Medicare program."[39]
>
> Among those penalties are criminal sanctions for false or fraudulent statements or representations, as well as civil penalties under the FCA and Social Security Act. *Id*.  "Remedies include compensatory and punitive damages, restitution, and recovery of the amount of the unjust profit."[40]

81.     When a provider submits a claim for payment, he or she does so subject to and under the terms of its certification to the United States that the services for which payment is sought were delivered in accordance with federal law, including, without limitation, the Anti-Kickback Statue.

82.     In the case of Medicaid, each State's Medicaid Program's applicable certifications also incorporate relevant State law.

83.     Each of the States' provider agreements in their respective Medicaid programs contains comparable provisions agreeing to comply with the AKS and acknowledging that their receipt of payment is conditioned upon compliance with such provisions.

---

[38] *Id*.

[39] *Id*. at 23.

[40] *Id*. at 24.

Filed Under Seal

24

84. Medicare and Medicaid claims for reimbursement of any goods or services that were the subject of a kickback constitute false claims. This is because compliance with the AKS is a precondition to participation as a health care provider under a Government Health Care Program, including Medicare and the State Medicaid programs. Moreover, compliance with the AKS is a condition of payment for any goods or services reimbursed by Medicare or Medicaid, including drugs.

85. When a kickback has been paid, the measure of damages is the full amount of the claim caused by the kickback-such as the amount of payments billed to Medicare or Medicaid as a result of a Shire Drug prescription induced by a kickback. Every Shire Drug prescription written by a physician to whom Shire paid a kickback is tainted, and the full cost of all amounts paid due to such prescriptions is owed back to the Government. From 2012 through the present, Medicare and the State Medicaid programs have paid hundreds of millions of dollars for Shire Drug prescriptions written by physicians to whom Shire have knowingly paid kickbacks.

## D. Copayment Assistance Programs

86. Consumer use of high-cost drugs, including specialty drugs, has been growing rapidly, particularly for so-called "orphan" drugs.[41] Individuals prescribed these high-cost drugs may face significant cost sharing as health payers shift a greater share of drug costs on to enrollees by increasing copayments, coinsurance, and plan deductibles. For example, employer-sponsored health plans have expanded the use of tiered pricing, in which enrollees are charged lower

---

[41] Suzanne M. Kirchhoff, Congressional Research Serv., *R44132, Specialty Drugs: Background and Policy Concerns* 1-2 (2015).

copayments for generic drugs and drugs that are more expensive or deemed less effective are put on higher tiers with greater copayments or coinsurance.[42]

87.     Two parallel trends—expanded insurance coverage through the Affordable Care Act coupled with more stringent cost sharing—have created a decline in average out-of-pocket spending with a simultaneous increase in spending for enrollees who may have chronic conditions and who have been prescribed high-cost drugs.[43]

88.     Various charitable 501(c)(3) foundations have been created to provide assistance to patients receiving costly drugs whose health plans may not cover the entire cost of the drug therapy.  These foundations may not only pay for the drug costs, but also may pay other costs associated with patient care, including transportation.  These entities are variously referred to as Patient Assistance Programs ("PAPs") or charitable copayment foundations ("Charitable Foundations").

89.     Pharmaceutical manufacturers and independent charities operate Charitable Foundations to help uninsured or underinsured individuals pay for prescription drugs.  Many non-governmental Charitable Foundations are set up as 501(c)(3) nonprofit organizations to provide prescription drugs or financial subsidies to qualified patients.  501(c)(3) entities are exempt from federal income taxes and qualify to receive tax-deductible contributions.[44]     As such,

---

[42] Henry J. Kaiser Family Foundation, *2018 Employer Health Benefits Survey* (Oct. 3, 2018), *available at* https://perma.cc/W4S5-ZE3V.  Tiering can be fluid.  With prices for some generic drugs increasing, insurers are instituting preferred and non-preferred generic tiers, placing higher-cost generics on what had been a brand-name tier and moving some lower-priced brand-name drugs down to what had been a generic tier.

[43] Congressional Research Serv., *R44264, Prescription Drug Discount Coupons and Patient Assistance Programs (PAPs)* 7 (2017).

[44] 26 U.S.C. §§ 170, 501.

pharmaceutical companies and other donors deduct donations of inventory or cash to Charitable Foundations on their tax returns.[45]

90.     Contributions to Charitable Foundations can have a huge return on investment for drug makers.  One analysis found that a $1 million contribution to a Charitable Foundation could result in $21 million in revenue for the pharmaceutical manufacturer.[46]

91.     Pharmaceutical manufacturers say their assistance programs are evidence of their commitment to ensure that prescription drugs remain affordable.  They note that although more people have insurance, a growing number of insured consumers have difficulty meeting required prescription copayments, deductibles, and other out-of-pocket costs.  That is especially true for patients prescribed high-cost specialty drugs.  Manufacturers and drug marketers also view Charitable Foundations as a tool for creating brand loyalty and developing markets for new drugs.[47]

92.     In the case of drug companies like Shire, funding to certain of these Charitable Foundations is not motivated solely out of generosity: "These patient-assistance charities are supported heavily by companies in their own interest—this is not purely about goodwill," says Steven Joffe, chief of the division of medical ethics at the University of Pennsylvania Perelman School of Medicine.[48]

---

[45] *See* Dept. of Health & Human Servs., *New Special Advisory Bulletin Provides Additional Guidance on Independent Charity Patient Assistance Programs for Federal Health Care Program Beneficiaries* (May 21, 2014), *available at* https://perma.cc/2ZFE-FT7Q.

[46] *See* Andrew Baum *et al.*, *The Straw That Could Break the Camel's Back*, Equities (May 16, 2017), at 5, *available at* https://perma.cc/KKA4-QZF6.

[47] HealthWell Foundation, *When Health Insurance Is Not Enough: How Charitable Copayment Assistance Organizations Enhance Patient Access to Care* 2 (2012), *available at* https://perma.cc/997E-R5QF.

[48] Carolyn Y. Johnson, *Mother, wife, million-dollar patient*, Wash. Post (Apr. 25, 2018), *available at* https://perma.cc/LRY6-SY8Z.

93.     As evidence of Shire's non-charitable motivations, Shire excludes Government Health Care Program patients from participating its own in-house charitable foundations (which cover 100% of drug cost), to ensure that such patients are routed through external charities where Shire's donation only covers the patient's copayment, thus recouping the remainder from Government Program reimbursements.

94.     Pharmaceutical company contributions to Charitable Foundations are growing dramatically.  A 2016 study of IRS information found that charitable expenditures by 10 leading manufacturer Charitable Foundations rose from $376 million in 2001 to $6.1 billion in 2014, and contributions by five independent charity Charitable Foundations increased from $2 million to $868 million during that period.[49]

95.     Longstanding HHS OIG guidance makes clear that donations to Charitable Foundations may "implicate the anti-kickback statute."[50]  Indeed, in an advisory opinion issued February 3, 2003, OIG explained that a patient assistance program that would have reimbursed Medicare Part B beneficiaries for cost-sharing amounts incurred in connection with particular drugs "is squarely prohibited by the [anti-kickback] statute.  Simply put, the [pharmaceutical company] is paying beneficiaries who use its product.  Subsidizing Medicare cost-sharing amounts can be very profitable to manufacturers.  So long as the manufacturer's sales price for the product exceeds its marginal variable costs plus the cost-sharing amounts, the manufacturer makes a profit.

---

[49] Austin Frerick, *The Cloak of Social Responsibility: Pharmaceutical Corporate Charity*, 153 Tax Notes 1151, 1159 (2016).

[50] Dep't of Health & Human Servs., *OIG Advisory Opinion No. 03-03* 4-5 (Feb. 3, 2003), *available at* https://perma.cc/V45B-7R2J.

Given that the marginal variable cost of a drug can be quite low, the profit can still be considerable despite the patient subsidy, especially for an expensive drug for a chronic condition."[51]

96.     OIG also explained that "the Proposed Arrangement would provide the Drugs with an obvious financial advantage over competing drugs in the market.  Since the [pharmaceutical company] would be providing cost-sharing assistance for its Drugs, rational beneficiaries would prefer treatment with the [pharmaceutical company]'s Drugs, rather than treatment with other drugs for which they must pay the cost-sharing amounts themselves."[52]

97.     In addition, the proposed patient assistance program "could result in increased costs to the Medicare program.  Since beneficiaries would be insulated from their financial liability for the [pharmaceutical company]'s Drugs, there would be no incentive to use competing, equally effective products, even if they were less expensive."[53]

98.     Similarly, in an advisory opinion issued September 27, 2002, HHS OIG evaluated a proposed arrangement involving financial assistance by a nonprofit foundation that a pharmaceutical company proposed to establish and fund in order to subsidize Medicare Part B cost-sharing amounts incurred by financially needy patients using its drug.[54]   Again, OIG explained that the proposed plan "would clearly implicate the anti-kickback statute."   *Id*. Addressing "whether [HHS OIG] should permit a manufacturer of a drug or device that is covered under a federal Health Care Program to subsidize copayments incurred by financially needy beneficiaries for using the manufacturer's product," OIG advised that "such arrangements

---

[51] *Id*. at 5.

[52] *Id*.

[53] *Id*.

[54] Dep't of Health & Human Servs., *OIG Advisory Opinion No. 02-13* 4 (Sept. 27, 2002), *available at* https://perma.cc/2QAK-RXPF.

implicate the antikickback statute and pose a substantial risk of program and patient fraud and abuse." *Id*. The proposed arrangement was "squarely prohibited by the statute" because it "pose[d] all the usual risks of fraud and abuse associated with kickbacks."[55]

99. In 2005, with Congress on the precipice of extending Medicare coverage for outpatient prescription drugs under Part D, OIG provided guidance in a special advisory bulletin, which outlined safeguards for company donations to Charitable Foundations to prevent violations of the AKS.[56] OIG's guidance focused on maintaining the independence of the independent charity, which required:

> **No control**: structuring an independent PAP in a manner that ensures drug company donors cannot "exert[] any direct or indirect influence or control over the charity";
> **Independence**: ensuring that the independent PAP awards financial assistance in "a truly independent manner that severs any link between the pharmaceutical manufacturer's funding and the beneficiary," such that "the assistance provided to the beneficiary cannot be attributed to" the donor;
> **No steering**: determining patient eligibility for assistance without regard for a patient's enrollment in a federal Health Care Program or the patient's choice of product, provider, practitioner, or supplier;
> **Uniform eligibility**: determining patient eligibility for assistance consistently in a "reasonable, verifiable and uniform manner" based on financial need; and
> **No return on investment analysis**: ensuring that donors do not "solicit or receive data from the charity that would facilitate the … [donor] in correlating the amount or frequency of its donations with the number of subsidized prescriptions for its products."[57]

100. To these ends, OIG admonished pharmaceutical companies to avoid directly or indirectly influencing "the identification of disease or illness categories" supported by the

---

[55] *Id*. at 5.

[56] Publication of OIG Special Advisory Bulletin on Patient Assistance Programs for Medicare Part D Enrollees, 70 Fed. Reg. 70623 (Nov. 22, 2005).

[57] *Id*. at 70626.

independent PAP, and cautioned donors to limit their donations solely to independent Charitable

Foundations that "define categories in accordance with widely recognized clinical standards and

in a manner that covers a broad spectrum of available products," as opposed to Charitable

Foundations that "define their disease categories so narrowly that [providing a donation]

effectively results in the subsidization of one (or a very few) of donor's particular products."[58]

101.  In addition, OIG has issued guidance on when so-called "services" offered to

physicians by pharmaceutical manufacturers run afoul of the AKS:

> Any time a pharmaceutical manufacturer provides anything of value
> to a physician who might prescribe the manufacturer's product, the
> manufacturer should examine whether it is providing a valuable
> tangible benefit to the physician with the intent to induce or reward
> referrals.  For example, if goods or services provided by the
> manufacturer eliminate an expense that the physician would have
> otherwise incurred (*i.e.*, have independent value to the physician),
> or if items or services are sold to a physician at less than their fair
> market value, the arrangement may be problematic if the
> arrangement is tied directly or indirectly to the generation of federal
> Health Care Program business for the manufacturer.[59]

102.  In 2014, OIG supplemented the 2005 special advisory bulletin, and reaffirmed that

Charitable Foundations will be subject to enhanced scrutiny under certain circumstances—

specifically: (1) disease specific Charitable Foundations with "improperly narrow approaches" to

defining diseases; and (2) Charitable Foundations that "limit assistance to a subset of available

products," especially a subset of "expensive or specialty drugs," instead of covering "all products

approved by the Food and Drug Administration for treatment of the disease state(s)," including

---

[58] *Id.* at 70627.

[59] OIG Compliance Program Guidance for Pharmaceutical Manufacturers, <u>68 Fed. Reg. 23731</u>, 23737 (May 5, 2003).

generic drugs.[60]  Although the Bulletin focuses on the charity as the actor, rather than a funding

pharmaceutical company, it is nonetheless instructive.  This Bulletin notes that "[i]f a donation is

made to a PAP to induce the PAP to … arrange for the purchase of the donor's federally

reimbursable items, the [antikickback] statute could be violated."[61]  OIG expressed particular

concern regarding situations where non-profits "define[d] their disease funds so narrowly that

earmarking effectively results in a donor's subsidization of its own products."[62]  A charity may

not permissibly "function as a conduit for payments or other benefits from the pharmaceutical

manufacturer to patients."[63]  A charity "with narrowly defined disease funds may be subject to

scrutiny if the disease funds result in funding exclusively or primarily the products of donors."[64]

103.    Ultimately, substantial caselaw and guidance from HHS OIG make clear that AKS

liability hinges upon the intent of the donating party, regardless of whether it has control over the

ultimate disposition of the donated funds.[65]

E.    **Drug Manufacturer cGMP and Post-Marketing Surveillance Obligations and Related Certifications**

104.    The federal government endeavors to ensure the safety and efficacy of drug

products consumed daily by millions of Americans through a combination of approvals,

inspections, enforcement, and self-regulation by drug manufacturers. As the FDA's Deputy

---

[60] Supplemental Special Advisory Bulletin: Independent Charity Patient Assistance Programs, 79 Fed. Reg. 31120, 31121-22 (May 30, 2014).

[61] *Id.* at 31121.

[62] *Id.*

[63] *Id.*

[64] *Id.*

[65] See 70 Fed. Reg. 70627 ("Simply put, the independent charity . . . must not function as a conduit for payments by the pharmaceutical manufacturer to patients and must not impermissibly influence beneficiaries' drug choices."); *see also United States v. Teva Pharms. USA, Inc.*, No. 20-cv-11548 (D. Mass. Sept. 9, 2021).

Associate General Counsel, Eric M. Blumberg, wrote, drug manufacturers "occupy a virtual fiduciary relationship to the public. . . . FDA shares this trustee relationship to the consumer with industry leaders, but the initial and ultimate responsibility remains with those leaders.  This is true not only because the law makes it so, but also for the practical reason that the FDA cannot be in every factory, much less monitor every decision that is made every day that affects the quality of our food and drugs."[66]

105.    Part of this landscape of ensuring that drug products meet appropriate standards are so-called current Good Manufacturing Practices ("cGMPs").  The cGMPs are FDA regulations found 21 CFR Parts 210 and 211.  Manufacturers demonstrate cGMP compliance through written documentation of procedures and practices.

106.    The cGMPs dictate, *inter alia*, standards for: personnel engaged in quality control; the design, construction and maintenance of buildings and facilities; the construction, cleaning and maintenance of equipment; the storage, inspection and testing of drug components and containers; the control of production and process, including procedures for sampling and testing of in-process drug products for conformity with specifications and prevention of microbiological contamination; control of packaging, labeling, storage and distribution; laboratory controls including testing of drug product batches for conformity with final specifications; the maintenance of records and reports relating to product quality and conduct of such investigations; and procedures for handling returned and salvaged product.

107.    Specifically, 21 CFR § 211.198 (titled "Complaint Files") governs procedures for the handling of and investigation of product quality complaints. Stated briefly, Section 211.198 requires that responsible entities have: (1) written procedures for how product quality complaints

---

[66] Eric M. Blumberg, *Abbott Laboratories Consent Decree and Individual Responsibility Under the Federal Food, Drug and Cosmetic Act*, 55 Food & Drug L.J. 145, 147 (2000).

Filed Under Seal

33

(whether written or oral) are handled; and (2) written records for each such complaint and any investigation steps taken under Section 211.192 (or reasons why no investigation was deemed necessary).

108.    Section 211.198 requires that such written procedures include provisions for review by the quality control unit (which is required to be established pursuant to 21 CFR § 211.22), as well as a decision as to whether an investigation is necessary pursuant to 21 CFR § 211.192.  Such procedures also require a review for whether the complaint represents a serious and unexpected adverse event required to be reported to the FDA pursuant to 21 CFR §§ 310.305 and 514.80.

109.    For written records of complaints, information that must be included in such records are: the name and strength of the drug product; lot number; name of complainant; nature of complaint; and the reply to the complainant.  Furthermore, the records must contain the findings of any investigation and/or follow up regardless of whether a formal investigation is commenced pursuant to 21 CFR § 211.192, as well as the reasons no such investigation was commenced.

110.    Drugs are deemed adulterated if they are not manufactured in compliance with the cGMPs or if they are contaminated.  *See* 21 U.S.C. §§ 351(a)(2)(A) and (B).  It is a violation of the Food, Drug, and Cosmetic Act to directly or indirectly cause adulterated drugs to be introduced or delivered for introduction into interstate commerce. 21 U.S.C.§ 331(a).

111.    The FDA operates a Drug Quality Reporting System, which includes the MedWatch reporting program. This system is designed to rapidly identify significant health hazards associated with the manufacturing and packaging of drugs, and to establish a central reporting system for detecting problem areas or trends requiring regulatory action.  Doctors and pharmacists can report drug quality problems, such as defective components, poor packaging or labeling, suspected contamination or questionable stability to the FDA, the manufacturer, or both, using a standard form.

112.    Pursuant to 21 CFR §§ 314.81(b)(1)(i) and (ii), manufacturers are required to notify the FDA by filing a "Field Alert" within 3 working days of the receipt, via MedWatch or otherwise, of: (i) information concerning any incident that causes the drug product or its labeling to be mistaken for, or applied to, another article; and (ii) information concerning any bacteriological contamination, or any significant chemical, physical, or other change or deterioration in the distributed drug product, or any failure of one or more distributed batches of the drug product to meet the specifications established for it in the new drug application.

113.    Product recalls are not within the FDA's regulatory authority.  Under 21 C.F.R. § 7.40, "[r]ecall is a voluntary action that takes place because manufacturers and distributors carry out their responsibility to protect the public health and well-being from products that present a risk of injury or gross deception or are otherwise defective."  The FDA's guidelines "categorize all recalls into one of three classes according to the level of hazard involved: Class I recalls – the most serious – are for dangerous or defective products that predictably could cause serious health problems or death."

114.    Because the FCA imposes liability on any government contractor that knowingly submits false claims to the United States or which uses false documents to get a false claim paid, a pharmaceutical manufacturer that knew or was recklessly indifferent to the fact that the manufacturing process was compromised by GMP violations is in the same position as any other contractor which is required to conform to contractual or regulatory standards.  The basis of liability under the FCA is that false records have been generated which caused (false) claims for drugs to be paid by the government.  The monetary damages result because the payor is paying for substandard drugs due to the GMP violations—later covered up by false statements in documents required to be completed under the GMP.

## VI.     FACTUAL ALLEGATIONS

### A.     Shire's Rare Disease Business

115.     Shire is a global biopharmaceutical company specializing in pharmaceutical drugs targeting rare diseases, defined in the Rare Disease Act of 2002 as conditions that affect fewer than 200,000 people.[67]  These are diseases with often life-threatening conditions with substantial impact on patients and their caregivers.  Most rare diseases are genetic, and thus are present throughout the person's entire life, even if symptoms do not immediately appear.

116.     Beginning in 2010, Shire developed a business model under which it sought to expand its focus on rare diseases through a series of mergers and acquisitions.  In 2010, the company acquired Movetis, a Belgian company focusing on gastrointestinal products, for $565 million.  A year later, Shire acquired regenerative medicine manufacturer Advanced BioHealing.  In 2012, the company acquired FerroKin BioSciences for $325 million.  In 2013, Shire acquired Lotus Tissue Repair, Inc., SARcode Bioscience Inc., and ViroPharma (a deal which closed in 2014).  At $4.2 billion, the ViroPharma purchase set a company record as its most expensive acquisition to date.  In 2014, Shire acquired two more rare disease drug companies: Fibrotech for $75 million and Lumena for $260 million.  In 2015, Shire acquired NPS Pharmaceuticals in a $5.2 billion stock purchase, bringing along its rare disease drug Natpara.  The company also acquired Meritage Pharma for $245 million, Foresight Biotherapeutics for $300 million, and Dyax for $6.5 billion.  In January 2016, the company made its most significant purchase, with the $32 billion acquisition of Baxalta, creating the largest global biotech company focused primarily on rare diseases.

---

[67] These are sometimes referred to as "orphan diseases."

Filed Under Seal

117.    As a result of this buying spree, Shire grew from a company with $6 billion in annual revenues to a company with over $15 billion in revenues by 2017, and had become a rare disease powerhouse.  Shire itself was acquired by Takeda in January 2018.

118.    By virtue of its aggressive acquisition strategy, Shire now manufactures more than 60 pharmaceutical drugs, many of which target rare diseases, including drugs treating: (a) hereditary angioedema ("HAE"), a disorder that results in recurrent attacks of severe swelling that most commonly affects the arms, legs, face, intestinal tract, and airway; (b) Hunter Syndrome, also known as mucopolysaccharidosis II ("MPS II"), a rare genetic metabolic disease caused by an enzyme deficiency resulting in the toxic buildup of complex sugars in the body called glycosaminoglycans ("GAGs); (c) Gaucher Disease ("GD"), another rare genetic disorder that is the most common lysosomal storage disorder ("LSD"); and (d) hypoparathyroidism ("HPT"), decreased function of the parathyroid glands with underproduction of parathyroid hormone, leading to low levels of calcium in the blood and often causing cramping and twitching of muscles or tetany (involuntary muscle contraction).

119.    Shire is segmented into the following divisions (with primary drugs and sales for 2017): Genetic Diseases (Elaprase, Replagal, VPRIV, $1.438 billion), Neuroscience (Vyvanse, Intuniv, Mydayis, $2.664 billion), Hematology (Adynovate, Advate, Feiba, $3.786 billion), Internal Medicine ( Natpara, $626 million), Immunology (Cinryze, Firazyr, Takhzyro $4.370 billion), Oncology (Oncaspar, Onivyde, $259 million), and Ophthalmology (Xiidra, $259 million).

120.    Given the small number of potential patients for its rare disease drugs, as well as the fact that patients with rare diseases are frequently misdiagnosed and thus are difficult to identify, Shire spends considerable time and energy to pinpoint physicians who may have patients affected by the rare diseases that Shire's products are intended to treat, as well as patient advocacy groups that might provide relevant leads.

121.     A large number of patients eligible to use the Shire Drugs are Medicare beneficiaries.  As a result, Medicare spends a significant amount of money each year on the Shire Drugs. For example, Medicare Part D reimbursed approximately $127 million and $72 million in Cinryze and Firazyr claims, respectively, in 2016 alone.  As both of these HAE drugs have only increased in total sales, Medicare's expenditures have increased accordingly.  In 2018, Medicare Part D reimbursed approximately $97 and $157 million in Cinryze and Firazyr claims, respectively.

122.     Shire's newest HAE drug, Takhzyro, which launched with only three (3) full months of sales in 2018, resulted in $12 million in Medicare Part D reimbursements during that limited time period. In 2019, Takhzyro and its $722,000 per year price tag accounted for more than $109 million in Medicare Part D reimbursements.

123.     At a whopping $11,262.58 per dosage unit, Medicare Part D's average spending per dosage unit of Takhzyro is almost four (4) times higher than that of Firazyr ($3,703.19) and almost five (5) times higher than that of Cinrzye ($2,930.42). And, as a Part D drug, the Government share of the drug's cost is higher than it would be under Part B.

**B.**     **Sales of the Shire Drugs**

124.     Shire has used a two-step method to locate the patients affected by the rare diseases that its drugs treat.  *First*, Shire has compiled a list of health care professionals in various geographic locations who, among other things, publish articles related to such rare diseases and prescribe Shire's drugs or drugs intended to treat conditions with similar symptoms.  *Second,* Shire's representatives explore whether such professionals are good leads, and provide notes regarding the same in Shire's confidential databases.  Accordingly, Shire's employees spend significant time honing its customer "lead list," which is maintained in its confidential database.

125. Shire has engaged several companies to find leads. For example, Shire has used a vendor, Symphony Health Solutions ("Symphony Health"), to identify different levels of leads (*i.e.*, highest value leads versus those less likely to yield results) in a given geographic region for physicians likely to prescribe Shire's rare disease products. Shire has paid Symphony Health hundreds of thousands of dollars in annual fees for this list, which is then integrated into Shire's secure database IQ2020, described below, and processed further to identify the highest-caliber leads within the list.

126. Shire also has used another vendor, Precision Analytics, to uncover leads for health care professionals treating patients with MPS II. This exercise yielded only twelve leads, demonstrating the high value of such information and the high cost associated with obtaining it.

## C. Shire PAMs' Direct Interactions with Charitable Foundations

127. According to their job description, Shire's Patient Access Managers ("PAMs") have been responsible, *inter alia*, for working with "physicians, genetic counselors, nurses, pharmacists and ancillary staff, as well as patients, and patient organizations and address barriers to patient access." Among their duties has been "reimbursement conflict resolution," which included regular interaction with Charitable Foundations. They have been required to "[w]ork closely with patient advocacy groups and foundations."

128. Shire PAMs have been responsible for coordinating patient access to Charitable Foundation money, including for patients enrolled in Government Health Care Programs. The following slide (of which Partner B took a photo) details this important PAM function regarding "Foundation Assistance":



129.     Shire has worked to ensure that patients who were prescribed Shire Drugs were aware that PAMs could assist with their financial needs.  The following brochure, of which Partner A took a photo, was mailed to every Shire patient:

130.   Among the PAMs' other duties was to coordinate the activities of the Shire Case Managers ("CMs").  CMs worked with specialty pharmacies to set up accounts, establish contact with insurers prior to drug purchase, verify patient eligibility, and ensure plan approval.  During Partner A's tenure as a Shire PAM, as part of their duties, CMs had regular (near daily) interactions on conference calls with patients and Charitable Foundations to fill out the paperwork to cover patients' copayments for the Shire Drugs.  CMs obtained and reviewed financial information and documents from the patients, and then discussed with Charitable Foundations what assistance each patient needed.  At all times material hereto, CMs knew what monies were available from Charitable Foundations, and openly discussed these monies in regular interactions with PAMs.

131.   Rarely have patients been denied access to Shire monies from the Charitable Foundations.

132.   Among the PAMs' interactions on behalf of Shire patients were regular contacts with various 501(c)(3) Charitable Foundations.  For example:

- Partner A was directed by Partner A's manager, Dan McNamara, Director of Patient Access, to have regular contact with Nancy Hollenkamp, head of the Aubrey Rose Foundation (discussed in further detail *infra*), concerning funding for patient car repairs, dental expenses, deposits on apartments, and other expenses.

- When Aubrey Rose ran out of money, Hollenkamp asked Shire for more money, stating: "until we can get funded I cannot help any of your families right now."

133.   As detailed below, Shire's Patient Dashboard spreadsheets for each of the Shire Drugs also document Shire employees' extreme efforts to coordinate Shire patients' receipt of Shire monies donated to Shire's preferred Charitable Foundations.

### D.        Shire's Staggering RBM Bonus Structure

134.   Shire's RBMs have been incentivized for both OnePath signups and so-called "patient additions."  In the case of Natpara, RBMs have earned up to $1,800 for each OnePath Start Form and $2,000 for each patient addition (dependent upon and on top of the OnePath Start

Form bonus money). Similar bonuses have existed for the other Shire Drugs, and in much greater amounts for Shire's rarer and more expensive treatments. Such bonuses could earn Shire's RBMs up to $400,000 per year for HAE patient OnePath enrollments and patient additions. As a result, at all times material hereto, Shire's sales force has aggressively and directly reached out to patients covered by Government Health Care Programs (and hundreds of other commercially-insured patients, including California and Illinois patients on the Shire Drugs) to pressure them to commence therapy. The wildly generous bonuses have incented Shire RBMs to go to extreme lengths to arrange financial assistance to cover the exorbitant cost of the Shire Drugs.

135. Shire's sales force, including the Patient Support Manager ("PSM"), the PAM, CM, and RBM, all have been directed to contact potential patients and their health care providers. For example, the notes from May 2017 for one Tacoma, Washington "Never Started" Natpara patient with the initials "ST" stated that the patient had not returned the calls of Shire employees "[d]espite aggressive outreach."

136. These aggressive outreach attempts are in no small part a result of the lucrative financial inducements Shire has provided to PAMs and other sales force employees. For any new account with new patients, a PAM has been sent to the prescriber's office within five (5) days to begin the process of ensuring that the patient actually ends up on therapy.

137. During Partner A's tenure at Shire, PAMs received bonuses based on "turn-around times" for patients—in other words, how quickly the PAM could get reimbursement or copayment assistance lined up, or prior authorization forms approved.

138. The hefty bonuses paid to PAMs were not without controversy. Shire has understood it was paying illegal bonuses for securing Charitable Foundation funding tied directly to the Shire Drugs. However, Shire management has been concerned that, without some way to measure PAM performance, it could not be sure employees were actually working. Thus, even

though Shire has known its scheme rewarded employees for coordinating illegal Charitable Foundation kickbacks, it has continued paying PAMs such bonuses, nonetheless.

139. This bonus structure was created as a way for Shire to ensure Shire Drugs patients receive Shire's Charitable Foundation funding, while at the same time disclaiming any responsibility for the means and methods by which PAMs obtain Charitable Foundation funding. In other words, Shire turned a blind eye to PAMs' tactics while incentivizing that very behavior.

140. In addition, each patient addition has earned the RBM several thousand dollars in bonus money ($2,000, in the case of Natpara), and such patient addition bonuses could be earned only from patients who had submitted OnePath Start Forms. Such patients have been viewed as low-hanging fruit, as Shire could target them and their physicians directly based on the OnePath authorization.

### E.  Shire Uses Symphony Health to Track Down Rare Disease "Leads" with a Frightening Level of Precision

141. Because the number of potential patients for the Shire Drugs is so small, identifying them is no small task. Shire has purchased data from a big data vendor, Symphony Health Solutions, Inc. ("Symphony Health"), located in Conshohocken, PA, to track down and then target potential new rare disease patient "leads." The Symphony Health data Shire acquires includes a granular weekly and monthly prescription audit, which provides a view of all retail and mail order prescriptions filled in the United States, reported by therapeutic class, product, physician specialty, geography, corporation/manufacturer, payment type, and patient age and gender.

142. This data is then used by Shire to create "lead lists" it distributed to sales representatives for targeted sales calls on physicians to sell the Shire Drugs.

143. Indeed, as alleged below with respect to Shire's HAE treatments, sales representatives would spring into immediate action upon being alerted of a new patient lead. Once

alerted, Shire's sales force would call on treating physicians and inform them of Shire's available rare drug treatments.

144.    Symphony Health data is so detailed that, in its targeted patient-specific sales calls, when Shire's sales representatives initiated the call they already knew exactly which patients physicians were treating who would be targets for the Shire Drugs.

145.    Even though Shire RBMs already knew the identity of the patient leads from the Symphony Health database, they were coached to (and did) mislead physicians as to _how_ they already knew about any particular lead.  Instead of acknowledging that they knew the physician was treating a patient with one of the rare diseases treatable with the Shire Drugs, sales representatives were instead told to (and did) lie to the physicians and state that they were there only as a "patient advocate" at the patient's request.  Even though patients had never requested that they act as their advocates, sales representatives were coached to (and did) misrepresent that they had been contacted by the patients concerning their interest in using the Shire Drugs.

146.    When asked for the name of the Shire patient(s) who had requested they speak to physicians, RBMs were coached to (and did) lie to physicians that they are prohibited by HIPAA privacy rules from disclosing the identities of the patients.  In this way, the RBMs could initiate promotion of the Shire Drugs under the guise that they had been requested to do so by the patient, when in fact they had not.

147.    Shire's sales force then set the scheme in motion by encouraging the physician to enroll the patient in OnePath (which physicians would be more likely to do if they thought patients had already requested Shire contact them), including discussions of coordinating available copayment monies through Charitable Foundations for Government Program beneficiaries.

Filed Under Seal

**F.**  **Payment of Kickbacks to Induce Patients to Promote the Shire Drugs**

148. Shire further devised and implemented an elaborate patient marketing scheme that offered kickbacks to patients themselves to reward them for their making what appeared to be unsolicited testimonial claims concerning the Shire Drugs to other potential patients and their family members.

149. One of Shire's patient-focused programs was its "Patient Ambassador" program. The Patient Ambassador program for the Shire Drugs was developed and managed by the Snow Corporation, located at 219 Bulifants Boulevard, Williamsburg, VA 23188, which worked with Shire to recruit, train, and pay patients to extol the benefits of the Shire Drugs to other patients and their family members.

150. The Shire Patient Ambassador programs have been rife with ethical and legal violations. Like all other advertising and promotion, its patient testimonials must follow the core principles established by law for promoting the Shire Drugs. Any testimonial used by Shire had not only to be consistent with the product label and must include or be accompanied by fair balance, but the testimonials could not include any claims that Shire could not make directly. Moreover, Shire could not disseminate any patient testimonial relating to a Shire product that did not clearly and conspicuously disclose what the generally expected performance would be in the depicted circumstances or clearly and conspicuously disclose the limited applicability of the experience described by the patient testimonial to what consumers of the Shire Drugs may generally expect to achieve.

151. Shire regularly violated these clear guidelines, instead rewarding Patient Ambassadors who were willing to read scripted promotional material for the Shire Drugs well beyond their limited experience in order to make claims Shire itself could not make.

152.    Even though Shire's patient events have been made to appear that they are unbiased endorsements of the Shire Drugs in relation to other competing drugs, unbeknownst to attendees, Shire Drug Patient Ambassadors have been rewarded for their testimonials between $350 and $600 per speaking engagement (along with travel expenses) to promote the Shire Drugs.  At no time have Patient Ambassadors informed attendees they were being paid to give their testimonials.

153.    Most of these testimonial events have been Shire-organized lunches or dinners set up by Shire's Marketing Department, where Patient Ambassadors were paid to extoll the benefits of the Shire Drugs, including that Shire would ensure reimbursement of patient copayments through OnePath or through Charitable Foundations.

154.    To add a layer of perceived distance, Patient Ambassadors were often hired to promote the Shire Drugs under the sponsorship of Shire-sponsored "independent" disease advocacy organizations.  For example, several Shire-funded promotional testimonials prepared by Gaucher Disease patients purportedly sponsored by the National Gaucher Foundation are available on YouTube even today, including:

- Shire "Ambassador" stories, with patient testimonials:

  https://www.youtube.com/watch?v=SZ7or63IV8M

- Testimony about National Gaucher Disease Foundation:

  https://www.youtube.com/watch?v=E6bXzlpDd9g

- Testimonial from Shire "Ambassadors":

  https://www.youtube.com/watch?v=CyrKu3JO8hQ

- Shire Gaucher Disease Awareness Month campaign:

  https://www.youtube.com/watch?v=0Zz3HpVK1cs

- Spotlight on Gaucher Disease by Shire: https://www.youtube.com/channel/UCLlYP-BGUgfI-P4Ma4TNpZg

- Shire "Ambassador" Emma's Story:

  https://www.youtube.com/watch?v=amN01RuMoAc

- Living with Gaucher Disease: https://www.youtube.com/watch?v=SZ7or63IV8M&t=86s

- Brian Benton's Gaucher Disease Story:

  https://www.youtube.com/watch?v=fLxHvJe4pUY

155. Because of their intimate knowledge of patients taking the Shire Drugs, Shire RBMs and PAMs have been able to identify cooperative patients who they thought would be good Shire Patient Ambassadors. Snow Companies then has interviewed candidates and selected those it would feature as Ambassadors. Snow has worked with those selected to prepare a heavily scripted "story" which would discuss the patient's "journey" with the disease leading them to the Shire Drugs, which had transformed their lives. Because the astronomical cost of the Shire Drugs would naturally be a concern for most patients (a single year of therapy on the Shire Drugs often easily exceeds the net worth of any individual patient), many of these Patient Ambassador testimonial videos have been aimed directly at neutralizing these financial concerns.

156. Even today, Shire includes testimonials from Patient Ambassadors on its website, including these for Firazyr and Natpara:

- Caeli's HAE Story, touting use of Firazyr:

  https://www.firazyr.com/firazyr-support/transcripts/transcript-Chaeli

- Bobby's HAE Story, touting use of Firazyr:

  https://www.firazyr.com/firazyr-support/transcripts/transcript-Bobbi

- "Chrissy's Journey" and "Cate's Journey, touting use of Natpara, even though it has been subject to a product recall, discussed *infra*:

  https://www.natpara.com/support-ambassador.html

157. Shire has continued using Patient Ambassadors for its newest HAE drug, Takhzyro. The Takhzyro website includes multiple testimonials under the website header "Real TAKHZYRO patient videos."[68]  These testimonial videos are heavily featured and promoted on the Takhzyro website.

158. Over time, some Patient Ambassadors became frustrated that Shire was only using them to promote its drugs and would restrict them from making candid (and balanced) complaints about their experiences with the Shire Drugs.  For example, when one Patient Ambassador complained that Snow was too controlling about her VPRIV message, she was told to stay with the script.  The Patient Ambassador quit and went on to work for Genzyme in a similar function.

159. Shire used the Aubrey Rose Foundation to fund numerous programs apart from the Patient Ambassador programs to bypass Shire's legal and compliance review.  The following chart shows Shire Gaucher programs funded through the Aubrey Rose Foundation from 2011 through 2015:

| EXPENSES FOR: | AMOUNT | FOR WHAT? | PAID HOW | PAID WHO | ADDRESS | STATE | PHONE # | EMAIL ADDRESS |
|---|---|---|---|---|---|---|---|---|
| BLT Rest. | $1,000.00 | DEPOSIT | AM EXP | BLT Rest. | 8720 West Sunset Blvd | CA | 310-360-1950 | |
| BLT Rest. | $3,843.15 | RESTAURANT CHARGE | AM EXP | BLT Rest. | 8720 West Sunset Blvd | CA | 310-360-1950 | |
| Chesterville Dutch | $39.95 | BREAKFAST EXPENSE | | Chesterville Dutch | | | | |
| Cheryl Elzinger | $600.00 | SPEAKING FEE | CK#1256 | Cheryl Elzinga | 8720 West Sunset | CA | 310-205-5708 | elzingac@toweroncology.com |
| Joel Casur DMD | $963.96 | SPEAKING FEE | | Joel Casur DMD | | | | |

---

[68] Takeda Pharmaceutical Co., Ltd., *Patient Stories*, https://www.takhzyro.com/videos/patient-videos (last visited Nov. 15, 2021).

| Michael Margolis | $6,330.00 | SPEAKING FEE | CK#1300 | Michael Margolis | 11834 Magnolia Blvd | CA | 818-521-5383 | reachmgm@gmail.com |
|---|---|---|---|---|---|---|---|---|
| Deanna Byck | $177.05 | EXPENSES | CK#1514 | Deanna Byck | 1899 27th St | UT | | |
| Deanna Byck | $343.80 | SPEAKING FEE | | Deanna Byck | 1899 27th St | UT | | |

160.    Shire has funded numerous Patient Ambassador programs throughout the United States, which were advertised by patient advocate "AstroTurf" organizations Shire sponsored. Here is a sampling of the Patient Ambassador programs sponsored by Shire and advertised on the National Gaucher Foundation website and which were touted as "NGF Events":

- Hear from Others Living with Type 1 Gaucher Disease – Oct 18, 2018, Maggiano's Little Italy, 600 Garden City Plaza, Garden City, NY

- Hear From Others Living with Type 1 Gaucher – Oct 16, 2018, Lui Lui, West Lebanon, 8 Glen Road, Suite 11, West Lebanon, NH

- Shire Patient Education Program – June 28, 2017, Bacchus, 925 E Wells Street, Milwaukee, WI 53202

- Shire Patient Education Program – May 4, 2017, Rye KC, 10551 Mission Road, Leawood, KS 66206

- Shire Patient Education Program – May 17, 2017, The Capital Grille, 236 Mall Boulevard, King of Prussia, PA

- Shire Patient Education Program – May 9, 2017, The Capital Grille, 7300 Dallas Parkway, Plano, TX

161.    Even though Natpara was recalled and taken off the market in September 2019, Takeda still includes on its website Patient Ambassador stories from Chrissy, Cate, Cece, and Melissa, telling about their "journey" with hypoparathyroidism and Natpara.  Melissa is quoted as saying she "reached out to the insurance company, and to OnePath, Shire's product support service, for information about co-pay assistance. Everyone I talked to was great and very supportive."  None of the Patient Ambassadors mentions they had been paid by Shire for their

testimonials, say anything about numerous reported adverse events, nor discuss the product recall.[69]

162.    This brochure for a Patient Ambassador event held on December 7, 2016 at Mastro's City Hall Steakhouse in Scottsdale, AZ, explains that the patient ambassador was to present information "about a prescription medication" (VPRIV) for use in treating Gaucher Disease.  Nothing in the brochure discloses Patient Ambassador "Brian" was being paid for his supposedly non-biased and spontaneous endorsement.  Instead, "Brian" would tell about the "ups and downs" of his Gaucher Disease and "learn" about how using VPRIV was a "silver lining":

## JOIN US FOR A FREE EDUCATIONAL EVENT ABOUT TYPE 1 GAUCHER DISEASE

**Learn** more about type 1 Gaucher disease

**Listen** to a person who has Gaucher disease share their story

**Hear** about a prescription medication indicated for long-term enzyme replacement therapy (ERT) for patients with type 1 Gaucher disease

Call 1-855-578-5349 to register by December 2nd

"Throughout my journey with Gaucher, I've had my share of ups and downs. I know it is up to me to find the silver lining and make the most of my experiences."



BRIAN

Shire Ambassador diagnosed with type 1 Gaucher disease

**WHEN**
Wednesday
December 7, 2016
Meeting Time: 6:30 PM

**WHERE**
Mastro's City Hall Steakhouse
6991 E. Camelback Road
Scottsdale, AZ 85251

Dinner will be provided.

**INDICATION**
VPRIV® (velaglucerase alfa for injection) is a prescription medication indicated for long-term enzyme replacement therapy (ERT) for patients with type 1 Gaucher disease.

**IMPORTANT SAFETY INFORMATION**
Hypersensitivity reactions, including serious allergic reactions (anaphylaxis) have occurred. VPRIV (velaglucerase alfa for injection) should be administered under the supervision of a healthcare professional. VPRIV is given every other week by intravenous infusion that typically takes up to 60 minutes. Appropriate medical support should be available when VPRIV is administered.

Please see accompanying full Prescribing Information, including Patient Information, and Important Safety Information on reverse.



VPRIV®
velaglucerase alfa
for injection



©Shire 2015 02/2015 | US/VEL-00003/15BD          Promotional program sponsored by Shire

---

[69]  *See* Takeda Pharmaceutical Co., Ltd., *Connect with Natpara Patient Ambassadors*, https://www.natpara.com/support-ambassador.html (last visited Nov. 15, 2021).

Filed Under Seal

163. These patient testimonials have been often laced with inherently misleading and unsubstantiated claims concerning quality of life, onset of action, duration of action, overstatement of efficacy, and minimization of risk associated with using the Shire Drugs.

164. Not only that, but these patient testimonials have regularly touted Shire's Charitable Foundation programs and other monies that were available as benefits in using the Shire Drugs in comparison to competing drug products.

165. For example, one Patient Ambassador video for Takhzyro is called "What happened after you decided to start taking TAKHZYRO?" One patient opens the video remarking that the process of starting Takhzyro therapy was "pretty much straight through." After her doctor told her about Takhzyro, she says the "the next thing I heard from OnePath" without any outreach on the patient's part. Another patient then takes up the dialogue, stating that her OnePath representative "helped me with receiving my medicine, and he also helped me with insurance questions." Those "insurance questions" include coordination of financial assistance from Shire-funded Charitable Foundations. None of these patients in this particular video disclosed that they were paid by Shire for their endorsements, or that their message had been heavily scripted by Shire and its marketing vendors such as Snow.

166. One video program series called GDP2P (for "Gaucher Disease People-To-People") was funded by $15,000 Shire grant through the Aubrey Rose Foundation and organized by a patient ambassador. The series (which still appears on YouTube) featured GD patient testimonials that were streamed over the internet to "serve as a springboard for viewers to set a meeting with the local [Shire sales representative] to service their personal needs. By the end of the program, the viewer will feel they know their Shire representative and a pathway will have been created to make an initial meeting as non-threatening and as convenient as possible." Shire

funded the series through the Aubrey Rose Foundation in order to bypass its legal and compliance review.

### G. Cinryze, Firazyr, and Takhzyro: Shire's HAE Drugs

#### 1. *Background on HAE*

167. HAE is a rare inherited disorder characterized by recurrent episodes of the accumulation of fluids outside of the blood vessels, blocking the normal flow of blood or lymphatic fluid and causing rapid swelling of tissues in the hands, feet, limbs, face, intestinal tract, or airway. The swelling most commonly affects the arms, legs, face, intestinal tract, and airway. If the intestinal tract is affected, abdominal pain and vomiting may occur. Swelling of the airway can result in its obstruction. Without treatment, attacks typically occur every couple of weeks and last for a few days.

168. Since there is no cure for HAE, patients require lifelong treatment.[70]

169. Among the options for prophylactically treating HAE, androgenic (male) steroids such as Danazol (danocrine) have been used for many years to treat HAE. It is estimated that 600 to 800 mg of Danazol given daily can reduce the number of HAE attacks by 90% and 100 to 400 mg can reduce attacks by 50%. Danazol is available as a generic drug and is very inexpensive.

170. Cinryze was approved in 2008 as the first alternative to Danazol for the prophylactic treatment of HAE. Also approved for prophylactic treatment are Haegarda (CSL Behring, 2017) and Takhzyro (Shire, 2018).

171. In treating acute HAE attacks, patients need rapid onset of symptom relief and quick resolution of symptoms allowing for a return to normal life. Early treatment is very

---

[70] Alan Lotvin, *New Treatments, Added Costs*, CVSHealth (April 18, 2017), https://perma.cc/945M-M66C.

important in reducing the severity of symptoms. Self-administration of drugs can reduce the time to symptom relief to an hour or so, but if the patient has to have the drug administered by a healthcare professional, relief can be delayed by a few hours. There are several competing products approved to treat acute attacks: (1) Berinert (CSL Behring, 2009), (2) Kalbitor (Shire, 2009), (3) Firazyr (Shire, 2011), and (4) Ruconest (Pharming, 2014). Cinryze and Danazol have not been approved to treat acute HAE attacks; they are approved only for prophylactic treatment.

172. As discussed herein, Shire (and to a degree, its product labeling) blurred the lines between prophylactic and acute HAE therapies, and as a result, prophylactic and acute HAE drugs often competed against each other for the same patient populations. This included Firazyr and Cinrzye, which were direct competitors until Shire's acquisition of Cinryze from ViroPharma in 2014.

### 2. *Shire's Promotion of Cinryze, Firazyr, and Takhzyro*

#### a) <u>Cinryze</u>

173. Cinryze was approved with an orphan drug designation by the FDA in 2008 for the treatment of routine prophylaxis against HAE attacks in adolescents and adult patients. Cinryze was launched by ViroPharma in 2009, reaching $100 million in U.S. sales that year. At the time Shire acquired ViroPharma in 2014 for $4.2 billion, Cinryze had reached $400 million in annual U.S. sales. Shire's revenues for Cinryze have followed suit with sales of $503 million in 2014, $617.7 million in 2015, $638.6 million in 2016, and $656.7 million in 2017.

174. ViroPharma had obtained the drug Cinryze in October 2008 when it acquired Lev Pharmaceuticals, Inc., just days after the FDA's orphan drug approval on or about Oct. 10, 2008. As early as July 15, 2008, ViroPharma asserted that its "Commercialization Plan in Place for Successful Launch" included a "Patient Assistance Program read to assure that every HAE patient would have access to drug."

175. At the time of the Cinryze launch, ViroPharma initiated a patient access program called Cinryze Solutions, which it described as assuring "every patient who needs Cinryze has access to it." The program would provide "assistance in navigating the maze of reimbursement and managing co-pays."

176. ViroPharma understood that its price tag for Cinryze was beyond the reach of ordinary patients. Accordingly, ViroPharma relied on Government Health Care Programs to reimburse for the vast majority of the cost of the drug. The following statement appears in ViroPharma's Form 10-K for 2012, and explains how critical it was to the product's success to gain access for Medicare and Medicaid patients (emphasis added):

> If we are unable to obtain reimbursement for Cinryze in the United States from government thealth administration authorities, private health insurers and other organizations, Cinryze may be too costly for regular use and our ability to generate revenues would be harmed.
>
> **Our future revenues and profitability will be adversely affected if governmental, private third-party payors and other third-party payors, including Medicare and Medicaid, do not sufficiently defray the cost of Cinryze to the consumer**. If these entities do not provide coverage and reimbursement for Cinryze or determine to provide an insufficient level of coverage and reimbursement, Cinryze may be too costly for general use, and physicians may not prescribe it.
>
> …
>
> **Because Cinryze is too expensive for most patients to afford without sufficient health insurance coverage, if adequate coverage and reimbursement by third-party payors is not available, our ability to successfully commercialize Cinryze may be adversely impacted.** Any limitation on the use of Cinryze or any decrease in the price of Cinryze will have a material adverse effect on our business.
>
> Even where patients have access to insurance, their insurance co-payment amounts may be too expensive for them to afford. We financially support the HAE financial assistance programs established by Patient Services Incorporated (PSI), which, among

Filed Under Seal

54

other things, assists patients in acquiring drugs such as Cinryze. Organizations such as PSI assist patients who have no insurance coverage for drugs, locate insurance, and also provide financial assistance to patients whose insurance coverage leaves them with prohibive co-payment amounts or other expensive financial obligations. In addition to assistance from organizations such as PSI, we provide Cinryze without charge for related charitable purposes. We are not able to predict the financial impact of the support we may provide for these and other charitable purposes; however, substantial support could have a material adverse effect on our ability to maintain profitability.

177. PSI became ViroPharma's primary partner in its endeavor to funnel kickbacks to patients. In its 2009 Form 10-K, ViroPharma disclosed its "inten[tion] to financially support the HAE financial assistance programs established by Patient Services Incorporated (PSI), which, among other things, assists patients in acquiring drugs such as Cinryze."

178. ViroPharma's relationship with PSI as particularly close. Confidential Informant No. 5 ("CI-5") worked at ViroPharma from 2010 through Shire's acquisition of Viropharma into 2015, first as a business analyst and then as a business operations manager. CI-5 stated that ViroPharma had a "special relationship" with PSI.

179. Indeed, PSI's website in 2012 briefly included a section bragging about the help PSI provided to ViroPharma for its "marketing strategy," including PSI's provision of "years of information and experiential patient need" to ViroPharma. The full passage reads as follows:

Our most recent success (2008 - 2009) was helping a pharmaceutical company [ViroPharma] bring [a] Hereditary Angioedema [drug] to market by helping them understand the patient assistance needs. As they were completing clinical trials, PSI was approached to help consult with the building of their comprehensive patient assistance program. We provided them with years of information and experiential patient need which helped them develop a top-notch patient assistance program and successful marketing strategy.

180. Those years of data provided by PSI helped ViroPharma tailor its "charitable" program to meet the exact needs of its own Cinryze patients. Indeed, PSI's 2014 Annual Report

bragged that "PSI has the greatest usage and accountability of funds reaching patients than any other foundation." According to the same 2014 Annual Report, PSI touted that "[d]onors will have greater insight and accessibility to assistance metrics through convenient reports and dashboards" and that "donors have flexible access to meaningful data."

181. Based on PSI's feedback, ViroPharma in 2010 brought its Cinryze patient assistance hub (which had been administered by CVS Caremark's TheraCom) in house. Confidential Informant No. 9 ("CI-9") was a senior supervisor Cinryze Solutions and nursing program lead for ViroPharma from February 2010 to April 2014, and then continued in that role at Shire until November 2014. CI-9 observed that "patient uptake swelled" as a result of the decision bring the hub in house, which freed the levers for ViroPharma to fully implement its illegal Patient Kickback scheme through PSI.

182. Indeed, ViroPharma's own 2010 Annual Report included the following discussion that taking CinryzeSolutions in-house "may be one of the best decisions we've ever made at ViroPharma":

> In 2010, we made what I believe may be one of the best decisions we've ever taken at ViroPharma, bringing our patient support program CINryzESolutions® in-house. This action, while certainly not a headline grabber or market mover, significantly strengthened our ability to listen and respond to the needs of our patients, and to help patients who could benefit from Cinryze have access. Thanks to this effort, we also have significantly reduced the time it takes for HAE patients to move through the reimbursement process and ultimately begin their therapy . . . . The relationship between our HAE specialists and their target audiences is very unique, and quite different from what you would expect from the typical pharmaceutical sales model.

183. With the help of PSI in providing needed information and data, ViroPharma funneled substantial copayment monies through PSI between 2009 and 2013 with the expectation that Cinryze prescription copayments would be covered by these funds. According to ViroPharma's 2012 Form 10-K, ViroPharma disclosed "carryforwards of . . . charitable

Filed Under Seal

contributions as of December 31, 2012" that amounted to $10,962,000, and actual charitable contrubutions of $504,762 in 2011 and $4,346,959 in 2012. The uptick in charitable contributions was based on both PSI feedback on ROI as well as ViroPharma's intent to funnel patient kickbacks in keeping with Cinryze demand. Given that Cinryze amounted to seventy-seven percent (77%) of ViroPharma's revenue in 2012, most (if not all) of those charitable contributions were made to PSI earmarked for Cinryze patients.

184. Shire's own SEC filings show that ViroPharma made another $3.1 million in charitable contributions for 2013.

185. With data provided by PSI, ViroPharma was thus able to closely track exactly when and how much to donate. CI-5 recalled that during his time working at ViroPharma between 2010 and 2015, "we were tracking contributions to charities outside" and that ViroPharma "did some analysis and understood what we donated . . . [and] made some inferences to say, 'well, based on the marketplace, we think X-number of patients are benefitting'" from ViroPharma's contributions to PSI. These analyses were based on the ROI information that had been provided to ViroPharma by PSI.

186. Confidential Informant No. 6 ("CI-6") worked as a bilingual patient care coordinator at ViroPharma and briefly for Shire from August 2013 to November 2014. During her time working for ViroPharma, the only Charitable Foundation it worked with was PSI.

187. At ViroPharma, CI-6 and her colleagues dealt with PSI directly, which always had funds to help patients with their copayments or insurance premiums. "When we received a service request form for a new patient, on the request form physician filled out everything," CI-6 said. "If it stated PSI, we filled out the paperwork."

188. Even after ViroPharma was acquired by Shire, she recalled it was very important that it not lose Cinryze patients during the transition from ViroPharma to the hub in Massachusetts. "Through the transition everything stayed the same," CI-6 said.

189. Confidential Informant No. 7 ("CI-7"), worked as a patient services representative for PSI from September 2011 to May 2015. She recalled that during her tenure at PSI the only HAE drugs it helped patients pay for were Cinryze and Firazyr. Patients who had been prescribed other drugs were rejected and referred to those drug's manufacturers. She recounted that "[w]e [would] just listen to what they're on, and refer them to the [other] manufacturer or whatever."

190. As a result of the "charitable" donations funneled through PSI, ViroPharma's Cinrzye sales expanded dramatically. Cinryze sales increased 400% between 2009 and 2013, growing from $100 million per year to $400 million per year.

191. Under the terms of Shire's acquisition of the outstanding shares of ViroPharma, Shire acquired all of ViroPharma's debts along with its liabilities.

192. By 2020, with an average monthly cost of $44,140 ($529,680 annually), Cinryze had reportedly become one of the most expensive drugs sold in the United States.[71]

193. By comparison, Danazol costs only $99.74 monthly ($1,196 annually). Cinrzye also competed directly with acute HAE treatments including but not limited to Firazyr.

194. Between 2011 and 2019, Medicare reimbursed approximately $816 million for Cinryze. By 2019, there were only 258 Medicare beneficiaries taking the drug. The average annual cost per Medicare beneficiary in 2011 was $384,331. By 2019, the average annual cost per Medicare beneficiary had risen to $566,918.

---

[71] *See* Jen Christensen, *The 5 most expensive drugs in the United States*, CNN (May 11, 2018), https://perma.cc/M22F-F5XK.

**b) <u>Firazyr</u>**

195.     On August 21, 2011, the FDA granted marketing approval for Firazyr (icatibant acetate) with an orphan drug designation for the treatment of acute attacks of HAE in adults 18 years of age and older.

196.     At the time, Shire initiated its "Quick Start" program and extended its OnePath Access Program to offer product-related services and support to HAE patients.

197.     Firazyr is very expensive.  In 2016, Business Insider listed Firazyr as the ninth most expensive drug in the U.S. with monthly costs of $35,800 ($429,600 annually).[72]

198.     Shire's sales of Firazyr have risen dramatically, with sales of $33 million in 2011, $116 million in 2012, $234 million in 2013, $364.2 million in 2014, $445 million in 2015, $510.9 million in 2016, and $581.2 million in 2017.

199.     Between 2011 and 2019, Medicare reimbursed approximately $803 million for Firazyr.  By 2019, there were only 660 Medicare beneficiaries taking the drug.  By 2016, the average annual cost per Medicare beneficiary was $267,434.

200.     Firazyr has had competition for the treatment of acute HAE attacks from Berinert (CSL Behring, first approved by the FDA on October 9, 2009) and Ruconest (Pharming, first approved by the FDA on July 16, 2014).

**c) <u>Takhzyro</u>**

201.     On or about August 23, 2018, the FDA granted marketing approval for Takhzyro with an orphan drug designation for the prophylactic treatment of HAE.  Takhzyro is also approved in Europe.

---

[72] *See* Lydia Ramsey, *The 10 most expensive drugs in the US*, Business Insider (Sept. 30, 2016), https://perma.cc/TA2R-F8SH.

202.    Takhzyro has become one of the most important rare disease drugs Takeda sells, as explained in its most recent Form 20-F SEC filing dated June 24, 2020. Takeda wrote in its 20-F that "[t]he United States Business Unit . . . is focused on the successful uptake of recently approved products such as TAKHZYRO® . . . supported by significant investment in marketing and sales force promotion."

203.    Takeda's focus on Takhzyro is not surprising, given that its Form 20-F also discloses Firazyr and Cinryze exclusivity loss dates of July 2019 and October 2020, respectively. Accordingly, Shire and Takeda have been focused on cannibalizing Firazyr and Cinryze market share by converting patients to the new HAE product, Takhzyro, which is much more expensive.

204.    Takhzyro's explosion in sales reflects Takeda and Shire's heavy investment in promoting the drug. In 2019, Takhzyro sales were ¥9.729 billion (or approximately $90.7 million). In its fiscal year 2020 (which ended March 31, 2020), Takhzyro sales grew by more than 600% year over year, with sales of ¥68.271 billion (or approximately $637 million).

205.    In its Consolidated Financial Results for FY Q3 2019,[73] Takeda featured the dramatic 622% growth in the sales of Takhzyro, due in no small part to losses in the sales of Firazyr and Cinryze:

---

[73] Takeda Pharmaceutical Co., Ltd., *Consolidated Financial Results for FY Q3 2019* at 10 (Feb. 4, 2020), *available at* https://www.takeda.com/siteassets/system/investors/report/quarterlyannouncements/fy2019/qr2019_q3-p01-en.pdf.



HEREDITARY ANGIOEDEMA
Q3 YTD, UNDERLYING REVENUE GROWTH

- Decline of FIRAZYR and CINRYZE due to effect of stocking in prior year, fewer patients on CINRYZE, and loss of exclusivity of FIRAZYR

206. Takeda explained the growth in sales of Takhzyro in the U.S. was the result of "[s]trong uptake across all prescribers; particularly among [Key Opinion Leaders]" as well as 30% of patients switching from Firazyr and another 30% of patients switching from Cinryze:

**U.S.:**
- Efficacy profile continues to position TAKHZYRO as a foundational HAE treatment
- Strong uptake across all prescribers; particularly among KOLs
- Diversified adoption:
  ~30% of patients are switches from FIRAZYR,
  ~30% of patients are switches from CINRYZE, and
  ~40% of patients are new to Takeda

207. Between 2018 and 2019, Medicare reimbursed approximately $121 million for Takhzyro. By 2019, there were only 299 Medicare beneficiaries taking the drug. The average annual cost per Medicare beneficiary in 2019 was $366,611.

### d) Lowering the Bar on Compliance

208. Confidential Informant No. 2 ("CI-2") worked first for ViroPharma and then for Shire as a Regional Business Manager from 2014 through 2018, promoting Cinryze in a three-state territory that included Utah, Nevada, and part of Idaho. She recalled that ViroPharma had

not been following traditional government rules as stringently as was the industry norm when it was acquired by Shire, and Shire did not seem to be any better.

209. During her time working at ViroPharma, she said the company was "trying to figure out [compliance] when they were purchased -- where they were . . . not following the path as much as they should have."

210. When she went to work for Shire, she described a chaotic environment because it was acquiring a new company every three or four weeks for the duration of her tenure. It was difficult for Shire's employees to express concerns about compliance because the company was going through so many changes and acquisitions. "In [Shire's] Rare Disease [Department,] they allowed us to talk to patients. We could even invite them to dinner," CI-2 said. "Shire had a program where you go in and it's the doctor, the patient, and the representative and you talk about things." During the visits, RBMs offered information about how the drug was used and the coverage options, including how to obtain financial assistance from Charitable Foundations Shire had funded.

211. While at Shire from October 2013 to April 2016, CI-4 explained that the company had about 18 to 20 Firazyr RBMs in the U.S. market, and each reported to one of the zone directors. RBMs oversaw each patient's care, directing a rare disease care team that included a CM and a PAM. Together the team identified, pulled through, and supported the patients over the course of their HAE treatment.

212. CMs supported the team in the field from the home office, and PAMs traveled separately to visit the same clinics as RBMs.

213. When a new patient filled out Shire's Start Form, CI-4 sent the form to Shire's third-party clearinghouse, LASH (a division of AmerisourceBergen under contract with Shire),

where a CM took on the work of obtaining prior authorizations. The CM then worked through the patient's insurance, copay, and prior authorization needs.

### e) The Shire Charitable Foundation Money Was Housed in the Patient Services Unit on the Commercial Side of the Company

214. Illustrating that the Charitable Foundation monies were not "charitable" at all, but were intended to drive sales of its HAE drugs, Shire's copayment monies were controlled by the commercial case management side of the organization.

215. According to Confidential Informant No. 3 ("CI-3"), head of a 10-to-12-person team of patient advocacy professionals from July 2016 to December 2017, "[w]hile I was there, the responsibility and budget for the copay charities lived in the commercial case management organization."

216. CI-3 and others raised concerns about the propriety of this arrangement. "We were asking, 'is this something that should live in our commercial organization?'" said CI-3. "We wanted to support patients in getting access to treatment, but we should be agnostic in what that treatment is."

217. CI-3 said that, when the commercial side of the company was deciding where to allocate the money, its goals were influenced by factors that went beyond the mere desire to support the patient community suffering from a particular disease. "We discussed how and when we give money to [the Charitable Foundation] Patient Services, Inc. That should not be a commercial play, because we are trying to help patients with that disease—we feel obligated," CI-3 said.

218. Through the end of CI-3's tenure at Shire, the funding for copay assistance charities remained housed in Shire's commercial division. "I participated in some of the discussions," CI-3

said. "I'm not sure what their motivations were, but by the time it was brought to me, I said I believe it would be best if it was a non-commercial investment."

### 3. *Shire's Fraudulent Funding of Charitable Foundations Receiving HAE Monies*

#### a) <u>Shire Used Patient Services CMs to Ensure Patients Get Access to HAE Drugs</u>

219. Confidential Informant No. 1 ("CI-1"), who worked in Shire's Patient Services department from November 2012 to March 2017, interacted with HAE patients as a CM in Shire's Patient Services unit, which supported patients living with one or more rare diseases by helping them obtain specialty medication and get training on how to inject their medication properly. The unit also provided ongoing support to those patients.

220. The purpose of the Patient Services unit at Shire was to connect patients with programs, both internal and third party, that assisted with their financial obligations for insurance premiums and drug copays. Shire had its own in-house copay program that helped patients with commercial insurance plans pay for their share of their medication's cost. The company also had a charitable access program. Patients with government coverage through programs like Medicare were not eligible for the in-house copay program, though. Instead, Shire referred those with government insurance to external 501(c)(3) organizations.

221. Asked what assistance CI-1 and the Shire Patient Services colleagues provided HAE and other rare disease patients who were unable to afford the significant copayments for their medication, CI-1 said that it depended on a patient's individual circumstances. The most important factor was who insured the patient. Those who procured their insurance through commercial carriers (including insurers in California and Illinois) were eligible for direct assistance through Shire in most cases, while those with insurance offered through the government were not. The

Filed Under Seal

64

patients with government coverage were directed to contact outside Charitable Foundations generously funded by Shire for copay assistance.

222. CI-1 said that Firazyr and Cinryze (and Takhzyro) were covered through the same disease state funds, even though the medications were used to treat different diagnoses. Firazyr was prescribed to patients who suffered acute episodes of HAE, while Cinryze was prescribed to prevent angioedema attacks through routine prophylaxis in patients who experienced multiple attacks weekly.

223. In 2013, when CI-1 began working in the Shire Patient Services unit, Shire Human Genetic Therapies had just acquired Cinryze through its merger with ViroPharma. CI-1 said Shire was already contributing to the Charitable Foundations that supported HAE patients when it acquired ViroPharma to help patients afford its orphan drug, Firazyr.

### b) The Shire Patient Services Unit Knew When a PAP Was out of HAE Funds

224. Shire knew it could use its in-house programs only to help patients cover the cost of their copayments if they were insured through a commercial carrier. Shire steered Government Health Care Program patients to PAPs.

225. According to CI-1, a senior case manager in Shire's Patient Services department from November 2012 to March 2017, "[i]f a patient had government insurance, we['d] refer them to copay assistance. We['d] refer to one of the charitable organizations out there." According to CI-1, Shire knew which charitable organizations had Shire money available for HAE programs when it made these referrals.

226. During CI-1's tenure at Shire, he referred HAE patients to three Charitable Foundations: Patient Services, Inc. ("PSI"), The Assistance Fund ("TAF"), and the National Organization for Rare Disorders ("NORD"). "We let them know where each organization was

and how they could help," explained CI-1. "Shire gave money to all those organizations," CI-1 said, referring to PSI, TAF, and NORD.

227.    When a patient assistance charity ran out of money to help patients pay for their medication, CI-1 and his colleagues were typically the first to find out.  The notification came as Shire's OnePath patient contacts learned from disappointed patients they had instructed to reach out to a given charity, but were turned away until more funding became available.  Shire then engaged in "pulsing": the strategic cycling of donations to PAPs to ensure the PAP funds were spent mostly or entirely on patients taking the Shire Drugs.

228.    "We'd learn from patients, then we'd say to the manager, 'are you guys aware this organization is rejecting patients?'" explained CI-1.  Such notifications up the chain of command delivered rapid results.  Soon after they notified their managers, the Shire Patient Services CMs reliably were notified that funds were available again.  "We'd tell the Shire manager, and he would say, 'okay,'" CI-1 said.  "Then, later on management said, 'I think this organization is accepting patients now.'"  That was code for the fact that Shire had pulsed a large donation to the PAP.  CI-1 and his colleagues then provided that information to patients whom they knew were anxiously awaiting copayment assistance for the Shire Drugs.

229.    Shire's control over the timing of such donations ensured that enough Cinryze and Firazyr patients would be in line to quickly exhaust most or all of Shire's donations, to the exclusion of patients seeking copayment assistance for Shire's competitors' products.  Shire's routine donation of funds to these charities ensured that patients waiting for copayment assistance would not have to wait long.

Filed Under Seal

c) **Shire's Illegal HAE Contributions to Charitable Foundations to Fund Copayments**

230.    CI-1, who worked in Shire's patient services department from November 2012 to March 2017, said it was well known within their department at Shire that the company was among the primary contributors to the HAE disease funds at the two patient assistance charities to which CI-1 referred patients: PSI and TAF.

231.    CI-1 said that Charitable Foundation funds were awarded to help patients pay for a range of expenses associated with rare disease treatment, including ancillary services, drug copayments, infusion expenses, insurance premiums, and even transportation to and from appointments with health care providers.

232.    Patients could contact each Charitable Foundation by phone to sign up, or they could visit a portal for each organization online and complete an application there.

233.    PSI's website does not allow users to view the specific medications that are eligible for coverage, although Confidential Informant No. 7 said that PSI covered only Shire's HAE treatments and would not cover any competitor's HAE drugs.

234.    According to CI-7, Shire's contributions to PSI were nearly limitless.  PSI not only covered copayments, but also insurance premiums for Cinryze and Firazyr patients.  Indeed, Shire continues to this day to donate about $20 million per year chiefly to PSI and TAF, earmarked for Shire's HAE drugs.

235.    Per CI-1, who worked in Shire's patient services department from November 2012 to March 2017, another non-profit, the U.S. Hereditary Angioedema Association ("HAEA") to which Shire contributed significant monies, offered the same patient group various services like travel assistance, but did not award copayment assistance grants.  However, HAEA did refer patients to Charitable Foundations that provided help with drug copayments.

236. CI-4, who worked as a Shire Regional Business Manager in Northern California from October 2013 to April 2016, said Shire contributed to organizations such as HAEA that took the lead on referring patients to the allergists and immunologists who were the source of most diagnoses of HAE.

237. HAEA has received large donations from Shire. For example, as recently as 2019, Shire donated $2.72 million to the organization. Shire has made similar donations annually to HAEA. Shire also pays many of HAEA's medical advisory board members hundreds of thousands of dollars annually for speaking, consulting, and research grants.

238. In one egregious example of bribery, in 2013, in order to retain an HAE patient located in Norman, Oklahoma who had Firazyr claims totaling over $1 million a year and who had reached the maximum amount allowed through the PSI Charitable Foundation, Shire agreed to fund this patient's home schooling through the Aubrey Rose Foundation, even though the Aubrey Rose Foundation was dedicated to Hunter Syndrome and Gaucher Disease only, and funded no other HAE patients at any time before or since.

### d) Shire's Charitable Copayment Contributions for HAE Patients Were Kickbacks

239. A small number of Charitable Foundations, including chiefly PSI and TAF, but also NORD and the PAN Foundation, received millions of dollars from Shire that were earmarked for assisting Shire HAE patients with respect to such patients' copayments.

240. For example, in 2016 alone, PSI received $8 million in Shire donations earmarked for either the "HAE Public Program" or the "HAE Private Program." In total, between Q1 2011 and Q3 of 2019, PSI received $38.76 million from Shire in HAE monies earmarked as public copayment assistance donations. PSI reserved substantially all such monies for the coverage of copayments associated with Shire's HAE drugs.

241.    TAF has also been a beneficiary of Shire's HAE copayment assistance largesse. Between Q3 2012 and the Q3 of 2019, TAF has received $37.67 million from Shire in HAE earmarked copayment assistance donations.  These funds were earmarked for TAF's "HAE Financial Assistance Program."

242.    The timing and control Shire has had over the distribution of these funds ensures Shire's control over the funds based on its knowledge of the status of funding availability at these charities.

243.    The following table contains a full list of Shire contributions from Q1 2011 through Q3 2019 related to HAE, totalling some $85,786,000 available for public copayment assistance:

| Charitable Foundation | Shire Description | Period | Amount |
|---|---|---|---|
| Patient Services, Inc. | ViroPharma HAE | Q1 2011 | $504,762 |
| Patient Services, Inc. | ViroPharma HAE | Q1 2012 | $4,346,959 |
| Patient Services, Inc. | HAE Financial Assistance Donation | Q1 2012 | $93,000 |
| Hereditary Angioedema Foundation | HAE Financial Assistance Donation | Q2 2012 | $250,000 |
| Patient Services, Inc. | HAE Financial Assistance Donation | Q2 2012 | $70,000 |
| HAEA | Sponsorship of 2012 HAEA Patient Conference | Q2 2012 | $50,000 |
| The Assistance Fund | HAE Financial Assistance Donation | Q3 2012 | $100,000 |
| HAEA | Charitable Contribution (HAE) For Rare Disease Awareness | Q3 2012 | $7,500 |
| Hereditary Angioedema Foundation | HAEA Awareness Activities | Q4 2012 | $250,000 |
| The Assistance Fund | Funding of HAE Health Services | Q4 2012 | $50,000 |
| Patient Services, Inc. | ViroPharma HAE | Q1 2013 | $3,100,000 |
| HAEA | Core Funding Support Q2 2014 | Q2 2014 | $325,000 |
| HAEA | Core Funding Support Q2 2014 | Q3 2014 | $325,000 |
| HAEA | Core Funding Support Q3 2014 | Q3 2014 | $325,000 |
| The Assistance Fund | Hereditary Angiodema Financial Assistance Program | Q4 2014 | $2,000,000 |
| The Assistance Fund | Support for Patients with Hereditary Angioedema | Q4 2014 | $1,026,000 |

Filed Under Seal

69

| Charitable Foundation | Shire Description | Period | Amount |
|---|---|---|---|
| HAEA | Core Funding Support Q3 2014 | Q4 2014 | $325,000 |
| Patient Services, Inc. | Hereditary Angioedema and Gaucher | Q1 2015 | $1,875,000 |
| Patient Services, Inc. | Premium, copay and incidental expense assistance | Q2 2015 | $1,875,000 |
| HAEA Foundation | US Hereditary Angioedema Association (HAEA) | Q3 2015 | $250,000 |
| HAEA Foundation | US Hereditary Angioedema Association (HAEA) | Q3 2015 | $10,000 |
| HAEA Foundation | US Hereditary Angioedema Association (HAEA) Wish Tree | Q3 2015 | $10,000 |
| The Assistance Fund | HAE Financial Assistance Program | Q1 2016 | $3,000,000 |
| Patient Services, Inc. | HAE Public Program | Q1 2016 | $2,000,000 |
| Patient Services, Inc. | HAE Public Program | Q2 2016 | $1,000,000 |
| HAEA | 2016 Charitable Donation | Q3 2016 | $2,800,000 |
| Patient Services, Inc. | HAE Public Program | Q3 2016 | $1,000,000 |
| The Assistance Fund | HAE Financial Assistance Program | Q4 2016 | $2,000,000 |
| Patient Services, Inc. | Hereditary Angioedema | Q1 2017 | $3,900,000 |
| Patient Services, Inc. | Hereditary Angioedema | Q1 2017 | $500,000 |
| The Assistance Fund | Hereditary Angioedema Financial Assistance Program | Q2 2017 | $7,238,000 |
| Patient Services, Inc. | Hereditary Angioedema | Q2 2017 | $3,000,000 |
| HAEA Association | 2017 Charitable Contribution | Q2 2017 | $2,800,000 |
| Patient Services, Inc. | 2017 Contributions Requests | Q2 2017 | $1,425,000 |
| The Assistance Fund | Hereditary Angioedema Financial Assistance Program | Q3 2017 | $2,450,000 |
| Patient Services, Inc. | Hereditary Angioedema | Q3 2017 | $1,300,000 |
| The Assistance Fund | Hereditary Angioedema Financial Assistance Program | Q4 2017 | $312,000 |
| The Assistance Fund | 2018 Hereditary Angioedema Financial Assistance Program | Q2 2018 | $5,000,000 |
| HAEA | HAE Health, Advocacy, Engagement and Research Programs | Q2 2018 | $2,800,000 |
| The Assistance Fund | Hereditary Angioedema (HAE) Financial Assistance Program | Q3 2018 | $2,500,000 |

| Charitable Foundation | Shire Description | Period | Amount |
| --- | --- | --- | --- |
| The Assistance Fund | Hereditary Angioedema Financial Assistance Program | Q3 2018 | $2,000,000 |
| Patient Services, Inc. | 2018 Hereditary Angioedema Public Assistance | Q2 2018 | $2,500,000 |
| Patient Services, Inc. | Hereditary Angioedema Public Assistance | Q3 2018 | $500,000 |
| HAEA, Inc. | Health Advocacy Support | Q4 2018 | $100,000 |
| The Assistance Fund | Hereditary Angioedema (HAE) Financial Assistance Program | Q1 2019 | $5,000,000 |
| Patient Services, Inc. | Hereditary Angioedema Public Assistance | Q1 2019 | $2,000,000 |
| HAEA | Hereditary Angioedema Patient Advocacy Programs | Q2 2019 | $2,720,000 |
| The Assistance Fund | Hereditary Angioedema (HAE) Financial Assistance Program | Q2 2019 | $2,500,000 |
| Patient Services, Inc. | Hereditary Angioedema Public Assistance | Q2 2019 | $1,000,000 |
| The Assistance Fund | Hereditary Angioedema (HAE) Financial Assistance Program | Q3 2019 | $2,500,000 |
| Patient Services, Inc. | Hereditary Angioedema Public Assistance | Q3 2019 | $1,000,000 |

244.    The pace of Shire's donations has only quickened between Q4 2018 and Q3 2019, related to Shire's heavy promotion of Takhzyro, which at $722,000 per year costs more than $200,000 more than Cinrzye, itself one of the most expensive drugs sold in the United States.  The following contains a full list of Shire's HAE specific donations for this period of four quarters:

| Charitable Foundation | Shire Description | Period | Amount |
| --- | --- | --- | --- |
| HAEA, Inc. | Health Advocacy Support | Q4 2018 | $100,000 |
| Patient Services, Inc. | Hereditary Angioedema Private Assistance | Q1 2019 | $1,750,000 |
| Patient Services, Inc. | Hereditary Angioedema Public Assistance | Q1 2019 | $2,000,000 |
| The Assistance Fund | Hereditary Angioedema (HAE) Financial Assistance Program | Q1 2019 | $5,000,000 |
| HAEA, Inc. | Hereditary Angioedema Patient Advocacy Programs | Q2 2019 | $2,720,000 |

| Patient Services, Inc. | Hereditary Angioedema Private Assistance | Q2 2019 | $875,000 |
|---|---|---|---|
| Patient Services, Inc. | Hereditary Angioedema Public Assistance | Q2 2019 | $1,000,000 |
| The Assistance Fund | Hereditary Angioedema (HAE) Financial Assistance Program | Q2 2019 | $2,500,000 |
| Patient Services, Inc. | Hereditary Angioedema Private Assistance | Q3 2019 | $875,000 |
| Patient Services, Inc. | Hereditary Angioedema Public Assistance | Q3 2019 | $1,000,000 |
| The Assistance Fund | Hereditary Angioedema (HAE) Financial Assistance Program | Q3 2018 | $2,500,000 |

**TOTAL: $20,320,000**

Given the extreme cost of Cinrzye and its even more expensive successor drug Takhzyro, many of these patients would have opted for a cheaper option unless Shire either: (1) subsidized their Cinryze, Firazyr, or Takhzyro costs through copayment assistance donations; or (2) lowered the price of Cinryze, Firazyr, or Takhzyro. Shire opted for subsidizing patient costs through copayment funding in order to maintain elevated overall prices at the expense of the Government Health Care Programs.

245. Even after 2017, Shire's release of HAE copayment funding to PSI and TAF has been tactically designed to maximize the efficiency of Shire's funds vis-à-vis other brand HAE competitors, chiefly including CSL Behring's Haegarda. Shire would wait until a significant number of patients for Takhzyro, Firazyr, or Cinryze were in the queue for copayment assistance (knowledge it obtained through its OnePath program), and then would deliver news of the funding to Shire's PAMs, CMs, or RBMs to pass along to patients. With the OnePath architecture in place, Shire effectively ensured that its own patients would learn of funding availability prior to its competitors' patients. In this way, Shire effectively controlled (i.e., pulsed) the release of funding such that Shire's HAE Firazyr, Cinryze, or Takhzyro patients would obtain the lion's share of Shire's copayment donations.

246. As an example of Shire's intimate involvement in the procurement of copayment funds for HAE patients, Partner A was told in or around May 2014 that the Aubrey Rose Foundation had run out of funding for a particular Firazyr patient, and that TAF was also out of funding. In response, Daniel McNamara (then Head of US Patient Services RDBU) wrote: "I just sent an email to the assistance fund [TAF] as I find it hard to believe they are out."

247. Takhzyro and Cinryze therapy costs hundreds of thousands of dollars per year, whereas HAE patients' alternative therapies may consist of inexpensive steroid treatment like Danazol or less expensive brand-name treatments sold by competitors such as Haegarda, Berinert, and Ruconest. Thus, from a financial standpoint, Shire has been faced with a hard sell for its HAE drugs, especially among patients who would have incurred a significant copayment (*e.g.*, Medicare patients without supplemental insurance or privately insured patients from California or Illinois) or whose conditions were already well-controlled by much cheaper drugs.

248. As a result, Shire's charitable PAP money for Cinryze, Firazyr and Takhzyro became a key selling point during Shire's interactions with patients enrolled in OnePath. And Shire's personnel have been aggressive in connecting with Charitable Foundation money because they were incentivized by several thousand dollars per patient in bonuses.

249. Shire effectively decided to provide financial assistance using external Charitable Foundations as a conduit for Cinryze, Firazyr and Takhzyro prescriptions paid for by Government Health Care Programs.

**H.** **Elaprase: Shire's Hunter Syndrome Drug**

**1.** *Background on Hunter Syndrome*

250. Hunter syndrome is a very rare, inherited genetic disorder caused by a missing or malfunctioning enzyme. Because the body does not have enough of the enzyme to break down certain complex molecules, the molecules build up in harmful amounts. In Hunter syndrome, the

buildup of massive amounts of these harmful substances eventually causes permanent, progressive damage affecting appearance, mental development, organ function and physical abilities.

251. Hunter syndrome is an extremely rare condition. Shire estimates that there are some 2,000 Hunter syndrome patients worldwide, with 25% (500) of those patients in the United States.

252. There is no cure for Hunter syndrome. Treatment involves management of symptoms and complications, including relief for respiratory complications, addressing heart complications, treatment for skeletal and connective tissue problems, managing neurological complications, managing behavioral problems, and addressing sleep issues.

### 2. Shire's Promotion of Elaprase

253. Shire's enzyme replacement therapy, idursulfase (Elaprase), was approved on July 24, 2006 with an orphan drug designation by the FDA as a treatment for Hunter syndrome (also referred to as "MPS II"). The original developer of the drug, TKT Therapeutics, was acquired by Shire in 2005. At the time, Elaprase was the first enzyme replacement therapy for the treatment of Hunter syndrome. In 2006, Elaprase had $23.6 million in sales. By 2015, Elaprase had $552.6 million in sales.

254. Elaprase is very expensive. At the time it was launched in 2006, Shire sold the drug for $300,000 annually, making it one of the most expensive drugs sold in the U.S.[74] A 2013 article in *Vanity Fair* touted Elaprase as one of four drugs that "cost more than your house."[75] As of

---

[74] *FDA Approves Shire's Pricey Elaprase*, FierceBiotech (July 24, 2006), https://perma.cc/YR3D-CFAA.

[75] Louisa Strauss, *The Drugs that Cost More than Your House*, Vanity Fair (December 19, 2013), https://perma.cc/44FB-HAQM.

2015, Elaprase was reportedly the fifth most expensive drug in the world.[76]  And its price has only risen since then.  As of 2017, one 3-milliliter unit cost over $1,000, making the annual cost of this drug over $500,000.

### 3.  *Shire's Charitable Copayment Contributions for Hunter Syndrome Patients Were Kickbacks*

255.    A small number of charitable patient assistance programs, including the National MPS Society, Buddies International, NORD, and TAF have received millions of dollars from Shire that was earmarked for assisting specifically Hunter syndrome patients cover their copayments.

256.    The following table contains a full list of Shire contributions from Q2 2012 through Q3 2018 related to Hunter syndrome, totalling $5,216,400:

| Charitable Foundation | Shire Description | Period | Amount |
|---|---|---|---|
| Aubrey Rose Foundation | OnePath Charitable Contribution | Q2 2012 | $100,000 |
| Aubrey Rose Foundation | OnePath Charitable Contribution | Q2 2012 | $15,000 |
| NORD | Hunter Financial Assistance Program | Q3 2012 | $50,000 |
| NORD | Support of Shire Hunter Financial Assistance Program | Q3 2012 | $50,000 |
| NORD | Hunter & Gaucher Patient Assistance Programs | Q3 2014 | $470,000 |
| Aubrey Rose Foundation | Patient Support | Q3 2014 | $100,000 |
| NORD | Hunter & Gaucher Patient Assistance Programs | Q4 2014 | $470,000 |
| NORD | Hunter & Gaucher Patient Assistance Programs | Q4 2014 | $200,000 |
| Aubrey Rose Foundation | Improving and Enhancing Patient Care | Q4 2014 | $100,000 |
| NORD | Hunter & Gaucher Patient Assistance Programs | Q1 2015 | $300,000 |
| NORD | Hunter & Gaucher Patient Assistance Programs | Q1 2015 | $200,000 |
| National MPS Society | 2015 Charitable Contribution | Q2 2015 | $65,000 |

---

[76] Sean Williams, *The Five Most Expensive Drugs in the World*, The Motley Fool (Aug. 15, 2015), https://perma.cc/64VN-JM8D.

Filed Under Seal

| Charitable Foundation | Shire Description | Period | Amount |
|---|---|---|---|
| NORD | Gaucher/ Hunter Syndrome Copay Assistance Programs | Q3 2015 | $200,000 |
| NORD | Gaucher/Hunter Syndrome Copay Assistance 2016 | Q2 2016 | $691,900 |
| Best Buddies International | Best Buddies – Hunter Syndrome | Q2 2016 | $50,000 |
| Best Buddies International | Best Buddies – Hunter Syndrome | Q1 2017 | $75,000 |
| NORD | Gaucher/Hunter Syndrome Copay Assistance Programs | Q1 2017 | $50,000 |
| NORD | Patient Assist. For Hunter Syndrome | Q2 2017 | $529,500 |
| The Assistance Fund | Hunter Syndrome Financial Assistance Program | Q1 2018 | $300,000 |
| NORD | Hunter's Syndrome Patient Assistance Program | Q2 2018 | $300,000 |
| NORD | Hunter Syndrome Financial Assistance Program | Q3 2018 | $100,000 |
| The Assistance Fund | Hunter Syndrome Financial Assistance Program | Q1 2019 | $500,000 |
| The Assistance Fund | Hunter Syndrome Financial Assistance Program | Q1 2019 | $300,000 |

257.    When monies were not available through one of the other Charitable Foundations, Shire would arrange for Hunter syndrome monies through the Aubrey Rose Foundation to ensure that patients remained on the Elaprase.  For example, Shire arranged for Aubrey Rose Foundation to provide $1,034.05 on August 17, 2011 in "financial help" to the Jean-Paul family from San Antonio, Texas.  On August 11, 2011, it arranged for Aubrey Rose to fund $2,923.89 in "financial help" to the Yama family from Tustin, California.

258.    Shire's charitable PAP money for Hunter syndrome became a key selling point during Shire's interactions with patients enrolled in OnePath. And Shire's personnel were

aggressive in connecting patients with foundation money because they were incentivized by thousands of dollars in bonuses.

259. Shire effectively decided to provide financial assistance using Charitable Foundations as conduits for Elaprase prescriptions paid for by Government Health Care Programs.

**I.      VPRIV:  Shire's Gaucher Disease Drug**

**1.  *Background on Gaucher Disease ("GD")***

260. GD is a rare genetic disorder in which the body lacks enough of the enzyme glucocerebrosidase, which is needed to break down certain fatty materials, or lipids.  Without this enzyme, harmful amounts of lipids can build up in the liver, spleen, bones, bone marrow and nervous system, and can prevent cells and organs from working properly.  As a result, cells that have built up a lot of the glucocerebrosidase enzyme, or "Gaucher cells," can accumulate and displace healthy normal cells in bone marrow and organs such as the liver and spleen.  People suffering from GD may experience symptoms such as easy bruising or bleeding, weakness, anemia, bone or joint pain, enlarged liver or spleen, reduced bone mineral density, and weakened bones that are easily fractured.

261. Approximately 1 in 40,000 people in the general population are affected by GD, or about 10,000 people worldwide.  In the United States, it is estimated that approximately 3,200 people currently suffer from GD, with over 1,700 currently receiving treatment, including investigational therapies in clinical trials.

**2.  *Shire's Promotion of VPRIV Through Paid Patient Ambassadors***

262. Approved by the FDA in February 2010, velaglucerase alfa (trade name VPRIV) is an enzyme replacement therapy developed and manufactured by Shire HGT for treatment of Type 1 GD.  It is designed to work by replacing or supplementing the patient's nonworking

glucocerebrosidase enzyme. VPRIV is indicated for long-term enzyme replacement therapy for pediatric and adult patients with Type 1 GD.

263. VPRIV has brand competition in the form of Cerezyme®, which is marketed by Genzyme Corporation. Because both VPRIV and Cerezyme are enzyme replacement therapies, there is little differentiation in their safety and efficacy profiles.

264. Even though VPRIV entered the market after Cerezyme, Shire was able to take more than 50% of Cerezyme's patients by offering a variety of illegal kickbacks through Charitable Foundations.

265. The cost to a patient to receive GD enzyme replacement therapy is weight-based, but approximately $500,000 to $600,000 per year.

### 3. Shire's Charitable Copayment Funding for GD Patients Was a Kickback

266. A small number of charitable patient assistance programs, including NGF, PSI, and NORD, have received millions of dollars from Shire that was earmarked for assisting specifically Gaucher Disease patients cover their copayments.

267. During part of Partner A's time at Shire, Shire had a strained relationship with NGF while Genzyme (whose drug Cerezyme was a direct competitor to VPRIV) had a strained relationship with NORD. As a result, most of the Shire GD monies went to NORD while Genzyme allocated its charitable monies to NGF.

268. Later, after its relationship with NGF had improved, Shire again gave numerous grants to NGF that it described as "CARE Foundation" monies, including (a) a $500,000 donation in the fourth quarter of 2015; (b) a $1,000,000 donation in the first quarter of 2016; and (c) a $1,400,000 donation in the first quarter of 2017. The NGF website states that it offers the CARE Program assistance with payment of insurance premiums to patients and their families who cannot afford their premiums.

269.   Shire also gave PSI grants that it described as "Gaucher Disease Financial Assistance Program," including (a) a $1,000,000 copayment assistance donation in Q2 2012, (b) a $100,000 donation in the first quarter of 2016; and (c) a $150,000 donation in the first quarter of 2017.   These monies were earmarked for Shire's VPRIV:

| Charitable Foundation | Shire Description | Period | Amount |
|---|---|---|---|
| PAN Foundation | Co-payment assistance donation | Q2 2012 | $1,000,000 |
| NGF | NGF Charitable Contribution | Q2 2012 | $50,000 |
| NGF | CARE Support Project | Q3 2012 | $50,000 |
| NGF | Support of NGF Care Project | Q4 2012 | $75,000 |
| NGF | Care Program | Q3 2014 | $200,000 |
| NGF | Care Program 1st Quarter | Q3 2014 | $200,000 |
| NGF | Care Program | Q4 2014 | $200,000 |
| NGF | Care Program 1st Quarter | Q4 2014 | $200,000 |
| NGF | Patient Meetings | Q4 2014 | $20,000 |
| NGF | CARE Foundation | Q1 2015 | $500,000 |
| NGF | Patient Meetings | Q3 2015 | $25,000 |
| NGF | CARE Foundation | Q4 2015 | $500,000 |
| NGF | CARE Foundation | Q1 2016 | $1,000,000 |
| Patient Services, Inc. | Gaucher Disease Financial Assistance Program | Q1 2016 | $100,000 |
| NGF | National Education and Awareness | Q3 2016 | $400,000 |
| NGF | Education, Awareness & Care | Q1 2017 | $1,400,000 |
| Patient Services, Inc. | Gaucher Disease | Q1 2017 | $150,000 |
| NORD | Patient Assistance for Gaucher Disease | Q2 2017 | $170,500 |
| Patient Services, Inc. | Gaucher Disease | Q4 2017 | $150,000 |
| NORD | Gaucher's Disease Patient Assistance Program | Q1 2018 | $170,500 |
| NGF | Education & Awareness | Q2 2018 | $300,000 |
| NGF | NGF CARE Programs | Q2 2018 | $179,500 |
| Patient Services, Inc. | 2018 Gaucher Disease Private Assistance | Q2 2018 | $225,000 |
| Patient Services, Inc. | 2018 Gaucher Disease Public Assistance | Q2 2018 | $75,000 |
| Patient Services, Inc. | Gaucher's Disease Private Assistance | Q1 2019 | $250,000 |
| Patient Services, Inc. | Gaucher Disease Public Assistance | Q1 2019 | $100,000 |

Filed Under Seal

79

#### 4. *Shire's Fraudulent Funding of the Aubrey Rose Foundation*

270.    As a way of differentiating VPRIV from its branded competition, when GD monies were not available from one of the other foundations, Shire secured donations through the Aubrey Rose Foundation.

271.    Despite being required to do so, Shire did not report any of these Aubrey Rose charitable gifts as part of its Integrity Agreement reporting obligations.

272.    Partner A, a former Shire PAM, worked closely with patients suffering from rare diseases to obtain reimbursement for treatment for conditions that included HAE, GD, and Hunter Syndrome.  Partner A provided billing and procurement information to providers, hospitals, and patients and was tasked with ongoing development of affiliated patient advocacy foundations.

273.    Partner A's manager, Dan McNamara, directed that one of Partner A's responsibilities would be to maintain a relationship with the Aubrey Rose Foundation, a Charitable Foundation that was funded by Shire.

274.    According to Partner A, Shire began to fund the Aubrey Rose Foundation around February of 2011.  Shire was entering the GD market and the main competition was Genzyme's Cerezyme.  At the time, Shire supported many foundations to assist with copayments and other issues.  However, using monies from Shire, the Aubrey Rose Foundation supported unpaid medical bills, dental bills, physical therapy, massage therapy, and sometimes even car repairs or apartment deposits.  The fact that Aubrey Rose would pay these costs on behalf of Shire was a competitive advantage since no Charitable Foundation to which its chief competitor, Genzyme, was providing monies would do so.

275.    Shire gave the Aubrey Rose Foundation at least $100,000 per year (with additional monies, as requested), which it used to fund numerous patient donations beyond just copayments.

The following table contains a list of Aubrey Rose Foundation donations from 2011 to 2015 based entirely on monies it received from Shire:

| DATE | GRANTS AWARDED | AMOUNT | CITY | STATE |
|---|---|---|---|---|
| 4/26/11 | Financial help for Family 1 | $2,311.27 | Seal Beach | CA |
| 4/26/11 | Financial help for Family 2 | $380.53 | Studio City | CA |
| 5/9/11 | Financial help for Family 3 | $517.50 | Woodside | CA |
| 6/7/11 | Financial help for Family 4 | $1,942.23 | Cedar Park | TX |
| 6/16/11 | Financial help for Family 5 | $500.00 | Los Angeles | CA |
| 8/12/11 | Financial help for Family 6 | $2,328.00 | Valley Village | CA |
| 8/12/11 | Financial help for Family 7 | $808.00 | Kensington | CA |
| 8/16/11 | Financial help for Family 8 | $4,000.00 | Moscow | ID |
| 8/17/11 | Financial help for Family 9 | $1,034.05 | San Antonio | TX |
| 9/2/11 | Financial help for Family 10 | $171.09 | El Paso | TX |
| 9/2/11 | Financial help for Family 10 | $398.01 | El Paso | TX |
| 9/20/11 | Financial help for Family 11 | $2,723.00 | Studio City | CA |
| 10/11/11 | Financial help for Family 5 | $150.00 | Los Angeles | CA |
| 10/11/11 | Financial help for Family 12 | $660.00 | Sherman Oaks | CA |
| 10/11/11 | Financial help for Family 13 | $758.00 | Corona | CA |
| 10/12/11 | Financial help for Family 14 | $910.83 | Solana Beach | CA |
| 10/13/11 | Financial help for Family 15 | $2,095.00 | Tarzana | CA |
| 10/13/11 | Financial help for Family 16 | $840.00 | Russelville | AL |
| 10/27/11 | Financial help for Family 17 | $2,492.19 | LaHonda | CA |
| 10/28/11 | Financial help for Family 14 | $2,890.82 | Solana Beach | CA |
| 10/31/11 | Financial help for Family 18 | $53.17 | Bronx | NY |
| 11/3/11 | Financial help for Family 19 | $2,596.50 | Ames | IA |
| 11/3/11 | Financial help for Family 20 | $1,540.00 | Tustin | CA |
| 11/4/11 | Financial help for Family 11 | $825.00 | Studio City | CA |
| 11/10/11 | Financial help for Family 21 | $424.86 | Loretto | MN |
| 11/22/11 | Financial help for Family 14 | $750.00 | Solana Beach | CA |
| 11/22/11 | Financial help for Family 14 | $5,763.83 | Solana Beach | CA |
| 11/22/11 | Financial help for Family 22 | $2,784.00 | League City | TX |
| 12/8/11 | Financial help for Family 23 | $800.00 | LaMirada | CA |
| 12/8/11 | Financial help for Family 24 | $3,546.12 | Albuquerque | NM |
| 12/17/11 | Financial help for Family 19 | $226.50 | Ames | IA |
| 1/10/12 | Financial help for Family 25 | $7,966.00 | Reseda | CA |
| 1/10/12 | Financial help for Family 26 | $3,663.44 | Carmichael | CA |
| 1/10/12 | Financial help for Family 27 | $497.56 | Los Angeles | CA |
| 1/12/12 | Financial help for Family 6 | $666.32 | Valley Village | CA |
| 1/12/12 | Financial help for Family 6 | $2,648.00 | Valley Village | CA |
| 1/12/12 | Financial help for Family 6 | $1,754.77 | Valley Village | CA |
| 1/12/12 | Financial help for Family 6 | $80.00 | Valley Village | CA |
| 1/12/12 | Financial help for Family 6 | $1,141.20 | Valley Village | CA |
| 1/17/12 | Financial help for Family 28 | $136.29 | Starkville | MS |
| 4/6/12 | Financial help for Family 28 | $81.16 | Starkville | MS |
| 4/20/12 | Financial help for Family 28 | $81.16 | Starkville | MS |
| 5/4/12 | Financial help for Family 28 | $80.33 | Starkville | MS |
| 5/18/12 | Financial help for Family 28 | $80.33 | Starkville | MS |

| DATE | GRANTS AWARDED | AMOUNT | CITY | STATE |
|---|---|---|---|---|
| 6/1/12 | Financial help for Family 28 | $80.33 | Starkville | MS |
| 6/16/12 | Financial help for Family 28 | $0.33 | Starkville | MS |
| 6/20/12 | Financial help for Family 28 | $80.00 | Starkville | MS |
| 6/29/12 | Financial help for Family 28 | $80.46 | Starkville | MS |
| 7/27/12 | Financial help for Family 28 | $80.46 | Starkville | MS |
| 8/24/12 | Financial help for Family 28 | $80.46 | Starkville | MS |
| 9/25/12 | Financial help for Family 28 | $80.46 | Starkville | MS |
| 10/23/12 | Financial help for Family 28 | $80.46 | Starkville | MS |
| 11/20/12 | Financial help for Family 28 | $80.46 | Starkville | MS |
| 12/18/12 | Financial help for Family 28 | $80.00 | Starkville | MS |
| 1/19/12 | Financial help for Family 29 | $2,648.53 | Santa Barbar | CA |
| 1/26/12 | Financial help for Family 30 | $138.13 | Jeffersonville | IN |
| 2/8/12 | Financial help for Family 12 | $770.00 | Sherman Oaks | CA |
| 2/8/12 | Financial help for Family 31 | $82.00 | Pomona | CA |
| 2/8/12 | Financial help for Family 32 | $277.00 | Mission Viejo | CA |
| 2/13/12 | Financial help for Family 33 | $171.93 | Long Beach | CA |
| 2/13/12 | Financial help for Family 11 | $975.00 | Studio City | CA |
| 3/2/12 | Financial help for Family 5 | $130.00 | Los Angeles | CA |
| 3/2/12 | Financial help for Family 34 | $230.00 | Los Angeles | CA |
| 3/2/12 | Financial help for Family 35 | $127.95 | Los Angeles | CA |
| 3/2/12 | Financial help for Family 31 | $286.00 | Pomona | CA |
| 4/4/12 | Financial help for Family 32 | $1,264.00 | | |
| 4/4/12 | Financial help for Family 5 | $125.00 | | |
| 4/4/12 | Financial help for Family 5 | $50.00 | Los Angeles | CA |
| 4/5/12 | Financial help for Family 36 | $540.00 | San Diego | CA |
| 4/5/12 | Financial help for Family 36 | $85.00 | | |
| 4/5/12 | Financial help for Family 36 | $113.00 | | |
| 4/5/12 | Financial help for Family 36 | $1,035.33 | | |
| 4/5/12 | Financial help for Family 36 | $109.70 | | |
| 4/9/12 | Financial help for Family 37 | $750.00 | Santa Monica | CA |
| 4/25/12 | Financial help for Family 25 | $46.54 | Reseda | CA |
| 4/25/12 | Financial help for Family 25 | $83.07 | Reseda | CA |
| 5/7/12 | Financial help for Family 31 | $158.00 | Pomona | CA |
| 5/15/12 | Financial help for Family 12 | $770.00 | Sherman Oaks | CA |
| 5/15/12 | Financial help for Family 11 | $1,700.00 | Studio City | CA |
| 6/1/12 | Financial help for Family 38 | $506.18 | Kentfield | CA |
| 6/11/12 | Financial help for Family 6 | $12.77 | Valley Village | CA |
| 6/11/12 | Financial help for Family 6 | $150.00 | Valley Village | CA |
| 6/11/12 | Financial help for Family 6 | $4,045.95 | Valley Village | CA |
| 6/11/12 | Financial help for Family 6 | $52.80 | Valley Village | CA |
| 6/13/12 | Financial help for Family 39 | $314.75 | Rockville | MD |
| 6/13/12 | Financial help for Family 25 | $6,400.00 | Reseda | CA |
| 6/13/12 | Financial help for Family 5 | $135.00 | Los Angeles | CA |
| 6/13/12 | Financial help for Family 5 | $120.00 | Los Angeles | CA |
| 6/14/12 | Financial help for Family 5 | $150.00 | Los Angeles | CA |
| 6/14/12 | Financial help for Family 14 | $828.36 | Solana Beach | CA |
| 6/15/12 | Financial help for Family 34 | $175.00 | Los Angeles | CA |
| 6/15/12 | Financial help for Family 34 | $15.00 | Los Angeles | CA |

| DATE | GRANTS AWARDED | AMOUNT | CITY | STATE |
|---|---|---|---|---|
| 6/15/12 | Financial help for Family 34 | $600.00 | Los Angeles | CA |
| 6/15/12 | Financial help for Family 31 | $400.00 | Pomona | CA |
| 6/15/12 | Financial help for Family 31 | $800.00 | Pomona | CA |
| 6/16/12 | Financial help for Family 40 | $413.00 | Philadelphia | PA |
| 7/3/12 | Financial help for Family 41 | $720.00 | Vista | CA |
| 7/3/12 | Financial help for Family 11 | $1,360.00 | Studio City | CA |
| 7/3/12 | Financial help for Family 42 | $240.00 | San Jose | CA |
| 7/11/12 | Financial help for Family 43 | $395.75 | Destrehan | LA |
| 7/16/12 | Financial help for Family 5 | $240.00 | Los Angeles | CA |
| 8/20/12 | Financial help for Family 43 | $966.70 | Destrehan | LA |
| 8/20/12 | Financial help for the Family 44 | $4,768.00 | East Troy | WI |
| 8/22/12 | Financial help for Family 15 | $30.00 | Tarzana | CA |
| 8/22/12 | Financial help for Family 15 | $70.00 | Tarzana | CA |
| 8/22/12 | Financial help for Family 15 | $700.00 | Tarzana | CA |
| 8/24/12 | Financial help for Family 25 | $36.12 | Reseda | CA |
| 8/29/12 | Financial help for Family 12 | $1,100.00 | Sherman Oaks | CA |
| 9/19/12 | Financial help for Family 31 | $5,000.00 | Pomona | CA |
| 9/19/12 | Financial help for Family 31 | -$5,000.00 | | |
| 9/20/12 | Financial help for Family 5 | $100.00 | Los Angeles | CA |
| 9/20/12 | Financial help for Family 5 | $150.00 | Los Angeles | CA |
| 9/20/12 | Financial help for Family 25 | $46.54 | Reseda | CA |
| 10/10/12 | Financial help for Family 63 | $1,967.87 | Bismarck | ND |
| 10/10/12 | Financial help for Family 63 | $32.13 | Bismarck | ND |
| 10/10/12 | Financial help for Family 63 | $1,000.00 | Bismarck | ND |
| 10/10/12 | Financial help for Fisher Family | $175.00 | Los Angeles | CA |
| 10/11/12 | Financial help for Family 45 | $2,116.58 | New Richmond | WI |
| 10/11/12 | Financial help for Family 45 | $1,751.62 | New Richmond | WI |
| 10/14/12 | Financial help for Family 16 | $840.00 | Russelville | AL |
| 10/25/12 | Financial help for Family 46 | $244.00 | Long Beach | CA |
| 10/31/12 | Financial help for Family 64 | $317.97 | Hartwell | GA |
| 10/31/12 | Financial help for Family 47 | $960.00 | Woodland Hills | CA |
| 11/14/12 | Financial help for Family 16 | $840.00 | Russellville | AL |
| 12/27/12 | Financial help for Family 5 | $125.00 | Los Angeles | CA |
| 6/28/13 | Financial help for Family 48 | $1,780.00 | Park City | UT |
| 01/15/2013 | Financial help for Family 28 | $80.00 | Starkville | MS |
| 01/30/2013 | Financial help for Family 11 | $164.00 | Studio City | CA |
| 01/31/2013 | Financial help for Family 11 | $450.00 | Studio City | CA |
| 02/05/2013 | Financial help for Family 11 | $340.00 | Studio City | CA |
| 02/05/2013 | Financial help for Family 11 | $1,324.00 | Studio City | CA |
| 02/08/2013 | Financial help for Family 43 | $523.20 | Destrehan | LA |
| 02/08/2013 | Financial help for Family 43 | $1,519.10 | Destrehan | LA |
| 02/12/2013 | Financial help for Family 28 | $150.56 | | |
| 02/15/2013 | Financial help for Family 14 | $2,475.00 | Sacramento | CA |
| 02/18/2013 | Financial help for Family 14 | $500.00 | Sacramento | CA |
| 03/07/2013 | Financial help for Family 65 | $3,619.95 | Northridge | CA |
| 03/12/2013 | Financial help for Family 28 | $80.64 | Starkville | MS |
| 03/15/2013 | Financial help for Family 11 | $105.00 | Studio City | CA |

Filed Under Seal

| DATE | GRANTS AWARDED | AMOUNT | CITY | STATE |
|---|---|---|---|---|
| 03/20/2013 | Financial help for Family 34 | $30.00 | Los Angeles | CA |
| 03/20/2013 | Financial help for Family 64 | $400.00 | | |
| 03/20/2013 | Financial help for Family 11 | $1,870.00 | Studio City | CA |
| 03/20/2013 | Financial help for Family 34 | $2,662.20 | Los Angeles | CA |
| 03/21/2013 | Financial help for Family 15 | $60.00 | Tarzana | CA |
| 03/21/2013 | Financial help for the Family 50 | $1,104.75 | San Francisco | CA |
| 03/21/2013 | Financial help for Family 11 | $2,643.00 | Studio City | CA |
| 03/22/2013 | Financial help for Family 64 | $299.00 | Hartwell | GA |
| 03/30/2013 | Financial help for Family 15 | $30.00 | Tarzana | CA |
| 04/03/2013 | Financial help for Family 15 | $100.00 | Tarzana | CA |
| 04/03/2013 | Financial help for Feingold Family | $297.00 | Mission Viejo | CA |
| 04/03/2013 | Financial help for Family 48 | $784.00 | Park City | UT |
| 04/04/2013 | Financial help for Family 50 | $212.50 | San Francisco | CA |
| 04/09/2013 | Financial help for Family 28 | $80.64 | Starkville | MS |
| 04/11/2013 | Financial help for Family 51 | $1,535.20 | Golden Valley | AZ |
| 04/16/2013 | Financial help for Family 15 | $100.00 | Tarzana | CA |
| 04/19/2013 | Financial help for Family 50 | $90.38 | San Francisco | CA |
| 04/19/2013 | Financial help for Family 15 | $2,300.00 | Tarzana | CA |
| 05/07/2013 | Financial help for Family 28 | $80.64 | Starkville | MS |
| 05/08/2013 | Financial help for Family 26 | $500.00 | Carmichael | CA |
| 05/09/2013 | Financial help for Family 48 | $1,618.00 | Park City | UT |
| 05/16/2013 | Financial help for Family 50 | $116.28 | San Francisco | CA |
| 05/30/2013 | Financial help for Family 50 | $731.25 | San Francisco | CA |
| 05/31/2013 | Financial help for Family 51 | $190.60 | Golden Valley | AZ |
| 05/31/2013 | Financial help for Family 53 | $1,266.30 | Beverly Hills | CA |
| 06/05/2013 | Financial help for Family 28 | $80.64 | Starkville | MS |
| 06/11/2013 | Financial help for Family 54 | $500.00 | Norman | AR |
| 06/26/2013 | Financial help for Family 50 | $125.21 | San Francisco | CA |
| 06/28/2013 | Financial help for Family 5 | $85.00 | Los Angeles | CA |
| 06/28/2013 | Financial help for Family 15 | $160.00 | Tarzana | CA |
| 06/28/2013 | Financial help for Family 50 | $425.00 | San Francisco | CA |
| 07/09/2013 | Financial help for Family 28 | $80.64 | Starkville | MS |
| 07/25/2013 | Financial help for Family 16 | -$840.00 | Russelville | AL |
| 07/25/2013 | Financial help for Family 16 | $840.00 | Russelville | AL |
| 07/25/2013 | Financial help for Family 11 | $1,200.00 | Studio City | CA |
| 07/25/2013 | Financial help for Family 47 | $1,380.00 | Woodland Hills | CA |
| 08/23/2013 | Financial help for Family 70 | $4,576.71 | North Hollywood | CA |
| 08/31/2013 | Financial help for Family 50 | $425.00 | San Francisco | CA |
| 09/04/2013 | Financial help for Family 69 | $895.00 | Norman | OK |
| 09/09/2013 | Financial help for Family 16 | $840.00 | Russelville | AL |
| 10/05/2013 | Financial help for Family 31 | $6,000.00 | Pomona | CA |
| 11/01/2013 | Financial help for Family 15 | $320.00 | Tarzana | CA |
| 11/02/2013 | Financial help for Family 15 | $30.00 | Tarzana | CA |
| 11/14/2013 | Financial help for Family 7 | $199.13 | Kensington | CA |
| 11/19/2013 | Financial help for Family 68 | $500.00 | Middlebury | IN |
| 02/04/2013 | Shire Program Speaker | $6,330.00 | Valley Village | CA |

| DATE | GRANTS AWARDED | AMOUNT | CITY | STATE |
|---|---|---|---|---|
| 07/16/2013 | 7/28/2013 Event in L.A./Shire Speaker Program | $343.80 | Los Angeles | CA |
| 08/07/2013 | Shire Program Speaker | $177.05 | | |
| 12/10/2013 | Financial help for Family 50 | $511.00 | San Francisco | CA |
| 1/22/14 | Financial help for Family 50 | $511.00 | San Francisco | CA |
| 2/12/14 | Financial help for Family 5 | $135.00 | Los Angeles | CA |
| 2/12/14 | Financial help for Family 5 | $65.00 | Los Angeles | CA |
| 2/12/14 | Financial help for Family 11 | $7,420.00 | Studio City | CA |
| 2/12/14 | Financial help for Family 17 | $1,444.00 | LaHonda | CA |
| 2/12/14 | Financial help for Family 17 | $156.00 | LaHonda | CA |
| 3/10/14 | Financial help for Family 56 | $575.50 | Mills | WY |
| 3/18/14 | Financial help for Family 57 | $1,562.00 | St. Louis | MO |
| 3/21/14 | Financial help for Family 50 | $511.00 | San Francisco | CA |
| 3/25/14 | Financial help for Family 58 | $725.00 | Phoenixville | PA |
| 3/25/14 | Financial help for Family 58 | $685.00 | Phoenixville | PA |
| 3/25/14 | Financial help for Family 58 | $198.00 | Phoenixville | PA |
| 4/15/14 | Financial help for Family 50 | $511.00 | San Francisco | CA |
| 5/8/14 | Financial help for Family 59 | $3,350.00 | Houston | TX |
| 8/8/14 | Financial help for Family 67 | $282.00 | Newburgh | NY |
| 8/11/14 | Financial help for Family 11 | $510.00 | Studio City | CA |
| 9/23/14 | Financial help for Family 50 | $511.00 | San Francisco | CA |
| 11/12/14 | Financial help for Family 66 | $504.00 | Bakersfield | CA |
| 11/12/14 | Financial help for Family 47 | $43.28 | Simi Valley | CA |
| 11/12/14 | Financial help for Family 47 | $94.09 | | |
| 11/24/14 | Financial help for Family 50 | $511.00 | San Francisco | CA |
| 11/24/14 | Financial help for Family 50 | $511.00 | San Francisco | CA |
| 12/4/14 | Financial help for Family 5 | $130.00 | Los Angeles | CA |
| 3/16/15 | Financial help for Family 25 | $118.53 | Reseda | CA |
| 3/16/15 | Financial help for Family 25 | $222.69 | Reseda | CA |
| 3/16/15 | Financial help for Family 25 | $46.54 | Reseda | CA |
| 1/7/15 | Financial help for Family 50 | $511.00 | San Francisco | CA |
| 3/16/15 | Financial help for Family 50 | $1,022.00 | San Francisco | CA |
| 3/19/15 | Financial help for Family 60 | $4,000.00 | Robstown | TX |
| 3/20/15 | Financial help for Family 61 | $780.00 | Ogden | UT |
| 3/20/15 | Financial help for Family 16 | $118.40 | Russelville | AL |
| 3/20/15 | Financial help for Family 16 | $50.03 | Russelville | AL |
| 4/3/15 | Financial help for Family 16 | $919.85 | Russelville | AL |

276. The Aubrey Rose Foundation soon became quite popular with GD patients because it was different from other Charitable Foundations. There were very few financial qualifications and almost everyone could qualify to use it, and it paid for expenses that other Charitable Foundations would not cover. All the Shire PAMs were aware of the Aubrey Rose Foundation and used it accordingly with their GD patients.

277. The Shire OnePath Customer Service team promoted the Aubrey Rose Foundation at patient meetings and when they had phone calls with patients.

278. Shire donated thousands of dollars to the Aubrey Rose Foundation so that patients would conduct Patient Ambassador programs or appear in its marketing materials without having to go through the approval process of Shire's compliance department.

279. On October 5, 2012, Dan McNamara requested Partner A to contact the Aubrey Rose Foundation and ask that they make an exception for a patient in New York. This patient was upset that he had paid many bills and found out these could not be reimbursed through the Foundation. McNamara asked that Partner A intervene with Nancy Hollenkamp, the founder of the Foundation. Partner A did so, and the Aubrey Rose Foundation then agreed to cover Davidson's bills.

280. Everyone selling VPRIV at Shire utilized the Aubrey Rose Foundation. When these employees had regional business meetings, they also discussed all resources available to patients at Shire. Senior Shire managers Dan McNamara (Director of Patient Services), Sean Ring (Senior Director), and Mike Blum (Vice President) encouraged use and funding for this Foundation.

281. On multiple occasions, the Foundation emailed Partner A to communicate that its funding was running low. Partner A then called Dan McNamara and told him the information. He instructed Partner A to have the Foundation write a letter to Shire, making a request for additional funds. McNamara said it would be faster if the Foundation sent such requests to Partner A, after which Partner A could mail those requests to Shire into an unmarked plain envelope to the attention or Mr. McNamara or to the attention of Mike Blum. Partner A did this on several occasions per McNamara's instructions.

282. Shire also used its relationships with Charitable Foundations as a means to bypass legal limits on patient reimbursement by Medicare.

283. In one example, Shire assisted a GD patient and Medicare beneficiary in receiving her VPRIV treatment at home, something that Medicare Part B would not cover.

284. To get around the Medicare Part B limitation, and in order to retain the patient as a VPRIV patient, Shire agreed that it would have the $1 million in VPRIV annual costs submitted through Medicare Part D. However, this meant that the patient would still be responsible for a 10% Part D copayment of some $100,000 per year. To resolve this issue, and in an effort to conceal its illegal VPRIV kickback, Shire funneled the $100,000 copayment to the patient through the Aubrey Rose Foundation as a charitable contribution.

### J. Natpara: Shire's Hypoparathyroidism Drug

#### 1. Background on Hypoparathyroidism ("HPT")

285. HPT is decreased function of the parathyroid glands with underproduction of parathyroid hormone, leading to low levels of calcium in the blood and often causing cramping and twitching of muscles or tetany (involuntary muscle contraction).

286. HPT can be inherited, but it is also encountered after thyroid or parathyroid gland surgery, and it can be caused by immune system-related damage as well as a number of rarer causes. The diagnosis is made with blood tests, and other investigations such as genetic testing depending on the results. The treatment of hypoparathyroidism is limited by the fact that there is no exact form of the hormone that can be administered as replacement. Most patients achieve control of their HPT condition through ingestion of calcium and vitamin D supplements. Natpara is the first FDA-approved HPT treatment.

## 2. *Natpara and Its OTC Competition*

287. Natpara is the first and only FDA-approved hormone replacement therapy indicated for the treatment of HPT. Annual treatment costs for Natpara are approximately $125,000. Natpara is administered as a once-daily injectable in the patient's thigh and the starting dose is 50 mcg. Patients and caregivers may administer the drug, but should receive training and instruction from a trained health care professional.

288. The only other treatment for HPT is with over-the-counter ("OTC") and much cheaper doses of calcium and vitamin D supplements. Many HPT patients are well-controlled on OTC supplements.

289. Compared to calcium and vitamin D supplements, Natpara is quite dangerous. Natpara use carries a significant risk of osteosarcoma, or bone cancer. As a result, the FDA has placed a "black box" warning (the most significant type of warning) on Natpara's label. Included in the black box warning is the following prescribing restriction: "Because of the potential risk of osteosarcoma, prescribe NATPARA only to patients who cannot be well-controlled on calcium and active forms of vitamin D and for whom the potential benefits are considered to outweigh the potential risk."

290. The FDA also mandated a Risk Evaluation and Mitigation Strategy ("REMS") for Natpara as part of its approval.[77] The goal of the FDA's Natpara REMS program is to "inform prescribers, pharmacists, and patients about the potential risk" of Osteosarcoma from using Natpara.[78]

---

[77] Shire-NPS Pharms., Inc., *NATPARA REMS Program*, http://www.natpararems.com/ (last visited Nov. 22, 2021).

[78] *Id.*

291.     The REMS Program for Natpara requires prescribers to complete several steps. First, prescribers must receive training and pass a Knowledge Assessment relating to Natpara and enroll in the Natpara Rems program.[79]   This is a "certification" requirement of all potential prescribers of Natpara.  Second, prescribers must counsel patients on the benefits and risks of Natpara prior to prescribing it.[80]   Third, prescribers must fill out and complete a Natpara REMS Program Patient Prescriber Acknowledgment Form ("PPAF") for each patient prior to the initiation of treatment.[81]   Fourth, prescribers must provide patients with a copy of the signed PPAF as well as the Natpara REMS: Patient Brochure.[82]

292.     The Natpara REMS Program also contains requirements for pharmacists. Pharmacies acting through a designated Pharmacy Representative must complete training including the Natpara Knowledge Assessment and enroll in the Natpara REMS Program similar to prescribers.[83]   Pharmacies must also implement staff training and processes to comply with the Natpara REMS Program, including: (a) verifying that all prescribers are certified in the Natpara REMS Program; and (b) verifying that the Natpara PPAF is on record for each patient and prescriber.[84]

293.     Despite the limited patient population and prescribing restrictions, Shire has turned Natpara into a successful franchise.  Natpara's sales have consistently and significantly increased for each year since launch.  Natpara sales were $24.4 million in 2015 (a partial year), $85.3 million

---

[79] *Id.*

[80] *Id.*

[81] *Id.*

[82] *Id.*

[83] *Id.*
[84] *Id.*

in 2016, and $147.4 million in 2017. For the first half of 2018, Natpara sales amounted to $105.6 million, on pace for over $200 million in sales for the entire year.

294. There are only about 75,000 HPT patients in the United States, and only a fraction of those are unable to achieve control of their HPT through over-the-counter calcium and vitamin D supplements.

295. In fact, the ability of the vast majority of HPT patients to control their HPT through calcium and vitamin D supplements has been established during the recent September 2019 nationwide Natpara recall affecting all doses. Takeda and the FDA have set up a "special use" program for certain Natpara patients who are unable to achieve control over their HPT on calcium and vitamin D. In a letter to patients, Takeda itself wrote that, "[i]t is anticipated that an extremely small number of patients prescribed NATPARA may be eligible for this very limited program." In a similar letter to physicians, Takeda outlined that the special use program is for patients facing "severe health consequences" as a result of an inability to access Natpara. In other words, only a very limited number of patients truly need Natpara compared to calcium and vitamin D supplements.

296. As a result of the small patient population for whom Natpara's benefits outweigh the risks and who meet the REMS requirements set forth above, the prescribing community is also quite small for Natpara, mostly limited to a handful of specialist endocrinologists. And REMS-certified prescribers number only in the hundreds. In 2016, only about 100 prescribers had submitted any claims to Medicare for Natpara.

297. Shire was acutely aware of this concentration in the market and deliberately focused its efforts on generating individual leads and incentivizing the sales force to aggressively hunt those leads.

298. According to Shire's incentive compensation structure, RBMs would earn up to $1,800 for each new patient "Start Form" (*i.e.*, enrollment in Shire's OnePath program) and up to $2,000 for each "Patient Addition" (commencement of therapy). These bonuses have been effectively uncapped and have created substantial incentive for Shire's sales force to aggressively target patients for Natpara, including in situations where such use was unwarranted.

299. Each sales force employee has access to a "NATPARA Real Time Opportunity Report" that provides the physician information (including name, address, specialty, individual prescribing NPI and ME numbers), the date the lead was generated, and flags as to the individual patient for hypoparathyroidism or hypocalcemia.

300. Sales employees have been trained to discuss each lead with the physician, and to encourage the physician to have the patient enroll in OnePath by completing a Start Form. For example, on one field ride in or around mid-2018, Partner B called on a physician whom Partner B knew had five recently-loaded Natpara leads in the system. Partner B was able to discuss each lead with the physician and was trained and incentivized to gather as much information about the patients as possible to later be able to claim their Start Form bonuses when those patients eventually submitted a Start Form. Indeed, at National Sales Meeting from May 9-11, 2018, Shire management stressed that the sales force had to enter such sales call details into Shire's call notes system ("Veeva"), including as much information about each lead as possible in order to gain credit.

301. Shire's data has been so detailed that sales representatives have been coached to be deceptive about just how much information they knew about the physician's patients and where Shire obtained that information. If a sales force employee was discussing an individual patient, for example, that sales force employee was trained to lie to the physician by stating that the patient had contacted Shire about Natpara when that was not true.

Filed Under Seal
91

### 3. *Once Enrolled in OnePath, Shire Pressures Patients and Physicians to Commence Natpara Therapy*

302. Shire's OnePath program has been a critical component of Shire's illegal efforts to get patients on therapy and secure copayment assistance. Once cajoled into signing up for OnePath, Shire has increased the pressure to actually commence Natpara therapy.

303. The primary tool for tracking prospective and on therapy Natpara patients has been Shire's Commercial Dashboard, which provides a detailed status of every patient or prospective patient who signed or was pressured into signing a OnePath Start Form. Partner B had access to each patient's information across the country.

304. Shire's Natpara Commercial Dashboard contains notes on direct contact between Shire employees and prospective patients. Shire employees have been directed to make what Shire refers to as "persistency calls" to prospective patients designed to pressure them into commencing Natpara therapy.

305. The following is a sample of data from Shire's Commercial Dashboard notes for some of these Medicare "Never Started" or "In Process" patients including communications with the patients' physicians or medical doctor's office ("MDO"). These notes show Shire's aggressive pull-through efforts including contacting patients' physicians even after the patient himself or herself expressed no interest in Natpara, multiple Shire personnel all reaching out with "persistency calls" and generally "pressuring" these prospective leads and their physicians:

| Patient Initials | Patient Primary Insurance Name | Case Status | Case Disposition Notes | Triad Notes |
|---|---|---|---|---|
| LD | Medicare | Never Started | 3/2/16 - CG - Referral was received by NPS in August 2015. System shows patient received one ship but was never trained. Patient was unresponsive to NPS. Patient has also been unresponsive to OnePath. Several calls were made to patient and MDO; no | |

| Patient Initials | Patient Primary Insurance Name | Case Status | Case Disposition Notes | Triad Notes |
|---|---|---|---|---|
| | | | response. It was agreed on today's triad to close case. | |
| DW | Medicare | Never Started | 6/3/16 JAG SPOKE W/ PT. SHE DOES NOT WANT TO MOVE FORWARD DUE TO THE POTENTIAL RISK OF BONE CANCER. HER EXACT WORDS "I WOULD HAVE TO BE CRAZY TO GO ON A MEDICATION THAT COULD GIVE ME CANCER". I LEFT A MESSAGE FOR THE MOD (MEGAN AND GINGER) AND ALSO LM FOR ABS | |
| DB | Medicare | Never Started | 8/16/16 DLC - Patient has expressed she's not interested on multiple occasions and feels we are pressuring her. She does not wish to be contacted further by OnePath. | |
| CG | Medicare | Never Started | 8/30/16 RID - Spoke with pt who currently has no interest in starting Natpara, will talk with Dr. Thompson and if something changes they will reach out. CM closing case. | |
| AK | Medicare | In Process | 2/23/18-NSH- Pt off therapy. PC to pt cell, left msg requesting return call. *last ship 8/15/17. PC to MDO, left a msg requesting return call from Danielle. -PSM to cont to f/u re: pt status | 11/10/17 SJW - PSM spoke with Pt. Pt is still off therapy. Pt has had several labs done since the bePatient AAing of Oct and MD wants her off Natpara for the time being. PSM will f/u with Pt again in 6 wks to check situation. |
| LR | Medicare | In Process | 2-1-2018-ND-RBM Action Item: RBM reports that the MDO will have the pt come in Mid January for an appt and MDO will assess the next steps. PSM to follow up with the triad by the end of the month February. On 2/1 PAM reports The patient cancelled her appointment. They are aware and working on updating labs. Patient's next appointment is | |

Filed Under Seal

93

| Patient Initials | Patient Primary Insurance Name | Case Status | Case Disposition Notes | Triad Notes |
|---|---|---|---|---|
| | | | not until April, however, Maribel is going to call the patient to see if she come in before that. | |
| SD | Medicare | In Process | 2/14/2018 - MB - PSM spoke with patient to complete persistency check in. Patient still remains off therapy at this time. Pt sees endo again this month and will see if this is something that still needs to be revisited in the future. PSM and Pt agreed to check in again in 6 weeks, 3/28/2018. | |
| CW | Medicare | In Process | 2/14..sl Per our Triad call PAM will reach out to the MDO- Update: email rec PAM Spoke to receptionist and gave detailed message. She knew were trying to get information to Natalie about this patient. Contact numbers for The PSM were provided to the office. | In process- Per our triad call today- RBM will reach out to the MDO - |
| TH | Medicare | In Process | 1/24/18 - MB - PSM spoke with patient who remains off therapy at this time. She has secured a new endo who is not currently REMS certified. Pt will be seeing new endo again on 4/3/18 and will discuss initiating therapy then. PSM will work with RBM to get new MDO certified and referral forms on hand. Will f/u with patient after appt to check in, 4/18/2018. | |
| SD | Medicare | In Process | 1/3/17 SKD - PSM s/w patient and patient advised that she and her MD spoke and have decided to hold off on therapy for right now. She has a follow up appointment in April and said to check back with her then. PSM to f/u with patient again mid-April. | |
| TP | Medicare | In Process | 2/23/18-NSH- PC to pt cell. Pt remains off therapy with no plans to restart. *last ship 11/30/17. -PSM to cont to f/u with pt | 5/22/17 AC Triad Owner: PSM Action Item: Follow up with the patient for denial letters. 6/5/17 Per triad, |

Filed Under Seal

| Patient Initials | Patient Primary Insurance Name | Case Status | Case Disposition Notes | Triad Notes |
|---|---|---|---|---|
| | | | | PSM to send unreachable letter to the patient. RBM and PAM to speak with MDO. |
| DT | Medicare | In Process | 3/1/18, JD - PSL has been trying to reach PT re: therapy status. Spoke with Josh again at MDO, who stated he would send another msg to MD re: status. Next f/u in one week. | RBM - F/U with MDO re: PT status. |

306.    As these records indicate, patients felt they were "being pressured," but Shire continued to contact them and their physicians regarding Natpara therapy even after being advised that the patient was not interested in taking the drug.

307.    Shire's sales force contacts, including the Patient Support Manager ("PSM"), the PAM, the CM, and RBM, were all directed to contact potential patients. For example, the notes from May 2017 for one Tacoma, Washington "Never Started" patient with the initials ST stated: "Despite aggressive outreach attempts patient has not returned call of PAM or PSM or SP."

308.    These aggressive outreach attempts are in part a response to the way PAMs and other Shire sales force employees are incentivized. For any new account with new Natpara patients, a PAM is sent to the prescriber's office within five (5) days to begin the process of ensuring that the patient ends up actually receiving Natpara. PAMs are incentivized based on "turnaround times" for patients—in other words, how quickly the PAM can get reimbursement or copayment assistance lined up, or prior authorization forms approved. In addition, as stated above, each patient addition could earn the sales representative up to $2,000, and such patient addition bonuses could only be earned from patients who had submitted OnePath Start Forms.

309.    Patients enrolled in OnePath were also viewed as low hanging fruit as Shire could target them and their physicians directly.

**4.** *Shire's Charitable Copayment Assistance Payments for HPT Patients Were Kickbacks*

310. OnePath enrollment has allowed Shire's personnel to assist in referring patients to various financial assistance programs to receive Shire money earmarked for its own patients.

311. A small number of Charitable Foundations, including NORD, PSI, TAF, and the Hypoparathyroidism Association, Inc. ("HPTAI"), received millions of dollars from Shire that were earmarked for assisting specifically HPT patients cover their copayments.

312. The following table contains a full list of Shire contributions from Q1 2015 through Q3 2018 related to HPT, totalling $7,708,250:

| Charitable Foundation | Shire Description | Period | Amount |
|---|---|---|---|
| Patient Services, Inc. | Hypoparathyroidism Program | Q4 2015 | $1,000,000 |
| The Assistance Fund | Parathyroid Diseases Financial Assistance Program | Q1 2016 | $1,000,000 |
| Hypoparathyroidism Association, Inc. | Organization Support | Q3 2016 | $40,000 |
| Patient Services, Inc. | Hypoparathyroidism Private Assistance | Q1 2018 | $450,000 |
| The Assistance Fund | Parathyroid Diseases Financial Assistance Program | Q1 2018 | $250,000 |
| Patient Services, Inc. | 2018 Hypoparathyroidism Public Assistance | Q2 2018 | $312,000 |
| The Assistance Fund | Parathyroid Diseases Financial Assistance Program | Q3 2018 | $500,000 |
| Patient Services, Inc. | Hypoparathyroidism Public Assistance Program | Q3 2018 | $487,500 |
| Patient Services, Inc. | Hypoparathyroidism Public Assistance Program | Q1 2019 | $450,000 |
| Patient Services, Inc. | Hypoparathyroidism Private Assistance | Q1 2019 | $262,500 |
| The Assistance Fund | Parathyroid Diseases Financial Assistance Program | Q1 2019 | $250,000 |
| Patient Services, Inc. | Hypoparathyroidism Public Assistance Program | Q2 2019 | $1,000,000 |
| Patient Services, Inc. | Hypoparathyroidism Private Assistance | Q2 2019 | $875,000 |

Filed Under Seal

96

| Charitable Foundation | Shire Description | Period | Amount |
|---|---|---|---|
| Patient Services, Inc. | Hypoparathyroidism Public Assistance Program | Q2 2019 | $225,000 |
| The Assistance Fund | Parathyroid Diseases Financial Assistance Program | Q2 2019 | $125,000 |
| Patient Services, Inc. | Hypoparathyroidism Public Assistance Program | Q3 2019 | $225,000 |
| Patient Services, Inc. | Hypoparathyroidism Private Assistance | Q3 2019 | $131,250 |
| The Assistance Fund | Parathyroid Diseases Financial Assistance Program | Q3 2019 | $125,000 |

313.    Because Natpara and OTC calcium and Vitamin D supplements are the only HPT treatments, these Shire "donations" were effectively reserved for Shire Natpara patients and meant to induce prescribing behavior, in particular for patients who were well-controlled on OTC supplements and for whom Natpara's sticker price would have been an impediment. By defining its disease funds to include only HPT, Shire has effectively subsidized use of Natpara, including among Government Health Care Program patients.

314.    Confidential Informant No. 8 ("CI-8") worked as a senior patient support manager at Takeda from January 2019 to November 2020 and prior to that as a senior patient support manager at Shire from May 2016 to November 2020. She was part of the Natpara patient support team based in Lexington, Massachusetts. According to CI-8, Shire regularly alerted its Natpara patient services managers when it had donated to a Charitable Foundation, resulting in a mad rush as Shire's patient support employees frantically called patients and told them to get in touch with the charity and apply for assistance. Each member of the Natpara team called patients immediately when funds were replenished, urging them to visit the organization's website and apply.

315.    Annual Natpara therapy costs are approximately $125,000 per year, compared to OTC calcium and vitamin D supplements at a fraction of the cost. Thus, from a financial standpoint, Shire was faced with a hard sell for Natpara, especially among patients who faced a

significant copayment (*e.g.*, Medicare patients) or whose condition was already well-controlled on OTC supplements.

316.    As a result, Shire's Charitable Foundation money became a key selling point during Shire's interactions with patients enrolled in OnePath.  And Shire's personnel were aggressive in providing patients with information about access to foundation money because they were incentivized by several thousand dollars per patient addition to therapy.

317.    Shire thus provided financial assistance using Charitable Foundations as conduits for Natpara prescriptions paid for by Government Health Care Programs.

318.    It became routine for Shire sales representatives to discuss access to Charitable Foundation assistance.  For example, the OnePath Guidance form stated that an "example of services available to eligible patients through OnePath" included "Co-Pay Support (when applicable) and information about third-party financial assistance programs, as necessary."

319.    Indeed, the free-text notes section of Shire's Commercial Dashboard is replete with references to such conversations between and among Shire personnel and Medicare patients.  These conversations reveal Shire's crucial role in helping Natpara Medicare patients to receive Shire's charitable PAP donations.  The following is a selection of some of these notes for Medicare patients, with emphasis added in red:

| Patient Initials | Patient Primary Insurance Name | Case Status | Case Disposition Notes | Triad Notes |
|---|---|---|---|---|
| DB | Medicare | On Therapy | 1/25/18-BA- Pt is doing well and has no concerns. Pt has no changes in MD, address, ins or dose. Pt re-enrolled in co-pay program. *Last ship 1/4/18- PSM to cont to f/u with pt. | Completed |

| Patient Initials | Patient Primary Insurance Name | Case Status | Case Disposition Notes | Triad Notes |
|---|---|---|---|---|
| JL | Medicare | On Therapy | 11/14/17 KES: Medicare/AARP Med Supp/PBM: SilverScript Caremark Med D/SPP: CVS; last 11/9/PSI Current? PA on file through 6/18. VM for pt to return call to confirm PSI and request updates with insurance and demographics for 2018. NEXT: Continue Persistency to assess access-related needs and assist as indicated. Confirm PSI; application for 2018. | CM/PAM to follow up with payer and MD office on PA renewals for two cases below. Follow up to happen as PA expiring in next two months. |
| JH | Medicare | Never Started | 9.21.16-CN- Informed by PAM DK to close out case. She spoke with the patient this week and meet with MD yesterday. Patient does not want to move forward bc of cost of drug and not getting approved for PSI. Next steps: close case. | |
| JW | Medicare | Never Started | 10/28..sl per our triad call on 10/27..patient not interested due to financial oop costs. patient not qualified for PSI and will not move forward unless her medication does not cost anything. OK to close case per Triad. | |
| VS | Medicare | On Therapy | 12/1/17 KES: Med D/NO LIS. TAF-pt reports reapplied for 2018; pt to return call with approval update. Spoke with pt; pt reports successfully scheduled next shipment | |

| Patient Initials | Patient Primary Insurance Name | Case Status | Case Disposition Notes | Triad Notes |
|---|---|---|---|---|
| | | | (3-month supply) and no other access-related issues notes. Pt has product on hand.<br>NEXT: Forwarded UPS to pt re: follow up and continue Persistency to continue to assess access-related issues. | |
| GE | Medicare | On Therapy | 2/5/18 SJW - PSM confirmed with Pt that she got a shipment after the lack of funding with the 501c3 situation. Pt stated that she was notified that funding came through and was able to get shipment. PSM will f/u with Pt week of 2/19 to ensure no issues with next shipment. | |
| CG | Medicare | On Therapy | 2-20-18 DD - PSM emailed pt for persistency call. Next call in 6 weeks, on 4-3-18. | Complete<br>6-15-17 DD - PSM to req BI to Lash as urgent process - PA in place. Req another EAP . Call pt - PSI needed- 33%. SP. |
| JP | Medicare | On Therapy | 1/30/18 SKD - PSM called patient for persistency follow up. LVM requesting a return call. PSM to f/u with patient again in 1 week if no response. | 2/23/18 SKD - Patient waiting on 501C3 assistance to schedule next shipment. PSM checked status today, and both 501C3's still do not have funding. PSM to check back again by 3/9/18 |
| BV | Medicare | Never Started | 7/28..sl spoke to the PAM- (J.S) Per MD patient is no longer interested in Natpara therapy. Patient hs medicare part D plan and oop cost to high- Pt did not qualify for PSI /TAF. | Closed case per PT- spoke to the PAM- per MD pt is not moving forward with treatment of Natpara. per Triad ok to close case |

Filed Under Seal

| Patient Initials | Patient Primary Insurance Name | Case Status | Case Disposition Notes | Triad Notes |
|---|---|---|---|---|
| | | | as income was to high. OK to close out case | |
| DS | Medicare | On Therapy | 12/7/17 KES: CURRENT: Medicare A,B (NO D)/Secondary Med: CHAMPVA/Optum RX/CVS. Pt reports approved PSI. Last ship 12/4/17. 10/23: Pt confirmed all above and will reach out to PSI to follow up 2018 approval status. Pt reports CVS ships without issue and has logistics to allow for rescheduling. 12/7: Pt returned call to PSM and reports no access-related issues. NEXT: Assess access-related needs, and assist as indicated consistent with new ON THERAPY status. | |
| HS | Medicare | On Therapy | 1/11/2018 MH- PSM spoke to patient and she is having SP issues with her co-pay. PSM requested a EAP and will check SP issues on 1/12. | 8/22/17- PSM will check in with pt on her PSI status. |
| AJ | Medicare | On Therapy | 2/14/18 - CG - PSM confirmed w/project manager that we cannot send free product as PT awaits funding. PSM let MDO/PT know. PSM will advise MDO/PT as soon as we learn from CVS (or otherwise) that funding is available. As of today, PT states she has 7 or 8 days of drug on-hand. | |

Filed Under Seal

| Patient Initials | Patient Primary Insurance Name | Case Status | Case Disposition Notes | Triad Notes |
|---|---|---|---|---|
| | | | PT reports no changes or issues. | |
| CC | Medicare | On Therapy | 1/23/18 NB called and spoke with PT to complete persistency call. PT reported no issues with daily injections. Next shipment scheduled for 1/25 and PT stated she has medication on hand. PT stated PSI did not cover copay advised PT to contact PSI regarding coverage. Next steps PSM to call PT on 3/6 to complete persistency call. | |
| EH | Medicare | In Process | 12/20/17 AC Called Walgreens with the patient. They ran a test claim and the patient did not meet OOP max. Walgreens does not have any other resources available to help the patient. The patient agreed to apply for TAF and PSI in January 2018. | 12/19/17 Triad PSM to call Walgreens with the patient. Complete. |
| RH | Medicare | In Process | 12/28/2017-MH- PA approved but pt is a medicare patient with a high co-pay. With no funding currently available case will be put on hold and triad will discuss options in the new year. | 11/17/17- IV sent back for corrections. PSM update triad when IV is completed. |
| CK | Medicare | In Process | 2/16..sl NO updates PT waiting for the 501 c assistance program to reopen to apply for oop. PSM will f/u with PT | In process- case on hold per PT- 501c program not open for new PT enrollment as of yet. |

Filed Under Seal

| Patient Initials | Patient Primary Insurance Name | Case Status | Case Disposition Notes | Triad Notes |
|---|---|---|---|---|
| EH | Medicare | In Process | 2/20..sl PT has government plan- PT is waiting on the 501c programs to reopen- PT training has been placed on hold per Pt. | in process- per our triad call on 2/5..In process- NO updates PT waiting for the 501 c assistance program to reopen to apply for oop. PSM will f/u with PT |
| WE | Medicare | In Process | 12.7 PSM advises PSM SF that he spoke again with patient who is comfortable with the plan of PAM/PSM monitoring the foundation and providing pt with updates. Pt agrees to also look at foundation website. | 1.16.18 PAM will continue to monitor the assistance funds |
| FJ | Medicare | In Process | 2.12.2018-cn- TAF and PSI remain closed. next steps: f/u with pt when TAF/SPI opens. | 2.12.2018-cn- TAF and PSI remain closed. next steps: f/u with pt when TAF/SPI opens. |
| DA | Medicare | In Process | 12/12/17-BA- Pt Aunt called for copay assistance and are unable to enroll to 501c3s as they are closed. PAM will follow up if pt aunt can apply online. PT aunt rpt to wait for the new year. - PSM to cont to f/u on stat | 2/20/18-BA- PAM rpt on 2/15 that MDO was unaware that pt has not yet accessed therapy. PAM provided MDO with an update that pt is pending 501c3 assistance. -PAM will f/u with pt to discuss LIS option. -PAM will provide update. 2/6/18-BA- PA was approved. PSM has left multiple msg with pt Aunt regarding applying for 501c3 and no return PC. - Per RBM, RBM will f/u with MDO to confirm if pt is still motivated. |
| AH | Medicare | On Therapy | 1/12/18 AC The patient called as she tried to refill her Rx with Accredo and was told she has a $2,000 copayment. Her insurance is Medicare Part | 12/19/17 Triad PSM to call the patient to schedule shipment. Complete. |

| Patient Initials | Patient Primary Insurance Name | Case Status | Case Disposition Notes | Triad Notes |
|---|---|---|---|---|
| | | | D. Provided her the phone numbers for PSI and TAF. | |
| MJ | Medicare | In Process | 2.12.2018-cn- TAF and PSI remain closed. next steps: f/u with pt when TAF/SPI opens. | 2.12.2018-cn- TAF and PSI remain closed. next steps: f/u with pt when TAF/SPI opens. |
| NG | Medicare | In Process | 1/26/18 SKD - Patient's shipment is ready to go out but patient has not qualified for 501C3 assistance yet due to both assistance funds being temporarily closed. PSM previously s/w patient and advised her to continue to calling the funds each week to apply. Once 501C3 assistance is in place, patient will move forward with ordering her shipment. PSM to check back next week for any updates. | 1/26/18 SKD - Patient's shipment is ready to go out but patient has not qualified for 501C3 assistance yet due to both assistance funds being temporarily closed. PSM previously s/w patient and advised her to continue calling the funds each week to apply. Once 501C3 assistance is in place, patient will move forward with ordering her shipment. PSM to check back weekly for any updates with 501C3 status. |
| NK | Medicare | In Process | 2/14..sl Called the PT and left a message to review the 501c and assistance program to see if Pt was able to seek other assistance. 501c program is still not accepting new applications. Natpara has not been reorder to date. | In process- NO updates PT waiting for the 501 c assistance program to reopen to apply for oop. PSM will f/u with PT |
| DF | Medicare | In Process | 01/18/18-RMC- Patient informed PA approved patient needs 501c3 approval to move forward. PSM will follow up once foundations are open for new patients. | 01/18/18-RMC- Patient informed PA approved patient needs 501c3 approval to move forward. PSM will follow up once foundations are open for new patients. |
| ML | Medicare | In Process | 1/22/18 RID - Patient is holding off for funding as she can't afford out of | Complete |

Filed Under Seal

| Patient Initials | Patient Primary Insurance Name | Case Status | Case Disposition Notes | Triad Notes |
|---|---|---|---|---|
| | | | pocket expenses. PAM is trying to work on getting assistance, once assistance is open we will work on getting patient shipment. | |
| AG | Medicare | In Process | 1/23/18 - CG - RBM advised PA approved 12/30/17 to 7/23/18. Info supplied to CVS SP. PSM asked about copay and it is very high; patient will need financial assistance. PSM reached out to patient but had to leave vm. | 1/23/18 - CG - RBM advised PA approved 12/30/17 to 7/23/18. Info supplied to CVS SP. PSM asked about copay and it is very high; patient will need financial assistance. PSM reached out to patient but had to leave vm. |
| GV | Medicare | On Therapy | 2/1..sl SP change successful- Pt is now rec product through WAG per plan. SP confirmed that shipment dd go out to the PT on 1/26.. PSM, will f/u with the Pt on a routine persistency call in March. PT was provided with the 501c foundation contact number for assistance as patient does no longer qualify for copay assistance through lash. | Completed- shipment did go out to the PT on 1.26. f/u task completed. |
| JF | Medicare | In Process | 3/2/18, JD - Conferenced PT with Debra at SP, who scheduled medication for delivery on 3/6/18 with zero copay. Next f/u on 3/6/18 to confirm. | PAM - F/U with MDO re: PA status. |
| RD | Medicare | In Process | 2/9/18 RMB - PSM called and tried to set up the order but high copay due. TAF/PSI unavailable at this time. PSM will F/U accordingly. | |

Filed Under Seal

| Patient Initials | Patient Primary Insurance Name | Case Status | Case Disposition Notes | Triad Notes |
|---|---|---|---|---|
| NC | Medicare | In Process | 2/12/18 RMB - Patient was contacted as financial assistance is needed by SP. PSM called patient again in regards to next steps. PSI/TAF is needed. | |
| PT | Medicare | In Process | 2/12/18 RMB -Patient stated she will reach back on to me when she has decided more. Copay is too high. TAF/PSI funding is needed. Triad notified. PSM to F/U accordingly. | |
| MP | Medicare | In Process | 2/13/18 ELF- PT is pending foundation assistance & is temporarily discontinuing due to OOP cost w/ Medicare plan. Explained LIS option to PT. PSM to reach out end of the week to follow up - but PT is currently off therapy | |
| MT | Medicare | In Process | 2/15/18 ELF- Spoke w/ PT last night & confirmed they have been off therapy for a few days. PT is okay for the time being & has been in contact w/ MD about alternative treatment options. PSM to reach out to PT ASAP once TAF has funding - PT has applied & been approved. | 2/9/18 ELF - PA approved. PT is out of med this weekend & will be discontinuing due to lack of funding & PT being in Medicare doughnut hole |
| MM | Medicare | In Process | 2/20..sl spoke to the PT 501c program is still not opened for new applications. did ref PT to RDCF for a reorder of the Natpara. PAM and PSM have left messages for the | In process- PAM and PSM left messages for Wanda @ the MDO - PA is required. |

Filed Under Seal
106

| Patient Initials | Patient Primary Insurance Name | Case Status | Case Disposition Notes | Triad Notes |
|---|---|---|---|---|
| | | | MDO re: the PA per last weeks notes. | |
| FK | Medicare | In Process | 2/23/18 ELF- PCG was having trouble w/ CVS due to her not being on PT's account. Added PCG to PT's account & they will f/u on TAF info & order med. PCG will call if there is any other issue. PSM to f/u next week on order status | |
| BG | Medicare | In Process | 2-21-18 DD - PSM sent Lash req to triage to new pref SP. | 2-21-18 DD- PAM adv PA Approval letter sent to MDO, and copy will be faxed. Pt may need PSI or TAF, and PSM to check co-pay amt and ck status if pt can apply. |
| PG | Medicare | In Process | 2/23/18 ELF- Off therapy due to OOP cost. PT did not qualify for LIS or a medicare advantage plan. Encourage PT to re-apply if anything ever changes. PSM to f/u w/ foundations & notify PT of funding once they re-open | 2/23/18 ELF- PT is off therapy due to OOP cost. |
| YK | Medicare | In Process | 2/22/18 CT - Spoke with PT to check on status of reorder, since it's been 45 days. PT informed me is unable to reorder due to large copay. I explained foundation assistance closed at this time. But will check status sporadically and in the mean time I've asked PT to speak with MD for alternative medication. PSM to f/u with 501c3's on 3/6. | Complete |

Filed Under Seal

| Patient Initials | Patient Primary Insurance Name | Case Status | Case Disposition Notes | Triad Notes |
|---|---|---|---|---|
| CR | Medicare | In Process | 2.22.18-cn- On 2.20.18 PT and CVS contacted OnePath and spoke to PSM BA. BA informed pt foundations are closed at this time, but will be informed when foundations are open. next steps: f/u with pt when PSI/TAF opens. | 2.12.2018-cn- On WAG call this week. PSI/TAF still closed.next steps: f/u with WAG call |
| TB | Medicare | In Process | 2/22/18 SJW - PSM changing disposition to on-hold as Pt won't return from Florida until April and will make decision then regarding the Natpara. Foundation assistance would also be needed. | 12/19/17 SJW - PSM called Accredo for status. SP has reached out to Pt twice, last dated being 12/14 with no return call. Pt has high out of pocket and 501c3's are full right now. PSM called Pt's wife and left message to discuss. Pt's wife had previously mentioned holding off at they go to FL from Jan through Apr but was going to talk to MD. PSM will f/u with Pt for status. |

320. These notes reveal that Medicare patients routinely decided not to initiate Natpara therapy when funding was unavailable to them.

321. Furthermore, these notes reflect active communications between Shire personnel and Charitable Foundations regarding the use of Shire's contributions for Shire's patients.

322. Indeed, the Commercial Dashboard even has tabs that track "Disposition Reason" types. Two such "Disposition Reasons" are "Patient Assistance Program" and "Patient on Therapy – PAP." Among these "Disposition Reasons" for Charitable Foundations include "Subtype[s]" including Shire's Rare Disease Charitable Foundation ("RDCF") and "Other 501c3" statuses. Sorting by these sub-types reveals many Government Health Care Program patients. The fact that

Shire had several columns dedicated to foundation assistance demonstrates just how pervasive and necessary such foundation monies have been to the success of Shire's Natpara franchise.

323.    Shire's intentions in funding patients' copayments are not altruistic.  Rather, the goal has been to remove any financial barrier for Natpara patients who may opt for cheaper OTC treatments, especially those participating in Government Health Care Programs.  As OIG has explained, "[w]hen consumers are relieved of copayment obligations, manufacturers are relieved of a market constraint on drug prices.  Excessive costs to Federal programs are among the harms that the anti-kickback statute is intended to prevent."[85]

### 5. *Shire Promotes, Markets, and Sells Natpara in the United States Despite Its Knowledge for Years of a Safety Issue That Would Later Become the Basis for an FDA Safety Recall*

324.    On or about September 5, 2019, the FDA announced a nationwide Class I safety recall of all doses of Natpara in the United States.  Class I recalls are the most severe and relate to issues that can cause serious health problems and death.  The safety issue, in the FDA's words, concerned an "issue related to rubber particulates originating from the rubber septum of the NATPARA cartridge."[86]

325.    Takeda acknowledged that there was a significant potential for underdosing where the patient is unable to inject the full dose of the drug due to these rubber particulates blocking delivery of the medication.[87]

---

[85] Dep't of Health & Human Servs., *Special Advisory Bulletin* 2 (Sept. 2014), *available at* https://oig.hhs.gov/fraud/docs/alertsandbulletins/2014/sab_copayment_coupons.pdf.
[86] Food & Drug Admin., *Takeda Issues US Recall of NATPARA® (parathyroid hormone) for Injection Due to the Potential for Rubber Particulate* (Sept. 5, 2019), https://www.fda.gov/safety/recalls-market-withdrawals-safety-alerts/takeda-issues-us-recall-natparar-parathyroid-hormone-injection-due-potential-rubber-particulate (last visited Nov. 15, 2021).
[87] Takeda Pharmaceutical Co. Ltd., *Takeda Issues US Recall of NATPARA® (parathyroid hormone) for Injection Due to the Potential for Rubber Particulate* (Sept. 5, 2019), *available at*

326. Unacknowledged during the recall (but acknowledged by Shire internally) was the serious health risk of patients injecting themselves with these particulates, as well as the difficulty of use of the injection pen itself.

327. Although the recall was voluntarily issued in September 2019 after discussions with the FDA, Shire/Takeda failed to disclose what they have been aware of this issue for years—even before Natpara was launched in 2015—and affirmatively lied to patients and physicians to prevent a deluge of product quality complaints.

328. Natpara was originally developed by NPS Pharmaceuticals, Inc. ("NPS"), a New Jersey-based biopharmaceutical company acquired by Shire in a 2015 stock purchase.

329. As part of NPS's development of Natpara, it had licensed the non-U.S. rights to the drug to Takeda (pre-merger with Shire in 2019), which marketed the drug for the treatment of osteoporosis under the brand name PREOTACT® ("Preotact"). According to NPS's then-Chief Financial Officer and Executive Vice President, Luke Beshar, Preotact was manufactured in the "exact same presentation, same product, same CMO, same suite for Takeda as for our product [Natpara]." In other words, NPS's Natpara and Takeda's Preotact were identical other than their brand names and their approved indications.

330. In 2012, according to NPS's 2012 Form 10-K, Takeda encountered what it described as a "technical production issue whereby Takeda is presently unable to have batches of finished product manufactured that are consistently within specification and we have been informed that as a result Takeda is no longer selling Preotact in their territories. We understand that Takeda has taken a number of actions to resolve the manufacturing issue and to accelerate a

---

https://www.takeda.com/en-us/newsroom/news-releases/2019/takeda-issues-us-recall-of-natpara-parathyroid-hormone-for-injection-due-to-the-potential-for-rubber-particulate/.

return to normal supply situation. We have not received any information as to when or if Takeda will re-introduce Preotact in the future."

331. Ultimately, Takeda never re-launched Preotact and gave back its Preotact and pen device license to NPS Pharmaceuticals for mere pennies on the dollar (for a mere $6.1 million in cash plus inventory on hand, according to Mr. Beshar, speaking on May 29, 2013).

332. Takeda thus understood long before its 2019 recall that Natpara/Preotact and the associated pen device was a product with a troubled safety record. NPS apparently agreed. Less than a year later, on March 21, 2014, NPS requested that the European Medicines Agency ("EMA") allow it to voluntarily withdraw Preotact from the market for undisclosed reasons. It had never been re-launched after NPS re-acquired the license. Noting that "Preotact was not marketed anywhere in the European Union," the EMA granted the withdrawal request on May 23, 2014.

333. Nevertheless, NPS moved forward with Natpara's HPT application with the FDA in the United States. Along the way, NPS encountered the same device-related manufacturing issues Takeda had encountered with Preotact. In fact, those issues temporarily halted NPS's efforts to get Natpara approved.

334. CI-8 remarked that it was widely known within Shire that the "rubber stopper was designed poorly and blocked the medication from getting to patients." As a result, CI-8 stated that Shire had observed increased reports of lack of efficacy in the adverse event data; CI-8 recalled it was openly discussed at Shire that "it was that the rubber stopper was blocking the medication."

335. In NPS's 2012 Form 10-K, filed on February 21, 2013 (just weeks before NPS withrew Preotact from the market in Europe), NPS stated: "We continue to work toward submitting our U.S. Biologics License Application (BLA) for Natpara. In order to finalize our submission, we need to resolve certain previously disclosed manufacturing issues." At NPS's 2012 Second

Quarter Earnings Conference Call, the following exchange occurred between an analyst and CFO Luke Beshar:

> **David Nierengarten – Wedbush Securities**
> Hi. A quick question on the NATPARA manufacturing, is that with the manufacturing of the actual hormone or does that have something do with the delivery devices, I believe, as you mentioned have been metered-dose, I'm just curious? Thanks.
>
> **Luke Beshar**
> It's actually -- it doesn't -- *we don't believe it has to do with API*. It's a final fill finish manufacturing process where the product is labilized and then put into a pool with a rubber stopper and water, we're – nearly prior to injection, the patient pushes the plunger in hand and reconstitutes the product.[88]

336. In other words, Mr. Beshar confirmed in 2012 that the manufacturing issue did not relate to the medication itself, but rather to the step just before injection where the patient reconstitutes the product by piercing the rubber stopper and pushing in the plunger.

337. Later in 2013, Mr. Beshar provided additional detail that the issue "resulted in the formation of visible particles" in the medication after reconstitution, but insisted they were not foreign particles.

338. NPS later claimed to have resolved the issue by 2014, but never disclosed the true nature of the issue. Of course, Takeda and NPS never claimed to have resolved the issue as regards Preotact in Europe, and simply abandoned the product altogether.

339. NPS, Takeda, and Shire were thus all aware of the presence of particulate matter in the medication as early as 2012. For everyone else, the benefit of hindsight now clearly demonstrates that the same injection pen device (without any intervening modifications) was dispensing rubber particulate matter into the medication that resulted in the 2019 recall.

---

[88] NPS Pharmaceuticals, Inc., *2Q 2012 Earnings Conference Call*, at 12 (emphasis added).

340. Partner B was trained on selling Natpara using several "modules," including a module known as "Module 5: NATPARA Instructions for Use" that bears an internal document number of S10603 and is dated March 2016.

341. Module 5 makes clear that the product cannot be reconstituted until the needle plunges the rubber stopper. For example, Module 5 states numerous times that "[t]he pen needle MUST be attached to the new medicine cartridge in order to mix the NATPARA medicine powder and liquid." In other words, at the step of the process where the particulate matter formed according to Mr. Beshar, the injection pen had to have necessarily plunged the rubber stopper at least one time.

342. When Partner B onboarded with Shire and was trained on how to market Natpara years before the recall, Partner B was told by Shire that there would be inquiries regarding floating particles in the liquid dose. Indeed, Partner B was informed that this was one of the most frequent questions she would field from patients and physicians regarding Natpara.

343. Shire instructed and trained its sales representatives to tell physicians and patients that it was "normal" for such particles to be present.

344. For instance, in a review quiz on Module 5, Shire asks its sales force trainees to "[i]dentify all true statements about preparing and mixing NATPARA." One of the statements reads: "The presence of small particles is normal in mixed NATPARA." According to Shire, that statement was true.

345.     Shire elaborated with the following language:

30                                                                              ⌒Shire

**What must the NATPARA liquid mixture look like in order to be administered?**

The presence of small particles is normal. The liquid should be colorless; if it is, proceed with Q-Cliq pen preparation. If the liquid is discolored, call 1-855-NATPARA (1-855-628-7272) for help.

346.     Shire reinforced this so-called "normal" feature of Natpara later in the same sales force training module. Despite instructing patients to inspect visually for particles, Shire advises to "remember that it is normal to see small particles in the liquid":

53                                                                              ⌒Shire

### ADMINISTER DOSES 2 THROUGH 14

If you are administering the 2nd through 14th doses in a medicine cartridge, you will need to repeat a few preparation steps before giving your NATPARA injection.

**Figure 4.18**



**Additional Preperation Step 1 of 3**
Wash and dry your hands, and then gather these supplies:

Your Q-Cliq pen from the refrigerator
New disposable Pen Needle
Puncture-resistant sharps container

Your medication cartridge was reconstituted on the "Mixed On" date, which is also the date you administered the first dose in the cartridge. Reconstituted NATPARA must be refrigerated in between injections.

Next, remove the cap from the Q-Cliq pen and visually inspect the medicine in the NATPARA cartridge for particulate matter and discoloration. Remember that it is normal to see small particles in the liquid and that the liquid should be colorless. If the liquid is not colorless, call 1-855-NATPARA (1-855-628-7272) for help.

347. In an FAQ section of the Module designed to train the Natpara sales force to "[c]orrectly answer questions frequently asked by patients about using NATPARA," one of those questions was "[w]hat should I do if the liquid has small particles in it?" The scripted answer Shire instructed its sales force to give was: "It is normal to sometimes see small particles."

348. Indeed, after going out into the field, Partner B routinely was asked about particulate matter in the liquid. Unaware of the product's troubled safety history, Partner B and all other sales force employees did as they had been trained and instructed patients and healthcare providers that such particles were "normal" to find.

349. By telling healthcare providers and patients that floating paritcles were normal, Shire thus represented that the product was safe when it was not in order to prevent a deluge of product quality complaints that Shire would have to track, investigate, and in some cases, report to the FDA pursuant to its cGMP and adverse event reporting obligations. At all times, Shire was fully aware of increased adverse event reports relating to lack of efficacy, and that the defective rubber stopper was to blame.

350. The presence of floating rubber particles is unsafe (1) because of the inherent safety risks of injecting oneself with such particles and (2) the significant likelihood of not receiving the full dose of the drug. Both of these safety issues were known to Shire and Takeda.

351. Another known safety issue to Shire was the difficulty of use of the injection pen device itself, of which Shire had knowledge but concealed, and which also contributed to the development of rubber particulate matter in the medication.

352. Indeed, as part of its submission to the FDA, Shire was required to conduct a so-called "Human Factors and Device Use" study (the "Human Factors Study") of the device to ensure that patients would be able to use the device, and that their healthcare providers would be able to teach them to self-administer their medication.

353.    The Human Factors Study was described as follows:

> This human factors validation study consisted of training and testing sessions for 3 user groups: experienced lay people (ELP), inexperienced lay people (ILP), and health care providers (HCP). The lay people (LP) participated in 3 testing sessions (day 2, day 15, and day 29, and day 1 being the training day) and the HCPs participated in 1 testing session. In the testing sessions, participants were asked to perform a series of tasks and answer open-ended questions. Both observational data and subjective evaluations from the participants were collected. There were 15 healthcare providers and 39 lay people participated in the study.

(CDER, Other Reviews, at 59.)

354.    The difficulty of use of the device is demonstrated by the HCPs' experience with the drug. Of the 15 HCPs enrolled in the Human Factors Study, "5 HCPs failed to correctly complete the testing scenario due to difficulty on 1 of the 3 tasks." Those tasks included: (1) mixing a new cartridge; (2) attaching the new cartridge onto the pen and priming the pen; and (3) performing an injection. A further two HCPs "had some difficulty," but ultimately completed the assignment. In other words, of the professionally-trained group of HCPs, one-third failed to properly use the device after being shown how to use it.

355.    As is clear from the FDA's review, the FDA had expressed concern about the potential harm patients could do to themselves through accidental underdosing. The Human Factors study reviewer at the FDA noted that:

> CDER medical officer indicated that missing a single dose can result in clinically important hypocalcemia, esp. if a patient was on an otherwise stable dose of drug and calcium/vitamin D supplements. Theoretically, the patient would have symptoms reflective of hypocalcemia and would take extra supplements (this population is used to this issue). But, this can cause serious harm, and would be worsened by multiple missed doses . . . . As far as underdosing, clearly repeated underdosing (from a device failure) is not acceptable.

356.    Shire responded that "the clinical significance associated with these errors [referring to underdosing or missing doses] are 'slight,' which means that hazard may cause temporary impairment of a body function or temporary damage to a body structure that does not

require medical/surgical intervention prevent permanent damage." *Id*. Shire/Takeda further asserted that the FDA's concern about "clearly repeated underdosing" was unjustified that "no further changes [were] necessary to the product." *Id*.

357. Ultimately, Shire/Takeda assuaged the FDA's concerns by asserting that patients would be given rigorous training on use of the device to ensure "every patient is to be properly trained." Absent those commitments from Shire, the FDA would have required device modifications or rejected Natpara.

358. However, Shire wantonly disregarded its commitments to the FDA regarding adequate device training. .

359. Relator B attended a multi-day New Hire Taining conference from May 22-25, 2017. During New Hire Training, Relator B and other Natpara sales force team members were trained with Natpara Demo Kits to learn how to properly reconstitute and set up the pen for injection.

360. Led by Mike Naylor, an internal trainer for Shire, each trainee was given a demo kit to learn how to reconstitute Natpara and properly insert the product into the Clik-Q Pen. Each demo kit included an Instructions for Use Guide with step-by-step instructions.

361. Despite following each step in the guide, a substantial number of the trainees had problems mixing the medication, and one trainee actually broke the cartridge and spilled the neon-colored dummy medication all over his hands and pants.

362. For those trainees who managed to assemble the pen correctly, many observed that that one pen had dark-colored particles in the solution. The trainees discussed this as a group and then Mr. Naylor read the IFU section stating that particles in the solution were "normal." Mr. Naylor also said this would be a common question from customers and that the trainees would need to address these concerns by reminding customers not to shake the solution vigorously and

that most particles would dissipate. Mr. Naylor did not explain why the particles were dark-colored or explain what they were.

363. The adverse events associated with the recall of Natpara have been significant. The FDA adverse event reporting data demonstrate that such issues exist, including 1,012 reported "serious" Adverse Events in which the patient was hospitalized or suffered from life threatening circumstances or, in 12 reported instances in which the patient died.

364. Shire itself has tracked all or nearly all Natpara patients across the United States since Natpara's launch, including through interactions with the so-called "Triad" of Shire personnel including RBMs, PAMs, and Patient Support Managers ("PSMs"), whose specific roles are to assist patients with the use of their drug.

365. Through these encounters, Shire routinely has received complaints regarding Natpara's drug delivery system related to particulate matter in the dosage and blockages of the injection device preventing access to the medicine. Shire personnel, as trained, routinely have misled complainants into believing that such particles were "normal" when, in fact, they presented a dangerous health risk and would later lead to a nationwide Class I safety recall of all Natpara doses.

366. By deflecting these inquiries as being normal, Shire also deliberately avoided logging many of these complaints or investigating them pursuant to its cGMP obligations under 21 CFR § 211.198.

367. And, even when written records of such complaints made their way, for example, into the Shire Patient Dashboard through free text entries memorializing its personnel's interactions with patients (internally, Shire dubbed these as Product Quality Problems ("PQPs") or Product Quality Complaints ("PQCs")), Shire never followed its protocols, logged these as complaints, or investigated them as required pursuant to 21 CFR § 211.198.

368. As a result, Shire effectively lied its way out of compliance with its cGMP obligations, resulting in the adulterated marketing, sale, and distribution of Natpara ever since its launch.

369. Shire's decision to lie about that these serious health risks as "normal" features of Natpara had an extremely harmful impact on the health of patients, and in many cases led to death and serious injury. Many of these patients were insured by Government Health Care Programs and their hospitalizations and related care cost Government Health Care Programs many millions of dollars.

370. Shire's Patient Dashboards show that there were only about 3,500 patients taking Natpara in the United States before the drug was recalled. The Adverse Event Report database contains 3,363 adverse events for Natpara patients, almost one such report per patient. Of those, 1,732 were classified as "serious" adverse events including 12 deaths, with 1,012 adverse events characterized as "life threatening" adverse events that resulted in hospitalization of the patient.

371. Many, if not most, of these adverse events would not have occurred if Shire had not lied about Natpara's serious defects relating to its injection mechanism. And Government Health Care Programs would not have further reimbursed for health care services for the hundreds of patients who had adverse effects resulting in hospitalization and death due to their use of Shire's adulterated Natpara.

372. Shire's efforts to conceal (and affirmative misrepresentations about) this manufacturing and/or design defect regarding Natpara resulted in the submission and payment of false claims to the Government Health Care Programs, and resulted in the submission and payment false claims for reimbursement pursuant to CIFPA and IICFPA.

373. First, Government Health Care Programs (as well as California and Illinois insurers) reimbursed for Natpara prescriptions that contained this defect. For years, Shire knew

that its Natpara contained this defect, and yet submitted claims and/or caused claims to be submitted for reimbursement. The materiality of these misrepresentations is proven by the fact that, once the FDA was apprised of the issue, a nationwide recall followed.

374. Shire's deceptive, unfair, and unconscionable actions and statements about the safety of Natpara and about its efforts to comply with its duties under the FDCA and its regulations were material, were false, were made with intent to deceive, were made with the intent that the recipient of the information or another party reasonably rely upon it, and were made to further a scheme to defraud Government Health Care Programs (as well as California and Illinois insurers).

375. Second, the recall itself acknowledged that, in many cases, patients were underdosed as result of this defect that was known to Shire for many years. Consequently, Government Health Care Programs (as well as California and Illinois insurers) reimbursed for full doses of Natpara when patients were only able to receive partial doses in many cases, with Shire's full knowledge.

376. Thus, Shire violated 31 U.S.C. § 3729(a)(1)(B) when it knowingly made, used, or caused to be made or used, false records or statements material to its false or fraudulent claims by, among others things: (i) failing to disclose that Natpara was not safe or effective as Shire represented, (ii) failing to adequately investigate and report the diminished efficacy and safety risks of Natpara, (iii) falsely verifying that each manufacturing lot of Natpara would be as safe and effective as identified in the labeling, (iv) falsely certifying the accuracy of applications filed with the FDA, (v) falsely certifying compliance with the terms of its cGMP obligations, (vi) mislabeling, misbranding, and falsely certifying the safety and efficacy of Natpara, and (vii) engaging in the other acts described herein to conceal the diminished safety and efficacy of Natpara.

377.     These false statements, records, and data and Shire's multiple failures to comply with its various duties of disclosure, investigation, testing, and reporting, were material to the Government's purchases of and payments for Natpara (as well as purchases by California and Illinois insurers). This materiality is reflected in:

- Shire's statutory duties to disclose all information regarding the safety and efficacy of Natpara;

- Shire's multiple, intentional violations of these duties; and

- The FDA's responsibility to ensure that all drugs manufactured and sold in the United States are safe and effective.

378.     Each representation Shire made asserting that Natpara was safe and effective, including through its product package insert, and otherwise, as described above, constituted a false statement or record.  Likewise, each invoice Shire submitted, or caused to be submitted, to the Government (as well as California and Illinois insurers) for payment for the purchase of Natpara constituted a false or fraudulent claim for payment.

379.     The federal and state governments and California and Illinois insurers have been damaged by and continue to be damaged by Shire's fraudulent conduct with regard to the safety and efficacy of Natpara.

## VII.     SHIRE CAUSED THE PRESENTATION OF FALSE CLAIMS TO THE FEDERAL AND STATE GOVERNMENTS

### A.     <u>Government Reimbursement for Cinryze, Elaprase, Firazyr, Natpara, Takhzyro and VPRIV</u>

380.     Through Medicare and Medicaid, the United States Government and the States reimburse a large percentage of all the prescriptions for the Shire Drugs.  Medicare not only covers individuals over age 65, but it also provides medical coverage for many individuals who are permanently disabled under the Social Security Act.  A significant number of the patients taking the Shire Drugs in the United States are covered by Medicare.

381.    Medicaid, a joint program between the states and the federal government, also routinely pays for the Shire Drugs.  Medicaid provides health coverage to millions of non-elderly low-income non-disabled adults, particularly those with families.  Medicaid also provides coverage to several million low-income seniors and non-elderly people with disabilities.  Given the substantial annual cost of the Shire Drugs, many uninsured patients turn to Medicaid to pay for their treatments.  The federal Government pays more than half of the funding for the Medicaid program.

382.    The United States also pays for the Shire Drugs through the Veteran's Administration, through the Federal Employees Health Benefits (FEHB) Program, and through TRICARE, its insurance program for Department of Defense personnel and their families.

383.    The amount that the federal Government and the states have spent on the Shire Drugs is becoming more substantial with each passing year as Shire's illicit activities take hold.

384.    Every time physicians seek reimbursement for the Shire Drugs from Medicare, Medicaid, or some other Governent Health Care Program for the administration of these drugs, a claim is presented for payment for the purposes of the FCA.  Similarly, every time a Medicare or Medicaid patient obtains the Shire Drugs from a specialty pharmacy, that pharmacy presents a claim for payment.  As noted above, all of these claims are conditioned upon compliance with the AKS.  Were the applicable Government Health Care Programs aware that the presented claims had been induced by kickbacks, they would not be permitted to pay them.

**B.**      **Shire Induced Medicare, Medicaid, and the Government Health Care Programs to Pay for Thousands of Prescriptions Tainted by Kickbacks**

385.    Shire's scheme was successful and played a substantial role in securing thousands of prescriptions for the Shire Drugs in exchange for the distribution of payments to physicians.

The result has been the improper and illegal submission of claims for reimbursement by Government Health Care Programs, and the reimbursement of those claims.

386. As alleged in this Third Amended Complaint, utilization of the Shire Drugs was significantly increased as a result of Shire's illegal subsidy of these drugs' copayments by laundering such funds through charitable entities. Without such funding, a large percentage of the Shire Drug patients would have remained on cheaper drugs. Shire's PA and REMS certification services also constituted kickbacks, and doctors wrote increased prescriptions for the Shire Drugs as a result of these kickbacks, which pharmacies then filled, submitting false claims for reimbursement to Government Health Care Programs in violation of federal and State anti-kickback laws. These laws are preconditions for reimbursement. Accordingly, as a result of the kickbacks Shire offered to physicians and patients, Shire caused thousands of false claims to be submitted for payment to Government Health Care Programs.

387. Doctors violated the anti-kickback laws when they wrote prescriptions for the Shire Drugs, knowing that Medicare and Medicaid claims for reimbursement would be submitted in connection with those prescriptions, in exchange for their offers of kickbacks. These doctors were aware that Shire's offers of kickbacks were contingent upon increasing the number of prescriptions that they wrote for the Shire Drugs; and that in order to continue receiving kickbacks, that doctors needed to continue prescribing these drugs. Accordingly, these doctors knowingly and willfully violated the AKS when they wrote prescriptions for Shire's drugs the Shire Drugs in exchange for this remuneration, knowing that the prescriptions they wrote would be paid for by Medicare or Medicaid. Moreover, in order to participate in the Government Health Care Programs that provided reimbursement for those prescriptions, the doctors were required to certify that they were not in violation of state and federal laws, including anti-kickback laws.

388.    Shire's kickback schemes also violated state kickback laws.  For example, New York's anti-kickback statute, which is similar to the federal AKS, provides that no medical assistance provider shall  (a) solicit, receive, accept or agree to receive or accept any payment or other consideration in any form from another person to the extent such payment or other consideration is given: (i) for the referral of services for which payment is made under title eleven of article five of this chapter; or (ii) to purchase, lease or order any good, facility, service or item for which payment is made under title eleven of article five of this chapter; or (b) offer, agree to give or give any payment or other consideration in any form to another person to the extent such payment or other consideration is given: (i) for the referral of services for which payment is made under title eleven of article five of this chapter; or (ii) to purchase, lease or order any good, facility, service or item for which payment is made under title eleven of article five of this chapter.[89]

389.    Shire knew, and expected, that its kickback scheme would result in Government Health Care Program reimbursements for its drugs.  Shire closely tracked the various third-party payers that reimbursed its drug products.  These sources included government payers such as Medicaid and Medicare.  For Shire Drugs that are reimbursed by Government Health Care Programs, Shire's unlawful schemes resulted in misbranded or tainted prescriptions that were presented to these pharmacies.  These pharmacies then submitted kickback-tainted false or fraudulent prescription claims to the federal or State program responsible for approving and facilitating reimbursement of the false claims.

390.    In the case of Medicaid, specialty pharmacies were engaged in providing pharmaceutical products to Medicaid recipients throughout the United States.  Many of the pharmaceutical products are provided under contractual agreements with the *Qui Tam* States

---

[89] N.Y. Soc. Serv. Law § 366-d(2).

through their Medicaid provider licensure programs, whereby the pharmacies agree to provide pharmaceuticals to the *Qui Tam* States' Medicaid patients, and the *Qui Tam* States in turn would reimburse the pharmacies their costs plus a fixed dispensing fee meant to provide the pharmacies with a profit for providing pharmaceutical products to Medicaid patients.

391.     As to Medicaid claims, these pharmacies periodically (*e.g.*, once per day) submit their Medicaid claims for reimbursement by "batching them" and submitting them electronically to the *Qui Tam* States (or in some cases, claims are initially submitted to Medicaid Managed Care plans).   These claims include the claims tainted by Shire's illegal kickbacks.   As such, the pharmacies unwittingly make false certifications and false claims directly to the *Qui Tam* States concerning Medicaid reimbursement on a daily (or periodic) basis.

392.     As part of each electronic claim, the pharmacies affix their unique Medicaid provider identification numbers, which serve as electronic stamps indicating that (as Medicaid providers) they are in compliance with all applicable federal and State laws.   The pharmacies are then reimbursed on a monthly basis by the *Qui Tam* States for all approved claims.

393.     The *Qui Tam* States are not financially responsible for paying one-hundred percent of the pharmacies' claims for reimbursement.   Medicaid is a joint federal-state program that provides health care benefits for certain groups, primarily low income and disabled persons.

394.     The federal involvement in Medicaid includes providing matching funds and ensuring that the states comply with minimum standards in the administration of the program.   The federal share of states' Medicaid payments, known as the federal Medical Assistance Percentage ("FMAP"), is based on each individual State's per capita income compared to the national average. Among the states, the FMAP is at least 50 percent, and in some instances, as high as 77 percent. Through the FMAP process, State Medicaid administrators obtain the federal government's share of the pharmacies' reimbursements by submitting a quarterly Form 64 to CMS.   For this reason,

claims submitted to State Medicaid agencies, including those in the *Qui Tam* States, are presented to the federal government within the meaning of the FCA.

395. The federal government pays Medicaid claims through a continuing line of credit certified by the Secretary of the Treasury in favor of the State payee.[90] The federal government authorizes the State payee "to draw federal funds as needed to pay the federal share of disbursements."[91] The State can draw down on those funds only to pay the Medicaid claims of health care providers.[92] The funds made available to the State thus remain federal funds, in a federal Reserve account, until they are drawn by the State and used to pay the pharmacies' claims.

396. The federal government also "approves," within the meaning of the FCA, the claims submitted and paid through the Medicaid program. When a State presents its Form 64 (*i.e.*, the quarterly report of actual expenditures) to CMS, the amounts of any fraudulent claims the State paid will be included in those reports. Based on the information in the reports, CMS determines and approves whether the claims that the State paid with federal funds were appropriate. If CMS determines that certain claims paid by the State were improper, CMS may recoup the amount of the erroneously expended funds by reducing the amount of money provided to the State during the next quarter. Because the Form 64 constitutes the United States' means for approving and paying the amount of federal funds expended by the State, these reports overstate the amount of federal funds to which the State was entitled by the amount fraudulently paid.

397. These are, therefore, false records or statements knowingly caused to be made or used by Shire to get false claims paid and approved by the United States in connection with the Medicaid program.

---

[90] 42 C.F.R. § 430.30(d)(3), (4).

[91] *Id.* § 430.30(d)(3).

[92] *Id* § 430.30(d).

398.    In the case of Medicare, specialty pharmacies were engaged in providing the Shire Drugs to Medicare Part D recipients throughout the United States.  Many of the Shire Drugs are provided under contractual agreements with Medicare Part D contractors, whereby the pharmacies agree to provide the Shire Drugs to Medicare-eligible patients, and the Part D contractors would reimburse the pharmacies their costs plus a fixed dispensing fee meant to provide the pharmacies with a profit for providing pharmaceutical products to Medicare patients.

399.    Under Medicare Part D, for beneficiaries dually eligible for both Medicaid and Medicare programs, the pharmacies' false claims for reimbursement were submitted to contractors designated by and under contract with the United States as Medicare Prescription Drug Plans ("PDPs").  Shire's schemes inflated MA-PDP and PDP for the Shire Drugs' costs, thereby causing increased Medicare Part D drug costs.

400.    Medicare Part D prescription drug coverage for eligible senior enrollees is provided through Medicare Advantage Prescription Drug Plans ("MA-PDPs") and stand-alone Prescription Drug Plans ("PDPs") administered by private companies, usually health insurers or pharmacy benefit managers.  These Part D programs are subsidized by the federal government, which cover the cost of drug payments, including for the Shire Drugs.  The false or fraudulent claims for the Shire Drugs were then included in drug utilization data submitted by plan sponsors to CMS through Prescription Drug Event ("PDE") records.

401.    These false claims embedded within the PDE records are then paid or approved by CMS pursuant to the Medicare Prescription Drug, Improvement, and Modernization Act of 2003.  CMS makes payments to plan sponsors on a monthly basis through estimated subsidy payments and, where needed, at year-end as a result of the payment reconciliation process.  The reconciliation process compares estimated subsidy payments made to plan sponsors throughout

Filed Under Seal

the year with the cost data submitted by plan sponsors through PDE records to determine any additional residual payments required by CMS to be paid to MA-PDPs and PDPs.

402. CMS payments made through the Part D subsidy process, or as a result of additional residual payments to MA-PDPs and PDPs, included payments for false claims for the Shire Drugs that were knowingly caused to be submitted as a result of Shire's unlawful schemes.

403. Shire knew that its unlawful schemes would cause third parties to create materially false records, statements, or claims which would be used to improperly obtain reimbursement or payment for the Shire Drugs from Government Health Care Programs, including Medicaid and Medicare.

404. Each and every one of these claims would not have been submitted had the United States known that the physician or patient (through a specialty pharmacy) who submitted the claim (or who wrote the prescription for the Shire Drugs that was the basis of the claim) had received a kickback from Shire. As such, Shire has caused the false claims which were submitted by the physicians and the pharmacies. Pursuant to the FCA, Shire is liable for the amount the United States paid on account of the false claims and a monetary penalty for each false claim submitted.

## VIII. SHIRE CAUSED GOVERNMENT HEALTH CARE PROGRAM PROVIDERS TO FALSELY CERTIFY COMPLIANCE WITH THE LAW

405. As alleged in this Third Amended Complaint, Shire not only caused pharmacies to submit false claims, they also caused physicians and pharmacies to falsely certify their compliance with applicable laws which require express and/or implied certifications of compliance with conditions of payment.

406. As to Medicaid, State Medicaid provider agreements include requirements that participating pharmacies and physician providers will comply with all laws, rules, and regulations governing the Medicaid program, including compliance with the AKS. These agreements also

include provisions that the pharmacies agree that the submittal of any claim by or on behalf of the pharmacy will constitute a certification that the pharmaceutical products for which payment is claimed were furnished in accordance with the requirements of Medicaid, and that the information submitted in, with, or in support of the claim is true, accurate, and complete.

407.    The Medicaid program expressly prohibits reimbursement for claims submitted as a result of kickbacks.  As alleged in this Third Amended Complaint, Shire's illegal schemes caused the Medicaid-participating pharmacies and/or physician-providers to falsely certify their compliance with all laws, rules, and regulations governing the Medicaid program, including the anti-kickback laws, which prohibit an entity from knowingly and willingly offering, paying, soliciting, or receiving any remuneration to induce the referral of individuals or the purchase of items for which payment may be made under Medicare, Medicaid, or other federal or State health programs.  These certifications were express, were a condition of payment or reimbursement by Government Health Care Programs and were material to the Government's decision to pay or reimburse for the Shire Drugs.

408.    As to Medicare, physicians must sign agreements in which they agree to abide by all applicable Medicare laws and regulations, and certify their understanding that reimbursement of claims under Medicare is conditioned on compliance with the AKS.  These certifications are also included in the claim forms themselves.[93]  Thus, reimbursement for Medicare requires compliance with the AKS.

409.    As to Medicare, pharmacies and Medicare Part D contractors are  required to abide by and certify compliance with all laws, rules, and regulations governing the Medicare program.[94]

---

[93] *See* Forms CMS-855A and CMS855I.

[94] *See, e.g.,* 42 C.F.R. § 423.505(k)(3).

When submitting claims data to CMS for payment, Part D plans (and their subcontractors) must certify that the claims data is true and accurate to the best of their knowledge and belief, which includes the absence of any false claims such as those prohibited by the FCA.

410. As alleged in this Third Amended Complaint, Shire's illegal schemes caused the Medicare Part D plans to falsely certify their compliance with all laws, rules, and regulations governing the Medicare program, including the FCA and the AKS. These certifications were express, were a condition of payment or reimbursement by Government Health Care Programs, and were material to the Government's decision to pay or reimburse for the Shire Drugs.

411. Shire knowingly caused pharmacies and Part D plans to falsely certify compliance with applicable laws, rules, and regulations, which caused Government Health Care Programs to reimburse or pay for the drugs the Shire Drugs not otherwise eligible for reimbursement or payment.

## IX. RETALIATION

412. Shire terminated Partner B's employment in retaliation for Partner B's whistleblowing activities. Rather than act on Partner B's reports of compliance violations, Shire chose to use Partner B as a scapegoat to cover its longstanding illegal conduct.

413. Given Partner B's extensive experience, Partner B was hired by Shire in 2017 as an RBM in the Chicago territory. Partner B was assigned to report to Jeff Schultz, District Manager.

414. Partner B was fired by Shire because Partner B had raised numerous questions with Partner B's manager and senior sales management regarding Shire's use of Charitable Foundations.

415. Prior to Partner B's termination, Partner B relied upon Shire's reporting policy and provided the aforementioned Shire personnel with specific information regarding what Partner B believed was in violation of Shire's policies and federal law.

416.    In response to these complaints, Shire retaliated by terminating Partner B's employment.

417.    Shire sought to, and did, intimidate, punish, and retaliate against Partner B for the lawful and proper decision to follow company policy and report what Partner B accurately considered to be illegal directions and activities by Partner B's supervisors and Shire.  As such, the company improperly retaliated against Partner B's whistleblowing activity.

418.    As a direct result of Shire's unlawful retaliation, Partner B has suffered, and continues to suffer, severe emotional distress.

419.    Partner B was discharged, threatened, harassed, and discriminated against by Shire because of the lawful acts in investigating and reporting compliance violations.  As such, Partner B is entitled to reinstatement, two times back pay, interest on the back pay, and compensation for all damages allowed by law, including but not limited to special damages, and damages for emotional distress, sustained as a result of the unlawful termination.

## X.    SHIRE VIOLATED THE CIFPA

420.    Shire's schemes have targeted and defrauded California private health insurance companies and other health benefits providers, including, without limitation, health benefit plans, health maintenance organizations, purchasing alliances, carriers, employers, pharmacy benefit managers, third party administrators, and managed care organizations (collectively, "insurers") on a massive scale.  Shire's fraudulent practices have caused doctors to write prescriptions for the Shire Drugs that they otherwise would not have written and caused insurers to pay reimbursement claims for prescriptions for these Shire drugs that they otherwise would not have paid.

421.    California insurers are an organized means of providing patients access to quality health care, while maintaining a special focus on keeping health benefits costs, such as a prescription drug benefit, under control.  By keeping costs down, insurers are able to control

premiums and patient cost-sharing. To achieve these goals, insurers utilize a number of cost-containment policies, including favoring utilization of cheaper drugs instead of wildly expensive drugs like the Shire Drugs. While insurers will sometimes reimburse expensive branded drugs instead of cheaper drugs, they typically require a showing that the drugs are medically necessary for the particular patient in question through a procedure called "prior authorization."

422.    Rather than work with insurers to gain coverage for its drugs, Shire has chosen instead to deceive them. Shire's primary tactic has been to deploy its sales force to arrange payments for copayments and coinsurance to cover the patient's out of pocket cost for the Shire Drugs.

423.    Shire also has deployed its sales representatives and other field personnel to coach physicians on how to bypass prior authorization requirements for the Shire Drugs. Shire's personnel have even assisted in the filling out of such forms for individual patients, including in California.

424.    Shire's fraudulent scheme has been executed nationwide, but California—which is the largest pharmaceutical market in the nation—has been its epicenter.

425.    As a result of the fraudulent and deceptive conduct described in this Third Amended Complaint, the insurers have incurred millions of dollars in extra costs, thereby injuring the millions of beneficiaries, employers and other health benefit sponsors which seek to control prescription drug costs. These insurers insure and/or administer health benefits for an estimated 60% or more of California's insured population.

A.      **The California Insurance Frauds Prevention Act**

426.    The California legislature enacted the California Insurance Frauds Prevention Act ("CIFPA") to combat abusive practices aimed at defrauding private insurance providers. The legislature made clear that it was specifically concerned with fraud on health insurance providers,

stating: "Health insurance fraud is a particular problem for health insurance policyholders. Although there are no precise figures, it is believed that fraudulent activities account for billions of dollars annually in added health care costs nationally. Health care fraud causes losses in premium dollars and increases health care costs unnecessarily."[95]

427.     The CIFPA subjects any person who violates Cal. Ins. Code § 1871.7(a), or Sections 549, 550, or 551 of the California Penal Code, to civil penalties of between $5,000 and $10,000, plus an assessment of not more than three times the amount of each claim for compensations, as defined pursuant to a contract of insurance.[96]  The CIFPA also vests the court with "the power to grant other equitable relief, including temporary injunctive relief, as is necessary to prevent the transfer, concealment, or dissipation of illegal proceeds, or to protect the public."[97]

428.     Cal. Ins. Code § 1871.7(a) prohibits the knowing employment of "runners, cappers, steerers or other persons to procure clients or patients … to perform or obtain services or benefits under a contract of insurance or that will be the basis for a claim against an insured individual or his or her insurer."

429.     California Penal Code § 549 makes it illegal for any firm or corporation to "solicit[], accept[], or refer[] any business to or from any individual or entity with the knowledge that, or with reckless disregard for whether" that individual intends to make or cause to be made any false or fraudulent claim for payment of a health care benefit.

---

[95] Cal. Ins. Code § 1871(h).

[96] Id. § 1871.7(b).

[97] Id.

430. California Penal Code § 550(a)(5) makes it unlawful to "[k]nowingly prepare, make, or subscribe any writing, with the intent to present or use it, or to allow it to be presented, in support of any false or fraudulent claim," or to aid, abet, solicit, or conspire with any person to do the same.

431. California Penal Code § 550(a)(6) makes it unlawful to "[k]nowingly make or cause to be made any false or fraudulent claim for payment of a health care benefit," or to aid, abet, solicit, or conspire with any person to do the same.

432. California Penal Code § 550(b)(1) makes it unlawful to "[p]resent or cause to be presented any written or oral statement as part of, or in support of or opposition to, a claim for payment or other benefit pursuant to an insurance policy, knowing that the statement contains any false or misleading information concerning any material fact," or to knowingly assist or conspire with any person to do the same.

433. California Penal Code § 550(b)(2) makes it unlawful to "[p]repare or make any written or oral statement that is intended to be presented to any insurer or any insurance claimant in connection with, or in support of or opposition to, any claim or payment or other benefit pursuant to an insurance policy, knowing that the statement contains any false or misleading information concerning any material fact," or to knowingly assist or conspire with any person to do the same.

434. Through the fraudulent scheme alleged above, Shire has violated the preceding provisions, making or causing fraudulent health care claims to be made to California insurers. By doing so, Shire has substantially and illegally increased California insurers' costs and in turn increased the costs of their participants' coverage.

## B.      Insurers and Cost-Containment Strategies

435.    The goal of California insurer health care coverage is to provide appropriate, affordable and accessible services and products in order to achieve positive short-term and long-term patient outcomes.

436.    California insurers routinely use a variety of tools and strategies, frequently in tandem, to achieve the goals of making available services and goods appropriate for the varied needs of beneficiaries, while managing costs for both beneficiaries and plan sponsors.

437.    Shire's fraudulent scheme has been intended to and did interfere with California insurers' cost control programs by inducing health care professionals to prescribe, recommend, and/or fill prescriptions for the Shire Drugs.

## C.      Shire's Use of Kickbacks to Defraud California Insurers

438.    Pharmaceuticals play an important role in the prevention, cure, and management of disease.  At the same time, expenditures for drugs have been and are expected to continue to increase at rates higher than or comparable to expenditures for other health-related products and services.

439.    A primary focus of California insurers is to lower their expenditures on pharmaceuticals.  In doing so, they save money for both plan sponsors and patients who pay the premiums, and ultimately help ensure the affordability and sustainability of drug benefit coverage.

440.    Shire's fraudulent schemes have been intended to and did interfere with California insurers' cost control programs by inducing health care professionals to prescribe, and/or to fill prescriptions with, higher-cost Shire brand name drugs instead of cheaper, equivalent drugs.

441.    Shire's kickback schemes have been intended to, and did, circumvent the cost-control measures California insurers sought to achieve through their provider agreements.

Filed Under Seal

135

### D. Competitive Choice as a Cost-Containment Strategy

442. A fundamental aspect of California insurers' cost-containment strategies is to ensure the availability of competitive services and products, grounded in the economic principle that free-market competition will keep prices down.

443. Shire's practices have deprived California insurers and their beneficiaries of the pricing and selection benefits of free-market competition.

444. Shire's practices also have deprived California insurers and their beneficiaries of the independent judgment of various health care professionals in the relevant health care sector. Instead, California insurer beneficiaries have been steered or compelled to use the Shire Drugs without regard to whether the Shire products were the best and/or most economical products for the beneficiaries' needs.

### E. California Insurers' Provider Agreements and Manuals

445. California insurers also attempt to control costs through the terms of their "provider" agreements, as set forth in the Provider Application/Agreement and in the Provider Manual. Collectively, those documents are the contracts insurers require health care providers to sign and be bound by before the California insurer will cover the services or goods.

446. For example, provider agreements universally require the provider to certify that he or she will provide covered patients with medical services that are "Medically Necessary." As one authority noted, "a common definition among insurers" is that goods and services are "Medically Necessary" only if it is "not more costly than an alternative service or sequence of

services that is at least as likely to produce equivalent therapeutic or diagnostic results as to the diagnosis or treatment of that patients' illness, injury, or disease."[98]

447. The current Blue Shield Provider Manual, similarly includes in its definition of "Medically Necessary" that "[i]f there are two or more Medically Necessary services that may be provided for the illness, injury or medical condition, Blue Shield will provide benefits based on the most cost-effective services."[99]

448. Provider agreements also require providers to certify that they will provide services in accordance with the law. For example, Blue Shield of California's Independent Physician and Provider Agreement requires providers to certify that they will "comply with applicable state and federal laws and regulations," and will "be in compliance with all applicable local, state and federal laws relating to the provision of services hereunder, and furnish such services in accordance with all applicable licensing requirements and all local standards of professional ethics and practice."[100]

449. Similarly, the Blue Shield of California Provider Manual notes that all physicians entering into an agreement to provide services to the insurer's subscribers or enrollees are deemed a "Physician Member" of Blue Shield of California and "shall be bound by the Bylaws, schedules of compensation for services rendered, and rules and regulations of the corporation."[101] In turn,

---

[98] *WPATH Clarification on Medical Necessity of Treatment, Sex Reassignment, and Insurance Coverage in the U.S.A.*, The World Prof'l Ass'n for Transgender Health, Inc. (June 17, 2008), https://perma.cc/9W67-7V55.

[99] Blue Shield of California, *Independent Physician and Provider Manual* App'x 1-A p. 16 (2019), *available at* https://perma.cc/PA8K-ZXFN.

[100] Blue Shield of California, *Independent Physician and Provider Agreement* 9 (2014), *available at* https://perma.cc/2UEJ-5E3R.

[101] Blue Shield of California, *Independent Physician and Provider Manual*, *supra*, at App'x 2, bylaws p. 2.

the rules and regulations of the corporation include the following prohibition against kickbacks, fraud, waste and abuse:

> Blue Shield's Code of Conduct and the Corporate Compliance Program Blue Shield is subject to a wide variety of federal, state, and local laws. These include, but are not limited to, laws governing confidentiality of medical records, personally identifiable information, health plan and insurance regulatory requirements, government contracts, kickbacks, fraud, waste, and abuse, false claims and provider payments.[102]

450. The insurers also have the right to enforce these requirements through audits of the provider's billing and other practices affecting the integrity of the claims submitted to the insurer for payment. For example, Blue Shield of California expressly notes its right to conduct provider audits to ensure the provider's compliance with "state and federal laws and regulations."[103]

451. A number of California insurers also have programs under their provider agreements in which doctors are offered financial incentives for meeting certain performance goals in furtherance of cost-containment objectives.

452. Shire's kickback scheme has been intended to, and did, circumvent the cost-control measures California insurers sought to achieve through their provider agreements. In particular, Shire's payments of kickbacks has undermined the financial incentives offered by California insurers to health care providers designed to further cost containment objectives.

---

[102] *Id.* at § 1 p. 18. The provider manuals of other insurers contain similar provisions. *E.g.*, OptumHealth Care Solutions, LLC, *Provider Operations Manual* 20 (2018) (prohibiting "[s]oliciting, offering or receiving a kickback or bribe") (applicable to CAN Group of California, Inc., d/b/a/ OptumHealth Physical Health of California), *available at* https://perma.cc/4HCV-R37F; MARCH Vision Care, *Provider Reference Guide* 32-33 (2018) (prohibiting kickbacks), *available at* https://perma.cc/J62T-RD9F.

[103] Blue Shield of California, *Independent Physician and Provider Manual*, *supra*, at § 1 p. 15.

### F.     Shire Caused False Claims to Be Submitted to California Insurers

453.    Shire has provided kickbacks for the purpose of illegally inducing and/or rewarding health care providers to purchase the Shire Drugs for use treating beneficiaries of various California insurers.  These kickbacks have been intended to, and did, induce purchasing, ordering, arranging for, or recommending purchasing or ordering of goods or items for which payment was made by California insurers, in violation of Cal. Ins. Code §§ 1871.7(a) & (b).

454.    These kickbacks have caused health care providers to use Shire's products rather than cheaper competitor drugs.

455.    Claims that have been submitted to California insurers as a result, in part or in whole, based on kickbacks provided by Shire, have therefore been false within the meaning of the CIFPA.

456.    Shire's payment of kickbacks therefore has caused the submission of claims that were false and not eligible for reimbursement to California insurers.

457.    Shire's payment and offers of payment of kickbacks have been made knowingly and with the intent to cause the submission of false claims to California insurers.

458.    California insurers have paid reimbursements for those false claims, and as a result have incurred significant damages due to Shire's illegal payment of kickbacks.

## XI.     SHIRE VIOLATED THE IICFPA

459.    Shire's schemes have targeted and defrauded Illinois insurers on a massive scale. Shire's fraudulent practices have caused doctors to write prescriptions for the Shire Drugs that they otherwise would not have written and caused insurers to pay reimbursement claims for prescriptions for these Shire drugs that they otherwise would not have paid.

460.    Rather than work with insurers to gain coverage for its drugs, Shire has chosen instead to deceive them.  Shire's primary tactic has been to deploy its sales force to arrange

payments for copayments and coinsurance to cover the patient's out of pocket cost for the Shire Drugs.

461.    Shire also has deployed its sales representatives and other field personnel to coach physicians on how to bypass prior authorization requirements for the Shire Drugs.  Shire's personnel have even assisted in the filling out of such forms for individual patients, including in Illinois.

462.    As a result of the fraudulent and deceptive conduct described in this Third Amended Complaint, Illinois insurers have incurred millions of dollars in extra costs, thereby injuring the millions of beneficiaries, employers and other health benefit sponsors which seek to control prescription drug costs.  These insurers insure and/or administer health benefits for an estimated 60% or more of Illinois's insured population.

A.      **The Illinois Insurance Claims Frauds Prevention Act**

463.    The Illinois Legislature enacted the Illinois Insurance Claims Frauds Prevention Act ("IICFPA") to combat abusive practices aimed at defrauding private insurance providers.

464.    The legislative findings and declarations make clear that it was specifically concerned with the social costs of fraud on private insurance providers, noting that the penalties in the IICFPA are "remedial" and intended to achieve the "goals of disgorging unlawful profit, restitution, compensating the State for the costs of investigations and prosecution, and alleviating the social costs of increased insurance rates due to fraud."[104]

465.    Relevant here, IICFPA subjects any person who violates subsection 5(a) thereof or certain criminal code sections (Section 17-8.5 ["Fraud on a governmental entity"] or Section17-10.5 ["Insurance fraud"] of the Criminal Code of 1961 or the Criminal Code of 2012, or Article

---

[104] 740 Ill. Comp. Stat. § 92/5(c).

46 ["Insurance Fraud, Fraud on the Government, and Related Offenses"] of the Criminal Code of 1961), each addressed sequentially below, to civil penalties of between $5,000 and $10,000, plus an assessment of not more than three times the amount of each claim for compensations under a contract of insurance.[105] The IICFPA also vests the court with "the power to grant other equitable relief, including temporary injunctive relief, as is necessary to prevent the transfer, concealment, or dissipation of illegal proceeds, or to protect the public."[106]

466. 740 Ill. Comp. Stat. § 92/5(a) makes it "unlawful to knowingly offer or pay any remuneration directly or indirectly, in cash or in kind, to induce any person to procure clients or patients to obtain services or benefits under a contract of insurance or that will be the basis for a claim against an insured person or the person's insurer."

467. Section 17-8.10.5(a)(1) of the Illinois Criminal Code of 2012 sets forth that a "person commits insurance fraud when he or she knowingly obtains, attempts to obtain, or causes to be obtained, by deception, control over the property of an insurance company or self-insured entity by the making of a false claim or by causing a false claim to be made on any policy of insurance issued by an insurance company or by the making of a false claim or by causing a false claim to be made to a self-insured entity, intending to deprive an insurance company or self-insured entity permanently of the use and benefit of that property."[107]

468. Section 17-8.10.5(a)(2) of the Illinois Criminal Code of 2012 sets forth that a "person commits health care benefits fraud against a provider, other than a governmental unit or

---

[105] 740 Ill. Comp. Stat. § 92/5(b).

[106] *Id.*

[107] 720 Ill. Comp. Stat. 5/17-10.5(a)(1); *see also* 720 Ill. Comp. Stat. 5/46-1(a) (effective January 1, 2006 through June 30, 2011).

agency, when he or she knowingly obtains or attempts to obtain, by deception, health care benefits and that obtaining or attempt to obtain health care benefits does not involve control over property of the provider."[108] Section 17-8.10.5(b)(1) of the Illinois Criminal Code of 2012 defines "aggravated insurance fraud" as 3 or more offenses within an 18-month period arising out of separate incidents or transactions.[109]

469. Section 17-8.10.5(b)(2) of the Illinois Criminal Code of 2012 further prohibits being an "organizer" of an aggravated insurance fraud, setting forth that a "person commits being an organizer of an aggravated insurance fraud on a private entity conspiracy if aggravated insurance fraud on a private entity forms the basis for a charge of conspiracy under Section 8-2 of this Code and the person occupies a position of organizer, supervisor, financer, or other position of management within the conspiracy."[110]

470. Section 17-8.10.5(c) of the Illinois Criminal Code of 2012 further prohibits conspiracy to commit fraud, setting forth: "If aggravated insurance fraud on a private entity forms the basis for charges of conspiracy under Section 8-2 of this Code, the person or persons with whom the accused is alleged to have agreed to commit the 3 or more violations of this Section need not be the same person or persons for each violation, as long as the accused was part of the common scheme or plan to engage in each of the 3 or more alleged violations."[111]

---

[108] 720 Ill. Comp. Stat. 5/17-10.5(a)(2).

[109] 720 Ill. Comp. Stat. 5/17-10.5(b)(a); *see also* 720 Ill. Comp. Stat. 5/46-2 (effective January 1, 2006 through June 30, 2011) (defining aggravated insurance fraud as 3 or more offenses within an 8-month period).

[110] 720 Ill. Comp. Stat. § 5/17-10.5(b)(2); *see also* 720 Ill. Comp. Stat. 5/46-4 (effective January 1, 2006 through June 30, 2011).

[111] 720 Ill. Comp. Stat. § 5/17-10.5(c); *see also* 720 Ill. Comp. Stat. 5/46-3 (effective January 1, 2006 through June 30, 2011).

471. Through its various schemes described herein, Shire has violated the preceding provisions, making or causing fraudulent health care claims to be made to Illinois insurers. By doing so, Shire has substantially increased Illinois insurers' costs and in turn increased the costs of their participants' coverage.

**B.** **Insurers and Cost-Containment Strategies**

472. The goal of Illinois insurer health care coverage is to provide appropriate, affordable and accessible services and products in order to achieve positive short-term and long-term patient outcomes.

473. Illinois insurers routinely use a variety of tools and strategies, frequently in tandem, to achieve the goals of making available services and goods appropriate for the varied needs of beneficiaries, while managing costs for both beneficiaries and plan sponsors.

474. Shire's fraudulent scheme has been intended to and did interfere with Illinois insurers' cost control programs by inducing health care professionals to prescribe, recommend, and/or fill prescriptions for the Shire Drugs.

**C.** **Shire's Use of Kickbacks to Defraud Illinois Insurers**

475. Pharmaceuticals play an important role in the prevention, cure, and management of disease. At the same time, expenditures for drugs have been and are expected to continue to increase at rates higher than or comparable to expenditures for other health-related products and services.

476. A primary focus of Illinois insurers is to lower their expenditures on pharmaceuticals. In doing so, they save money for both plan sponsors and patients who pay the premiums, and ultimately help ensure the affordability and sustainability of drug benefit coverage.

477. Shire's fraudulent schemes have been intended to and did interfere with Illinois insurers' cost control programs by inducing health care professionals to prescribe, and/or to fill prescriptions with, higher-cost Shire brand name drugs instead of cheaper, equivalent drugs.

478. Shire's kickback schemes have been intended to, and did, circumvent the cost-control measures Illinois insurers sought to achieve through their provider agreements.

**D.** **Competitive Choice as a Cost-Containment Strategy**

479. A fundamental aspect of Illinois insurers' cost-containment strategies is to ensure the availability of competitive services and products, grounded in the economic principle that free-market competition will keep prices down.

480. Shire's practices have deprived Illinois insurers and their beneficiaries of the pricing and selection benefits of free-market competition.

481. Shire's practices also have deprived Illinois insurers and their beneficiaries of the independent judgment of various health care professionals in the relevant health care sector. Instead, the Illinois insurers' beneficiaries were steered or compelled to use Shire products without regard to whether the Shire products were the best and/or most economical products for the beneficiaries' needs.

**E.** **Illinois Insurers' Provider Agreements and Manuals**

482. Illinois insurers also attempt to control costs through the terms of their "provider" agreements, as set forth in the Provider Application/Agreement and in the Provider Manual. Collectively, those documents are the contracts insurers require health care providers to sign and be bound by before the Illinois insurer will cover the services or goods.

483. For example, provider agreements universally require the provider to certify that he or she will provide covered patients with medical services that are "Medically Necessary." As one authority noted, "a common definition among insurers" is that goods and services are

"Medically Necessary" only if it is "not more costly than an alternative service or sequence of services that is at least as likely to produce equivalent therapeutic or diagnostic results as to the diagnosis or treatment of that patients' illness, injury, or disease."[112]

484.    The current BlueCross BlueShield of Illinois Provider Manual similarly includes in its definition of "Medically Necessary" that the service be "not more costly than an alternative service or sequence of services at least as likely to produce equivalent therapeutic or diagnostic results as to the diagnosis or treatment of that patient's illness, injury or disease."[113]  Similarly, BlueCross BlueShield mandates that "[s]ervices should be provided in the most cost effective manner and in the least costly setting required for the appropriate treatment of the member."[114]

485.    Providers are also required to provide services in accordance with the law. For example, BlueCross BlueShield of Illinois states that benefit coverage is subject to "applicable state and/or federal law."[115]

486.    The insurers also have the right to enforce these requirements through audits of the provider's billing and other practices affecting the integrity of the claims submitted to the insurer for payment.[116]  Indeed, BlueCross BlueShield of Illinois has created a Special Investigations Department ("SID"), which identifies and investigates conduct that may constitute health care fraud or abusive billing.[117]

---

[112] *WPATH Clarification on Medical Necessity of Treatment, Sex Reassignment, and Insurance Coverage in the U.S.A.*, The World Prof'l Ass'n for Transgender Health, Inc. (June 17, 2008), https://perma.cc/9W67-7V55.

[113] BlueCross BlueShield of Illinois, *Provider Manual, Billing and Reimbursement* 4, ¶ 8 (2016), *available at* http://www.bcbsil.com/pdf/standards/manual/billing_and_reimbursement.pdf.

[114] *Id.* ¶ 9.

[115] *Id.* at p. 6, ¶ 19.

[116] *Id.* at p. 4, ¶ 11.

[117] BlueCross BlueShield of Illinois, *Provider Manual, Fraud and Abuse Program* 3 (2018), *available at* https://www.bcbsil.com/pdf/standards/manual/fraud_and_abuse.pdf.

Filed Under Seal

487. By making such representations and warranties to insurers, healthcare providers thus certify, among other things, that they will comply with the IICFPA.

488. Shire's kickback schemes have been intended to, and did, circumvent the cost-control measures Illinois insurers sought to achieve through their provider agreements. In particular, Shire's payments of kickbacks to health care providers: have caused those health care providers to write and/or fill prescriptions for the Shire Drugs that did not comply with the certifications made in the provider agreements; and have undermined the financial inducements offered by the insurers to the health care providers designed to further cost-containment objectives.

## F. Shire Caused False Claims to Be Submitted to Illinois Insurers

489. Shire has provided kickbacks for the purpose of illegally inducing and/or rewarding those providers to purchase the Shire Drugs for use treating beneficiaries of various Illinois insurers. These kickbacks have been intended to (and did) induce purchasing, ordering, arranging for or recommending purchasing or ordering of goods or items for which payment was made by Illinois insurers, in violation of the IICFPA.

490. These kickbacks have caused Health Care Providers to use Shire's products rather than cheaper competitor drugs.

491. Claims that were submitted to Illinois insurers as a result, in part or in whole, based on kickbacks provided by Shire, have therefore been false within the meaning of the IICFPA.

492. Shire's payment of kickbacks therefore has caused the submission of claims that were false and not eligible for reimbursement to Illinois insurers.

493. Shire's payment and offers of payment of kickbacks have been made knowingly and with the intent to cause the submission of false claims to Illinois insurers.

494.     Illinois insurers have paid reimbursements for those false claims, and as a result have incurred and continue to incur significant damages due to Shire's illegal payment of kickbacks.

## XII.    COUNTS

### COUNT I

**(Violation of False Claims Act, 31 U.S.C. § 3729(a)(1); 31 U.S.C. § 3729(a)(1)(A))**

495.     Relator incorporates by reference the preceding paragraphs of this Third Amended Complaint as though fully set forth herein.

496.     Shire, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, has knowingly presented or caused to be presented to the United States of America false or fraudulent claims for payment or approval, in violation of 31 U.S.C. § 3729(a)(1)(A).

497.     As a result of Shire's actions, as set forth above, the United States of America has been severely damaged.

### COUNT II

**(Violation of False Claims Act, 31 U.S.C. § 3729(a)(2); 31 U.S.C. § 3729(a)(1)(B))**

498.     Relator incorporates by reference the preceding paragraphs of this Third Amended Complaint as though fully set forth herein.

499.     Shire, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, has knowingly made, used, or caused to be made or used false records or statements material to the payment of false or fraudulent claims, in violation of 31 U.S.C. § 3729(a)(1)(B).

500.     Shire's false and fraudulent statements, including with respect to the safety and efficacy, superiority, and medical necessity and appropriateness of its drugs, to the public, to

patients, to the Health Care Providers, and to Government Health Care Programs, were material to the Health Care Providers' decisions to prescribe these drugs and the United States' decisions to pay claims for these drugs and related services.

501. The United States, unaware of the falsity of the claims and/or statements made by Shire, and in reliance on the accuracy of these claims and/or statements, has paid or reimbursed for the Shire Drugs prescribed to patients enrolled in Government Health Care Programs.

502. As a result of Shire's actions, as set forth above, the United States of America has been, and may continue to be, severely damaged.

## COUNT III

### (Violation of False Claims Act, 31 U.S.C. § 3729(a)(3); 31 U.S.C. § 3729(a)(1)(C))

503. Relator incorporates by reference the preceding paragraphs of this Third Amended Complaint as though fully set forth herein.

504. Shire knowingly has conspired with the Charitable Foundations and others, including those identified and alleged herein, to commit acts in violation of 31 U.S.C. § 3729(a)(1)(A) & (a)(1)(B). Shire and the Charitable Foundations committed overt acts in furtherance of the conspiracy as alleged above.

505. By virtue of the acts described above, Shire has conspired with the Charitable Foundations knowingly to present or to cause to be presented materially false or fraudulent claims for payment or approval to Medicare in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(C).

506. Payment of the false and fraudulent claims was a reasonable and foreseeable consequence of the conspiracy between and among Shire and the Charitable Foundations.

507. As a result of Shire's actions, the United States of America has been severely damaged in an amount to be determined at trial.

Filed Under Seal

148

## COUNT IV

### (Violation of False Claims Act, 31 U.S.C. § 3730(h))

508. Relator incorporates by reference the preceding paragraphs of the Third Amended Complaint as though fully set forth herein.

509. Partner B was threatened, harassed and discriminated against in the terms and conditions of her employment by Shire in retaliation for lawful acts taken by Partner B to report violations of the FCA.

510. Because of Partner B's lawful acts in furtherance of protected activities investigating and reporting fraud, Shire retaliated against Partner B by terminating her employment.

511. Shire's unlawful termination of Partner B has proximately caused Partner B to suffer and to continue to suffer substantial damage, in an amount to be proven at trial.

## COUNT V

### (Violation of California False Claims Act)

512. Relator incorporates by reference the preceding paragraphs of this Third Amended Complaint as though fully set forth herein.

513. Shire, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly has presented or caused to be presented false or fraudulent claims for payment or approval, in violation of Cal. Gov't Code § 12651(a)(1).

514. Shire, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly has made, used, or caused to be made or used false records or statements material to false or fraudulent claims, in violation of Cal. Gov't Code § 12651(a)(2).

515.     Shire knowingly has conspired with the Charitable Foundations to commit violations of <u>Cal. Gov't Code §§ 12651(a)(1)</u> & <u>(a)(2)</u>, in violation of <u>Cal. Gov't Code § 12651(a)(3)</u>.

516.     The State of California, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Shire, and in reliance on the accuracy of these claims and/or statements, have paid for prescription drugs and prescription drug-related management services for recipients of State and State subdivision funded health insurance programs.

517.     As a result of Shire's actions, as set forth above, the State of California and/or its political subdivisions have been severely damaged.

## COUNT VI

### <u>(Violation of Colorado Medicaid False Claims Act)</u>

518.     Relator incorporates by reference the preceding paragraphs of this Third Amended Complaint as though fully set forth herein.

519.     Shire, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly has presented, or caused to be presented to an officer or employee of the State of Colorado, or its political subdivisions, false or fraudulent claims for payment or approval, in violation of Colo. Rev. Stat. § 25.5-4-305(1)(a).

520.     Shire, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly has made, used, or caused to be made or used false records or statements material to false or fraudulent claims, in violation of Colo. Rev. Stat. § 25.5-4-305(1)(b).

521.     Shire knowingly has conspired with the Charitable Foundations to commit violations of Colo. Rev. Stat. §§ 25.5-4-305(1)(a) & (1)(b), in violation of Colo. Rev. Stat. § 25.5-4-305(1)(g).

522.     The State of Colorado, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Shire, and in reliance on the accuracy of these claims and/or statements, have paid for prescription drugs and prescription drug-related management services for recipients of State and State subdivision funded health insurance programs.

523.     As a result of Shire's actions, as set forth above, the State of Colorado and/or its political subdivisions have been severely damaged.

**COUNT VII**

**(Violation of Connecticut False Claims Act for Medical Assistance Programs)**

524.     Relator incorporates by reference the preceding paragraphs of this Third Amended Complaint as though fully set forth herein.

525.     Shire, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly has presented, or caused to be presented, to an officer or employee of the State of Connecticut, or its political subdivisions, false or fraudulent claims for payment or approval under a medical assistance program administered by the Department of Social Services, in violation of Conn. Gen. Stat. § 4-275(a)(1).

526.     Shire, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements to secure the payment or approval by the State of Connecticut, or its

Filed Under Seal

151

political subdivisions, false or fraudulent claims under a medical assistance program administered by the Department of Social Services, in violation of Conn. Gen. Stat. § 4-275(a)(2).

527. Shire knowingly has conspired with the Charitable Foundations to commit violations of Conn. Gen. Stat. § 4-275(a)(1) & (a)(2), in violation of Conn. Gen. Stat. § 4-275(a)(3).

528. The State of Connecticut, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Shire, and in reliance on the accuracy of these claims and/or statements, have paid for prescription drugs and prescription drug-related management services for recipients of State and State subdivision funded health insurance programs.

529. As a result of Shire's actions, as set forth above, the State of Connecticut and/or its political subdivisions have been severely damaged.

## COUNT VIII

### (Violation of Delaware False Claims and Reporting Act)

530. Relator incorporates by reference the preceding paragraphs of this Third Amended Complaint as though fully set forth herein.

531. Shire, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly has presented or caused to be presented, to an officer or employee of the State of Delaware, or its political subdivisions, false or fraudulent claims for payment or approval, in violation of Del. Code tit. 6, § 1201(a)(1).

532. Shire, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly has made, used, or caused to be made and used, false records or statements to get false or fraudulent

claims paid or approved by the State of Delaware, or its political subdivisions, in violation of Del. Code tit. 6, § 1201(a)(2).

533.    Shire knowingly has conspired with the Charitable Foundations to commit violations of Del. Code tit. 6, § 1201(a)(1) & (a)(2), in violation of Del. Code tit. 6, § 1201(a)(3).

534.    The State of Delaware, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Shire, and in reliance on the accuracy of these claims and/or statements, have paid, for prescription drugs and prescription drug-related management services for recipients of Health Care Programs funded by the State of Delaware.

535.    As a result of Shire's actions, as set forth above, the State of Delaware and/or its political subdivisions have been severely damaged.

## COUNT IX

### (Violation of District of Columbia False Claims Act)

536.    Relator incorporates by reference the preceding paragraphs of this Third Amended Complaint as though fully set forth herein.

537.    Shire, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly has presented, or caused to be presented, to an officer or employee of the District, or its political subdivisions, false or fraudulent claims for payment or approval, in violation of D.C. Code § 2-381.02(a)(1).

538.    Shire, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly has made, used, or caused to be used false records or statements to get false claims paid or approved by the District, or its political subdivisions, in violation of D.C. Code § 2-381.02(a)(2).

539. Shire knowingly has conspired with the Charitable Foundations to commit violations of D.C. Code § 2-381.02(a)(1) & (a)(2), in violation of D.C. Code § 2-381.02(a)(7).

540. The District of Columbia, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Shire, and in reliance upon the accuracy of these claims and/or statements, have paid, for prescription drugs and prescription drug-related management services for recipients of health insurance programs funded by the District.

541. As a result of Shire's actions, as set forth above, the District of Columbia and/or its political subdivisions have been severely damaged.

### COUNT X

### (Violation of Florida False Claims Act)

542. Relator incorporates by reference the preceding paragraphs of this Third Amended Complaint as though fully set forth herein.

543. Shire, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly has presented or caused to be presented, to an officer or employee of the State of Florida, or its agencies, false or fraudulent claims for payment or approval, in violation of Fla. Stat. § 68.082(2)(a).

544. Shire, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly has made, used, or caused to be made and used, false records or statements to get false or fraudulent claims paid or approved by the State of Florida, or its agencies, in violation of Fla. Stat. § 68.082(2)(b).

545. Shire knowingly has conspired with the Charitable Foundations to commit violations of Fla. Stat. § 68.082(2)(a) & (2)(b), in violation of Fla. Stat. § 68.082(2)(c).

546. The State of Florida, or its agencies, unaware of the falsity of the claims and/or statements made by Shire, and in reliance on the accuracy of these claims and/or statements, have paid for prescription drugs and prescription drug-related management services for recipients of health insurance plans funded by the State of Florida or its agencies.

547. As a result of Shire's actions, as set forth above, the State of Florida and/or its agencies have been severely damaged.

## COUNT XI

### (Violation of Georgia False Medicaid Claims Act)

548. Relator incorporates by reference the preceding paragraphs of this Third Amended Complaint as though fully set forth herein.

549. Shire, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly has presented or caused to be presented, to the Georgia Medicaid program false or fraudulent claims for payment or approval, in violation of Ga. Code § 49-4-168.1(a)(1).

550. Shire, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly has made, used, or caused to be made and used, false records or statements to get false or fraudulent claims paid or approved by the Georgia Medicaid program, in violation of Ga. Code § 49-4-168.1(a)(2).

551. Shire knowingly has conspired with the Charitable Foundations to commit violations of Ga. Gode § 49-4-168.1(a)(1) & (a)(2), in violation of Ga. Gode § 49-4-168.1(a)(3).

Filed Under Seal

155

552. The State of Georgia, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Shire, and in reliance on the accuracy of these claims and/or statements, have paid for prescription drugs and prescription drug-related management services for recipients of Medicaid.

553. As a result of Shire's actions, as set forth above, the State of Georgia and/or political subdivisions have been severely damaged.

## COUNT XII

### (Violation of Hawaii False Claims Act)

554. Relator incorporates by reference the preceding paragraphs of this Third Amended Complaint as though fully set forth herein.

555. Shire, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly has presented or caused to be presented, to an officer or employee of the State of Hawaii, or its political subdivisions, false or fraudulent claims for payment or approval, in violation of Haw. Rev. Stat. § 661-21(a)(1).

556. Shire, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly has made, used, or caused to be made and used, false records or statements to get false or fraudulent claims paid or approved by the State of Hawaii, or its political subdivisions, in violation of Haw. Rev. Stat. § 661-21(a)(2).

557. Shire knowingly has conspired with the Charitable Foundations to commit violations of Haw. Rev. Stat. § 661-21(a)(1) & (a)(2), in violation of Haw. Rev. Stat. § 661-21(a)(3).

558. The State of Hawaii, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Shire, and in reliance upon the accuracy of these claims and/or statements, have paid for prescription drugs and prescription drug-related management services for recipients of state-funded health insurance programs.

559. As a result of Shire's actions, as set forth above, the State of Hawaii and/or its political subdivisions have been severely damaged.

## COUNT XIII

### (Violation of Illinois False Claims Act)

560. Relator incorporates by reference the preceding paragraphs of this Third Amended Complaint as though fully set forth herein.

561. Shire, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly has presented or caused to be presented, false or fraudulent claims for payment or approval, in violation of 740 Ill. Comp. Stat. 175/3(a)(1)(A).

562. Shire, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly has made, used, or caused to be made and used, false records or statements material to get false or fraudulent claims paid or approved by the State of Illinois, or its political subdivisions, in violation of 740 Ill. Comp. Stat. 175/3(a)(1)(B).

563. Shire knowingly has conspired with the Charitable Foundations to commit violations of 740 Ill. Comp. Stat. 175/3(a)(1)(A) & (a)(1)(B), in violation of 740 Ill. Comp. Stat. 175/3(a)(1)(C).

564. The State of Illinois, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Shire, and in reliance on the accuracy of those claims and/or

statements, have paid for prescription drugs and prescription drug-related management services for recipients of state-funded health insurance programs.

565.     As a result of Shire's actions, as set forth above, the State of Illinois and/or its political subdivisions have been severely damaged.

## COUNT XIV

### (Violation of Indiana False Claims and Whistleblower Protection Act)

566.     Relator incorporates by reference the preceding paragraphs of this Third Amended Complaint as though fully set forth herein.

567.     Shire, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly or intentionally presented, or caused to be presented, and may still be presenting or causing to be presented, false claims to the State of Indiana, or its political subdivisions, for payment or approval, in violation of Ind. Code § 5-11-5.5-2(b)(1).

568.     Shire, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly or intentionally made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements to obtain payment or approval of false claims from the State of Indiana, or its political subdivisions, in violation of Ind. Code § 5-11-5.5-2(b)(2).

569.     Shire knowingly has conspired with the Charitable Foundations to commit violations of Ind. Code § 5-11-5.5-2(b)(1) & (b)(2), in violation of Ind. Code § 5-11-5.5-2(b)(7).

570.     The State of Indiana, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Shire, and in reliance on the accuracy of those claims and/or statements, have paid for prescription drugs and prescription drug-related management services for recipients of state-funded health insurance programs.

571.    As a result of Shire's actions, as set forth above, the State of Indiana and/or its political subdivisions have been severely damaged.

## COUNT XV

### (Violation of Iowa False Claims Act)

572.    Relator incorporates by reference the preceding paragraphs of this Third Amended Complaint as though fully set forth herein.

573.    Shire, in reckless disregard or deliberate ignorance for the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented, or caused to be presented, and may still be presenting or causing to be presented, false or fraudulent claims for payment or approval, in violation of Iowa Code § 685.2(1)(a).

574.    Shire, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly has made, used, or caused to be made and used, false records or statements material to false or fraudulent claims, in violation of Iowa Code § 685.2(1)(b).

575.    Shire knowingly has conspired with the Charitable Foundations to commit violations of Iowa Code § 685.2(1)(a) & (1)(b), in violation of Iowa Code § 685.2(1)(c).

576.    The State of Iowa, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Shire, and in reliance on the accuracy of these claims and/or statements, have paid for prescription drugs and prescription drug-related management services for recipients of health insurance programs funded by the State or its political subdivisions.

577.    As a result of Shire's actions, as set forth above, the State of Iowa and/or its political subdivisions have been severely damaged.

## COUNT XVI

### (Violation of Louisiana Medical Assistance Programs Integrity Law)

Filed Under Seal

159

578. Relator incorporates by reference the preceding paragraphs of this Third Amended Complaint as though fully set forth herein.

579. Shire, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented, or caused to be presented, and may still be presenting or causing to be presented, false or fraudulent claims, in violation of La. Rev. Stat. § 46:438.3(A).

580. Shire, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly engaged in misrepresentation, and may still be engaging in misrepresentation, to obtain, or attempt to obtain, payment from medical assistance programs funds, in violation of La. Rev. Stat. § 46:438.3(B).

581. Shire knowingly has conspired with the Charitable Foundations to commit violations of La. Rev. Stat. § 46:438.3(A) & (B), in violation of La. Rev. Stat. § 46:438.3(D).

582. The State of Louisiana, its medical assistance programs, political subdivisions and/or the Department, unaware of the falsity of the claims and/or statements made by Shire, or their actions as set forth above, have acted in reliance on the accuracy of Shire's claims and/or statements in paying for prescription drugs and prescription drug-related management services for medical assistance program recipients.

583. As a result of Shire's actions, as set forth above, the State of Louisiana, its medical assistance programs, political subdivisions and/or the Department have been severely damaged.

## COUNT XVII

### (Violation of Maryland False Health Claims Act)

584. Relator incorporates by reference the preceding paragraphs of this Third Amended Complaint as though fully set forth herein.

Filed Under Seal

585. Shire, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly has presented or caused to be presented, false or fraudulent claims for payment or approval, in violation of Md. Code, Health-Gen. § 2-602(a)(1).

586. Shire, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly has made, used, or caused to be made and used, false records or statements to obtain payment or approval of claims by the State of Maryland, or its political subdivisions, in violation of Md. Code, Health-Gen. § 2-602(a)(2).

587. Shire knowingly has conspired with the Charitable Foundations to commit violations of Md. Code, Health-Gen. § 2-602(a)(1) & (a)(2), in violation of Md. Code, Health-Gen. § 2-602(a)(3).

588. The State of Maryland, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Shire, and in reliance on the accuracy of these claims and/or statements, have paid for prescription drugs and prescription drug-related management services for recipients of health insurance programs funded by the State or its political subdivisions.

589. As a result of Shire's actions, as set forth above, the State of Maryland and/or its political subdivisions have been severely damaged.

## COUNT XVIII

### (Violation of Massachusetts False Claims Act)

590. Relator incorporates by reference the preceding paragraphs of this Third Amended Complaint as though fully set forth herein.

591. Shire, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly has

presented or caused to be presented, false or fraudulent claims for payment or approval, in violation of Mass. Gen. Laws ch. 12, § 5B(a)(1).

592. Shire, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly has made, used, or caused to be made and used, false records or statements to obtain payment or approval of claims by the Commonwealth of Massachusetts, or its political subdivisions, in violation of Mass. Gen. Laws ch. 12, § 5B(a)(2).

593. Shire knowingly has conspired with the Charitable Foundations to commit violations of Mass. Gen. Laws ch. 12, § 5B(a)(1) & (a)(2), in violation of Mass. Gen. Laws ch. 12, § 5B(a)(3).

594. The Commonwealth of Massachusetts, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Shire, and in reliance on the accuracy of these claims and/or statements, have paid for prescription drugs and prescription drug-related management services for recipients of health insurance programs funded by the State or its political subdivisions.

595. As a result of Shire's actions, as set forth above, the Commonwealth of Massachusetts and/or its political subdivisions have been severely damaged.

## COUNT XIX

### (Violation of Michigan Medicaid False Claims Act)

596. Relator incorporates by reference the preceding paragraphs of this Third Amended Complaint as though fully set forth herein.

597. Shire, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly has

made or caused to be made, false statements or false representations of material facts in an application for Medicaid benefits, in violation of Mich. Comp. Laws § 400.603(1).

598. Shire, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly has made or caused to be made false statements or false representations of a material fact for use in determining rights to a Medicaid benefit, in violation of Mich. Comp. Laws § 400.603(2).

599. Shire, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly has concealed or failed to disclose an event affecting its initial or continued right to receive a Medicaid benefit, or the initial or continued right of any other person on whose behalf Shire has applied for or is receiving a benefit with intent to obtain a benefit to which Shire were not entitled or in an amount greater than that to which Shire were entitled, in violation of Mich. Comp. Laws § 400.603(3).

600. Shire, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly has a kickback or bribe in connection with the furnishing of goods or services for which payment is or may be made in whole or in part by Medicaid, in violation of Mich. Comp. Laws § 400.604.

601. Shire knowingly has conspired with the Charitable Foundations to commit violations of the Social Welfare Act, Mich. Comp. Laws §§ 400.1-400.122, in violation of Mich. Comp. Laws § 400.606(1).

602. Shire, in possession of facts under which they are aware or should be aware of the nature of their conduct and that their conduct is substantially certain to cause the payment of a Medicaid benefit, knowingly has made, presented, or caused to be made or presented, to an employee or officer of the State of Michigan, or its political subdivisions, false claims under the

Social Welfare Act, Mich. Comp. Laws §§ 400.1-400.122, in violation of Mich. Comp. Laws § 400.607(1).

603.    The State of Michigan, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Shire, and in reliance on the accuracy of these claims and/or statements, have paid for prescription drugs and prescription drug-related management services for recipients of Medicaid.

604.    As a result of Shire's actions, as set forth above, the State of Michigan and/or its political subdivisions have been severely damaged.

## COUNT XX

### (Violation of Minnesota False Claims Act)

605.    Relator incorporates by reference the preceding paragraphs of this Third Amended Complaint as though fully set forth herein.

606.    Shire, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly has presented or caused to be presented, to an officer or employee of the State of Minnesota, or its political subdivisions, false or fraudulent claims for payment or approval, in violation of Minn. Stat. § 15C.02(a)(1).

607.    Shire, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly has made, used, or caused to be made and used, false records or statements to get false or fraudulent claim paid or approved by the State of Minnesota, or its political subdivisions, in violation of Minn. Stat. § 15C.02(a)(2).

608.    Shire knowingly has conspired with the Charitable Foundations to commit violations of Minn. Stat. § 15C.02(a)(1) & (a)(2), in violation of Minn. Stat. § 15C.02(a)(3).

609. The State of Minnesota, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Shire, and in reliance on the accuracy of these claims and/or statements, have paid for prescription drugs and prescription drug-related management services for recipients of State and State subdivision funded health insurance programs.

610. As a result of Shire's actions, as set forth above, the State of Minnesota and/or its political subdivisions have been severely damaged.

## COUNT XXI

### (Violation of Montana False Claims Act)

611. Relator incorporates by reference the preceding paragraphs of this Third Amended Complaint as though fully set forth herein.

612. Shire, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly has presented or caused to be presented, to an officer or employee of the State of Montana, or its political subdivisions, false or fraudulent claims for payment or approval, in violation of Mont. Code § 17-8-403(1)(a).

613. Shire, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly has made, used, or caused to be made and used, false records or statements to get false or fraudulent claims paid or approved by the State of Montana, or its political subdivisions, in violation of Mont. Code § 17-8-403(1)(b).

614. Shire knowingly has conspired with the Charitable Foundations to commit violations of Mont. Code § 17-8-403(1)(a) & (1)(b), in violation of Mont. Code § 17-8-403(1)(c).

615. The State of Montana, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Shire, and in reliance on the accuracy of these claims and/or

statements, have paid for prescription drugs and prescription drug-related management services for recipients of health insurance programs funded by the State or its political subdivisions.

616. As a result of Shire's actions, as set forth above, the State of Montana and/or its political subdivisions have been severely damaged.

**COUNT XXII**

**<u>(Violation of Nevada False Claims Act)</u>**

617. Relator incorporates by reference the preceding paragraphs of this Third Amended Complaint as though fully set forth herein.

618. Shire, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly has presented or caused to be presented, false claims for payment or approval, in violation of <u>Nev. Rev. Stat. § 357.040(1)(a)</u>.

619. Shire, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly has made, used, or caused to be made and used, false records or statements to obtain payment or approval of false claims, in violation of <u>Nev. Rev. Stat. § 357.040(1)(b)</u>.

620. Shire knowingly has conspired with the Charitable Foundations to commit violations of <u>Nev. Rev. Stat. § 357.040(1)(a)</u> & <u>(1)(b)</u>, in violation of <u>Nev. Rev. Stat. § 357.040 (1)(i)</u>.

621. The State of Nevada, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Shire, and in reliance on the accuracy of these claims and/or statements, have paid for prescription drugs and prescription drug-related management services for recipients of health insurance programs funded by the State or its political subdivisions.

Filed Under Seal

166

622.     As a result of Shire's actions, as set forth above, the State of Nevada and/or its political subdivisions have been severely damaged.

## COUNT XXIII

### (Violation of New Jersey False Claims Act)

623.     Relator incorporates by reference the preceding paragraphs of this Third Amended Complaint as though fully set forth herein.

624.     Shire, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly or intentionally presented or caused to be presented, and may still be presenting or causing to be presented, to an employee, officer or agent of the State of New Jersey, or to any contractor, grantee, or other recipient of State funds, false or fraudulent claims for payment or approval, in violation of N.J. Stat. § 2A:32C-3(a).

625.     Shire, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to made or used, and may still be making, using, or causing to be made or used, false records or statements to get false or fraudulent claims paid or approved by the State of New Jersey, or its political subdivisions, in violation of N.J. Stat. § 2A:32C-3(b).

626.     Shire knowingly has conspired with the Charitable Foundations to commit violations of N.J. Stat. § 2A:32C-3(a) & (b), in violation of N.J. Stat. § 2A:32C-3(c).

627.     The State of New Jersey, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Shire, and in reliance on the accuracy of these claims and/or statements, have paid for prescription drugs and prescription drug-related management services for recipients of Medicaid.

628. As a result of Shire's actions, as set forth above, the State of New Jersey and/or its political subdivisions have been severely damaged.

## COUNT XXIV

### (Violation of New Mexico Medicaid False Claims Act)

629. Relator incorporates by reference the preceding paragraphs of this Third Amended Complaint as though fully set forth herein.

630. Shire, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly has presented or caused to be presented, to the State of New Mexico, or its political subdivisions, false or fraudulent claims for payment under the Medicaid program, in violation of N.M. Stat. § 27-14-4(A).

631. Shire, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly has made, used, or caused to be made and used, false records or statements to obtain false or fraudulent claims under the Medicaid program paid for or approved by the State of New Mexico, or its political subdivisions, in violation of N.M. Stat. § 27-14-4(C).

632. Shire knowingly has conspired with the Charitable Foundations to commit violations of N.M. Stat. § 27-14-4 (A) & (B), in violation of N.M. Stat. § 27-14-4(D).

633. The State of New Mexico, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Shire, and in reliance on the accuracy of these claims and/or statements, have paid for prescription drugs and prescription drug-related management services for recipients of health insurance programs funded by the State or its political subdivisions.

634. As a result of Shire's actions, as set forth above, the State of New Mexico and/or its political subdivisions have been severely damaged.

## COUNT XXV

### (Violation of New York False Claims Act)

635.    Relator incorporates by reference the preceding paragraphs of this Third Amended Complaint as though fully set forth herein.

636.    Shire, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly has presented or caused to be presented, false or fraudulent claims for payment or approval, in violation of N.Y. State Fin. Law § 189(1)(a).

637.    Shire, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly has made, used, or caused to be made and used, false records or statements material to false or fraudulent claims, in violation of N.Y. State Fin. Law § 189(1)(b).

638.    Shire knowingly has conspired with the Charitable Foundations to commit violations of N.Y. State Fin. Law § 189(1)(a) & (1)(b), in violation of N.Y. State Fin. Law § 189(1)(c).

639.    The State of New York, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Shire, and in reliance on the accuracy of these claims and/or statements, have paid for prescription drugs and prescription drug-related management services for recipients of health insurance programs funded by the State or its political subdivisions.

640.    As a result of Shire's actions, set forth above, the State of New York and/or its political subdivisions have been severely damaged.

## COUNT XXVI

### (Violation of North Carolina False Claims Act)

641.    Relator incorporates by reference the preceding paragraphs of this Third Amended Complaint as though fully set forth herein.

642.    Shire, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly has presented or caused to be presented, false or fraudulent claims for payment or approval, in violation of N.C. Gen. Stat. § 1-607(a)(1).

643.    Shire, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly has made, used, or caused to be made and used, false records or statements material to false or fraudulent claims, in violation of N.C. Gen. Stat. § 1-607(a)(2).

644.    Shire knowingly has conspired with the Charitable Foundations to commit violations of N.C. Gen. Stat. § 1-607(a)(1) & (a)(2), in violation of N.C. Gen. Stat. § 1-607(a)(3).

645.    The State of North Carolina, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Shire, and in reliance on the accuracy of these claims and/or statements, have paid for prescription drugs and prescription drug-related management services for recipients of health insurance programs funded by the State or its political subdivisions.

646.    As a result of Shire's actions, as set forth above, the State of North Carolina and/or its political subdivisions have been severely damaged.

## COUNT XXVII

### (Violation of Oklahoma Medicaid False Claims Act)

647.    Relator incorporates by reference the preceding paragraphs of this Third Amended Complaint as though fully set forth herein.

Filed Under Seal

170

648. Shire, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly has presented or caused to be presented, to an officer or employee of the State of Oklahoma, or its political subdivisions, false or fraudulent claims for payment or approval, in violation of Okla. Stat. tit. 63, § 5053.1(B)(1).

649. Shire, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly has made or caused to be made false records or statements to get false or fraudulent claims paid or approved by the State of Oklahoma, or its political subdivisions, in violation of Okla. Stat. tit. 63, § 5053.1(B)(2).

650. Shire knowingly has conspired with the Charitable Foundations to commit violations of Okla. Stat. tit. 63, § 5053.1(B)(1) & (B)(2), in violation of Okla. Stat. tit. 63, § 5053.1(B)(3).

651. The State of Oklahoma, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Shire, and in reliance on the accuracy of these claims and/or statements, have paid for prescription drugs and prescription drug-related management services for recipients of Medicaid.

652. As a result of Shire's actions, as set forth above, the State of Oklahoma and/or its political subdivisions have been severely damaged.

**COUNT XXVIII**

**<u>(Violation of Rhode Island False Claims Act)</u>**

653. Relator incorporates by reference the preceding paragraphs of this Third Amended Complaint as though fully set forth herein.

Filed Under Seal

171

654. Shire, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly has presented or caused to be presented, to an officer or employee of the State of Rhode Island or a member of Rhode Island's National Guard, false or fraudulent claims for payment or approval, in violation of R.I. Gen. Laws § 9-1.1-3(a)(1).

655. Shire, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly has made or caused to be made false records or statements to get false or fraudulent claims paid or approved by the State of Rhode Island, or its political subdivisions, in violation of R.I. Gen. Laws § 9-1.1-3(a)(2).

656. Shire knowingly has conspired with the Charitable Foundations to commit violations of R.I. Gen. Laws § 9-1.1-3(a)(1) & (a)(2), in violation of R.I. Gen. Laws § 9-1.1-3(a)(3).

657. The State of Rhode Island, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Shire, and in reliance on the accuracy of these claims and/or statements, have paid for prescription drugs and prescription drug-related management services for recipients of Medicaid.

658. As a result of Shire's actions, as set forth above, the State of Rhode Island and/or its political subdivisions have been severely damaged.

## COUNT XXIX

### (Violation of Tennessee Medicaid False Claims Act)

659. Relator incorporates by reference the preceding paragraphs of this Third Amended Complaint as though fully set forth herein.

660. Shire, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly has presented or caused to be presented, to the State of Tennessee, or its political subdivisions, false or fraudulent claims for payment under the Medicaid program, in violation of Tenn. Code § 71-5-182(a)(1)(A).

661. Shire, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly has made, used, or caused to be made and used, false or fraudulent records or statements to get false or fraudulent claims under the Medicaid program paid for or approved by the State of Tennessee, or its political subdivisions, in violation of Tenn. Code § 71-5-182(a)(1)(B).

662. Shire knowingly has conspired with the Charitable Foundations to commit violations of Tenn. Code § 71-5-182(a)(1)(A) & (a)(1)(B), in violation of Tenn. Code § 71-5-182(a)(1)(C).

663. The State of Tennessee, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Shire, and in reliance on the accuracy of these claims and/or statements, have paid for prescription drugs and prescription drug-related management services for recipients of the Medicaid program.

664. As a result of Shire's actions, as set forth above, the State of Tennessee and/or its political subdivisions have been severely damaged.

## COUNT XXX

### (Violation of Texas Medicaid Fraud Prevention Act)

665. Relator incorporates by reference the preceding paragraphs of this Third Amended Complaint as though fully set forth herein.

Filed Under Seal

173

666.     Shire, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly has made or caused to be made false statements or misrepresentations of material fact that permitted Shire to receive a benefit or payment under the Medicaid program that was not authorized or that was greater than the benefit or payment that was authorized, in violation of Tex. Hum. Res. Code § 36.002(1).

667.     Shire, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly has concealed or failed to disclose, or caused to be concealed or not disclosed, information that permitted Shire to receive a benefit or payment under the Medicaid program that was not authorized or that was greater than the payment that was authorized, in violation of Tex. Hum. Res. Code § 36.002(2).

668.     Shire, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly has made, caused to be made, induced, or sought to induce false statements or misrepresentations of material fact concerning information required to be provided by federal or state law, rule, regulation or physician agreement pertaining to the Medicaid program, in violation of Tex. Hum. Res. Code § 36.002(4)(B).

669.     Shire, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly has made claims under the Medicaid program for services or products that were inappropriate, in violation of Tex. Hum. Res. Code § 36.002(7)(C).

670.     Shire has committed violations of Tex. Hum. Res. Code. Ann. § 32.039(b)(1-e) by offering or paying remuneration to induce a person to purchase, order, arrange for, or recommend

the purchase or order of, a good, service, or item for which payment may be made, in whole or in part, under the medical assistance program by the State of Texas, or its political subdivisions, in violation of Tex. Hum. Res. Code. Ann. § 36.002(13).

671.    Shire knowingly has conspired with the Charitable Foundations to commit violations of Tex. Hum. Res. Code § 36.002(1), (2), (4)(B), (7)(C), & (13), in violation of Tex. Hum. Res. Code § 36.002(9).

672.    The State of Texas, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Shire, and in reliance on the accuracy of these claims and/or statements, have paid for prescription drugs and prescription drug-related management services for recipients of Medicaid.

673.    As a result of Shire's actions, as set forth above, the State of Texas and/or its political subdivisions have been severely damaged.

## COUNT XXXI

### (Violation of Vermont False Claims Act)

674.    Relator incorporates by reference the preceding paragraphs of this Third Amended Complaint as though fully set forth herein.

675.    Shire, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly has presented or caused to be presented, false or fraudulent claims for payment or approval, in violation of Vt. Stat. tit. 32, § 631(a)(1).

676.    Shire, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly has made, used, or caused to be made and used, false records or statements to obtain payment or

approval of claims by the State of Vermont, or its political subdivisions, in violation of Vt. Stat. tit. 32, § 631(a)(2).

677.    Shire, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly has presented, or caused to be presented, a claim to the State of Vermont or its political subdivisions that includes items or services resulting from a violation of 42 U.S.C. § 1320a-7b, in violation of Vt. Stat. tit. 32, § 631(a)(3).

678.    Shire knowingly has conspired with the Charitable Foundations to commit violations of Vt. Stat. tit. 32, § 631(a)(1), (a)(2), & (a)(3), in violation of Vt. Stat. tit. 32, § 631(a)(12).

679.    The State of Vermont, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Shire, and in reliance on the accuracy of these claims and/or statements, have paid for prescription drugs and prescription drug-related management services for recipients of health insurance programs funded by the State or its political subdivisions.

680.    As a result of Shire's actions, as set forth above, the State of Vermont and/or its political subdivisions have been severely damaged.

## COUNT XXXII

### (Violation of Virginia Fraud Against Taxpayers Act)

681.    Relator incorporates by reference the preceding paragraphs of this Third Amended Complaint as though fully set forth herein.

682.    Shire, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly has presented or caused to be presented, to an officer or employee of the Commonwealth of Virginia,

or its political subdivisions, false or fraudulent claims for payment or approval, in violation of Va. Code § 8.01-216.3(A)(1).

683. Shire, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly has made, used, or caused to be made and used, false records or statements to get false or fraudulent claims paid or approved by the Commonwealth of Virginia, or its political subdivisions, in violation of Va. Code § 8.01-216.3(A)(2).

684. Shire knowingly has conspired with the Charitable Foundations to commit violations of Va. Code § 8.01-216.3(A)(1) & (A)(2), in violation of Va. Code § 8.01-216.3(A)(3).

685. Shire,

686. The Commonwealth of Virginia, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Shire, and in reliance upon the accuracy of these claims and/or statements, have paid for prescription drugs and prescription drug-related management services for recipients of state-funded health insurance programs.

687. As a result of Shire's actions, as set forth above, the Commonwealth of Virginia and/or its political subdivisions have been severely damaged.

## COUNT XXXIII

### (Violation of Washington Medicaid False Claims Act)

688. Relator incorporates by reference the preceding paragraphs of this Third Amended Complaint as though fully set forth herein.

689. Shire, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly has presented or caused to be presented, false or fraudulent claims for payment of approval, in violation of Wash. Rev. Code §§ 74.66.020(1)(a).

690.     Shire, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly has made, used, or caused to be made and used, false records or statements material to false or fraudulent claims, in violation of Wash. Rev. Code § 74.66.020(1)(b).

691.     Shire knowingly has conspired with the Charitable Foundations to commit violations of Wash. Rev. Code § 74.66.020(1)(a) & (1)(b), in violation of Wash. Rev. Code § 74.66.020(1)(c).

692.     The State of Washington, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Shire, and in reliance upon the accuracy of these claims and/or statements, have paid for prescription drugs and prescription drug-related management services for recipients of state-funded health insurance programs.

693.     As a result of Shire's actions, as set forth above, the State of Washington and/or its political subdivisions have been severely damaged.

## COUNT XXXIV

### (Violation of the California Insurance Frauds Protection Act)

694.     Plaintiff re-alleges and incorporates by reference all prior paragraphs.

695.     Shire knowingly has employed health care providers as "runners, cappers, steerers, or other persons" by paying them kickbacks to "procure clients or patients to perform or obtain services or benefits under a contract of insurance," in violation of Cal. Ins. Code § 1871.7(a).

696.     Shire also knowingly has employed its RBMs and PAMs as "runners, cappers, steerers, or other persons" to cause health care professionals, and their staff, to be paid kickbacks, and/or to falsify health care claims or cause said health care providers to falsify health care claims, all to "procure clients or patients to perform or obtain services or benefits under a contract of insurance," and all in violation of Cal. Ins. Code § 1871.7(a).

697. Through its payment of kickbacks, Shire has knowingly prepared, made, and/or subscribed a writing, with the intent to present or use it, or to allow it to be presented, in support of false and/or fraudulent claims in violation of <u>Cal. Ins. Code § 1871.7(b)</u> and <u>Cal. Penal Code § 550(a)(5)</u>.

698. Through its payment of kickbacks, Shire also knowingly has made or caused to be made false or fraudulent claims for the payment of a health care benefit in violation of <u>Cal. Ins. Code § 1871.7(b)</u> and <u>Cal. Penal Code § 550(a)(6)</u>.

699. Through its payment of kickbacks, Shire has presented or caused to be presented written and/or oral statements as part of, or in support of, claims for payment or other benefit pursuant to an insurance policy, knowing that the statements contained false and/or misleading information concerning one or more material facts in violation of <u>Cal. Ins. Code § 1871.7(b)</u> and <u>Cal. Penal Code § 550(b)(1)</u>.

700. Through its payment of kickbacks, Shire has prepared or made written and/or oral statements that were intended to be represented to an insurer or insurance claimant in connection with, or in support of, claims for payment or other benefits pursuant to an insurance policy, knowing that the statements contained false or misleading information concerning one or more material facts in violation of <u>Cal. Ins. Code § 1871.7(b)</u> and <u>Cal. Penal Code § 550(b)(2)</u>.

701. The payment and receipt of kickbacks as described herein has had the direct effect of greatly increasing the number of claims submitted to and paid by California insurers for various premium Shire products Cinryze, Elaprase, Firazyr, Natpara, and VPRIV, thereby increasing the amount of money spent by California insurers for these drugs.

**COUNT XXXV**

**<u>(Violation of the Illinois Insurance Claims Fraud Protection Act)</u>**

702. Plaintiff re-alleges and incorporates by reference all prior paragraphs.

Filed Under Seal

179

703.    Shire knowingly has employed offered or paid remuneration directly or indirectly, in cash or in kind, to induce patients to obtain services or benefits under a contract of insurance or that would be the basis for a claim against insured persons or the person's insurers, in violation of 740 Ill. Comp. Stat. 92/5(a).

704.    Shire knowingly has employed its RBMs and PAMs to induce them to procure clients or patients for the purchase of Shire's products that were the basis for claims against insured persons or the persons' insurers, in violation of 740 Ill. Comp. Stat. 92/5(a).

705.    Shire also has violated the IICFPA by knowingly committing "insurance fraud" through payment of kickbacks and/or falsification of, or causing the falsification of, prior authorization requests and/or health care claims, and/or presenting or causing to be presented written and/or oral statements as part of, or in support of, claims for payment or other benefit pursuant to an insurance policy, knowing that the claims and/or statements contained false and/or misleading information concerning one or more material facts, and/or knowingly preparing, making, and/or subscribing a writing, with the intent to present or use it, or to allow it to be presented, in support of false and/or fraudulent claims, all in violation of 740 Ill. Comp. Stat. § 92/5(b), the Illinois Criminal Code of 2012 (720 Ill. Comp. Stat. 17-8.10.5(a)(1)), and the Illinois Criminal Code of 1961 (720 Ill. Comp. Stat. 5/46-1(a)) (effective January 1, 2006 through June 30, 2011).

706.    Shire further has violated the IICFPA by knowingly committing "health care benefits fraud" through paying kickbacks and/or falsifying, or causing the falsification of, prior authorization requests and/or health care claims, and/or presenting or causing to be presented written and/or oral statements as part of, or in support of, claims for payment or other benefit pursuant to an insurance policy, knowing that the claims and/or statements contained false and/or

misleading information concerning one or more material facts, in violation of 740 Ill. Comp. Stat. § 92/5(b) and the Illinois Criminal Code of 2012 (720 Ill. Comp. Stat. 5/17-8.10.5(a)(2)).

707.    Shire's violations of the IICFPA have been "aggravated" offenses because Shire caused 3 or more violations within 18 months, all in violation of 740 Ill. Comp. Stat. § 92/5(b), the Illinois Criminal Code of 2012 (720 Ill. Comp. Stat. 5/17-8.10.5(b)(1)), and the Illinois Criminal Code of 1961 (720 Ill. Comp. Stat. 5/46-2) (effective January 1, 2006 through June 30, 2011).

708.    Shire's violations of the IICFPA have been in the nature of a "conspiracy" or "conspiracies" with other persons and/or entities, all in violation of 740 Ill. Comp. Stat. 92/5(b), the Illinois Criminal Code of 2012 (720 Ill. Comp. Stat. 5/17-8.10.5(c)), and the Illinois Criminal Code of 1961 (720 Ill. Comp. Stat. 5/46-3) (effective January 1, 2006 through June 30, 2011).

709.    Shire was "organizer" of the conspiracy or conspiracies with other persons and/or entities, in violation of 740 Ill. Comp. Stat. 92/5(b), the Illinois Criminal Code of 2012 (720 Ill. Comp. Stat. 5/17-8.10.5(b)(2)), and the Illinois Criminal Code of 1961 (720 Ill. Comp. Stat. 5/46-4) (effective January 1, 2006 through June 30, 2011).

710.    The payment and/or receipt of kickbacks as described herein has had the direct effect of greatly increasing the number of claims submitted to and paid by Illinois insurers for various premium Shire products Cinryze, Elaprase, Firazyr, Natpara, and VPRIV, thereby increasing the amount of money spent by Illinois insurers for these drugs.

**PRAYER FOR RELIEF**

**WHEREFORE,** Relator prays for judgment against Shire as follows:

A. That Defendants be ordered to cease and desist from submitting any more false claims, or further violating 31 U.S.C. §§ 3729 *et seq.*; Cal. Gov't Code §§ 12650 *et seq.*; Cal. Ins. Code

§ 1871.7; Colo. Rev. Stat. §§ 25.5-4-304 *et seq.*; <u>Conn. Gen. Stat. §§ 4-274</u> *et seq.*; Del. Code tit. 6, §§ 1201 *et seq.*; D.C. Code §§ 2-381.01 *et seq.*; <u>Fla. Stat. §§ 68.081</u> *et seq.*; Ga. Code §§ 49-4-168 *et seq.*; <u>Haw. Rev. Stat. §§ 661-21</u> *et seq.*; <u>740 Ill. Comp. Stat. 175</u>/1 *et seq.*; <u>740 Ill. Comp. Stat. 92</u>/1 *et seq.*; <u>Ind. Code §§ 5-11-5.7</u> *et seq.*; Iowa Code tit. 15 §§ 685.1 *et seq.*; <u>La. Rev. Stat. §§ 46:437.1</u> *et seq.*; Md. Code, Health Gen. §§ 2-601 *et seq.*; Mass. Gen. Laws ch. 12, §§ 5A *et seq.*; <u>Mich. Comp. Laws §§ 400.601</u> *et seq.*; Minn. Stat. §§ 15C.01 *et seq.*; Mont. Code §§ 17-8-401 *et seq.*; <u>Nev. Rev. Stat. §§ 357.010</u> *et seq.*; <u>N.J. Stat. §§ 2A:32C-1</u> *et seq.*; N.M. Stat. Ann. §§ 27-14-1 *et seq.*; N.Y. State Fin. Law §§ 187 *et seq.*; N.<u>C. Gen. Stat. §§ 1-605</u> *et seq.*; Okla. Stat. tit. 63, §§ 5053 *et seq.*; R.I. Gen. Laws §§ 9-1.1-1 *et seq.*; Tenn. Code §§ 71-5-181 *et seq.*; <u>Tex. Hum. Res. Code §§ 36.001</u> *et seq.*; Va. Code §§ 8.01-216.1 *et seq.*; Vt. Stat. tit. 32, §§ 630 *et seq.*; and Wash Rev. Code §§ 74.66.005 *et seq.*;

B.  That judgment be entered against Defendants in the amount of each false or fraudulent claim, multiplied as provided for in <u>31 U.S.C. § 3729(a)</u>, plus a civil penalty of not less than eleven thousand six hundred sixty-five dollars ($11,665) or more than twenty-three thousand three hundred thirty-one dollars ($23,331) per claim as provided by <u>31 U.S.C. § 3729(a)</u> and <u>28 C.F.R. § 85.5</u>,[118] to the extent such multiplied penalties shall fairly compensate the United States of America for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

C.  That judgment be entered under <u>31 U.S.C. § 3730(h)</u> in Partner B's favor and against Defendants in the amount of the damages sustained by Partner B as a result of Defendants' discharge, suspension, and harassment in the terms and conditions of her employment because

---

[118] These figures are subject to change pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, Pub. L. 101-410, <u>104 Stat. 890</u> (Oct. 5, 1990), as amended.

of her lawful acts in furtherance of her whistleblowing activities, including (1) reinstatement with the same seniority status she would have had but for Defendants' retaliation, (2) two times the amount of back pay and benefits, interest on back pay and benefits, and (3) compensation for special damages she sustained as a result of Defendants' discharge, suspension, harassment in the terms and conditions of her employment because of her lawful acts in furtherance of her whistleblowing activities;

D. That judgment be entered in Relator's favor and against Defendants in the amount of the damages sustained by the State of California or its political subdivisions multiplied as provided for in Cal. Gov't Code § 12651(a), plus a civil penalty of not less than the minimum civil penalty and not more than the maximum civil penalty allowed under the federal False Claims Act (31 U.S.C. § 3729(a)(1)) per claim as provided by Cal. Gov't Code § 12651(a), to the extent such penalties shall fairly compensate the State of California or its political subdivisions for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

E. That judgment be entered in Relator's favor and against Defendants in the amount of the damages sustained by the State of Colorado or its political subdivisions multiplied as provided for in Colo. Rev. Stat. § 25.5-4-305(1), plus a civil penalty of not less than the minimum civil penalty and not more than the maximum civil penalty allowed under the federal False Claims Act (31 U.S.C. § 3729(a)(1)) for each act as provided by Colo. Rev. Stat. § 25.5-4-305(1), to the extent such multiplied penalties shall fairly compensate the State of Colorado or its political subdivisions for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

F. That judgment be entered in Relator's favor and against Defendants in the amount of the damages sustained by the State of Connecticut multiplied as provided for in Conn. Gen. Stat.

§ 4-275(b)(2), plus a civil penalty of not less than the minimum civil penalty and not more than the maximum civil penalty allowed under the federal False Claims Act (31 U.S.C. § 3729(a)(1)) for each act in violation of the Connecticut False Claims Act, as provided by Conn. Gen. Stat. § 4-275(b)(1), to the extent such multiplied penalties shall fairly compensate the State of Connecticut for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

G. That judgment be entered in Relator's favor and against Defendants in the amount of the damages sustained by the State of Delaware multiplied as provided for in Del. Code tit. 6, §1201(a), plus a civil penalty of not less than the minimum civil penalty and not more than the maximum civil penalty allowed under the federal False Claims Act (31 U.S.C. § 3729(a)(1)) for each act in violation of the Delaware False Claims and Reporting Act, as provided by Del. Code Atit. 6, §1201(a), to the extent such multiplied penalties shall fairly compensate the State of Delaware for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

H. That judgment be entered in Relator's favor and against Defendants in the amount of the damages sustained by the District of Columbia, multiplied as provided for in D.C. Code § 2-381.02(a), plus a civil penalty of not less than five thousand five hundred dollars ($5,500) or more than eleven thousand dollars ($11,000) for each false claim, and the costs of this civil action brought to recover such penalty and damages, as provided by D.C. Code § 2-381.02(a), to the extent such multiplied penalties shall fairly compensate the District of Columbia for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

Filed Under Seal

184

I. That judgment be entered in Relator's favor and against Defendants in the amount of the damages sustained by the State of Florida or its agencies multiplied as provided for in Fla. Stat. § 68.082(2), plus a civil penalty of not less than five thousand five hundred dollars ($5,500) or more than eleven thousand dollars ($11,000) for each false claim as provided by Fla. Stat. Ann. § 68.082(2), to the extent such multiplied penalties shall fairly compensate the State of Florida or its agencies for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

J. That judgment be entered in Relator's favor and against Defendants in the amount of the damages sustained by the State of Georgia or its political subdivisions multiplied as provided for in Ga. Code § 49-4-168.1(a), plus a civil penalty of not less than five thousand five hundred dollars ($5,500) or more than eleven thousand dollars ($11,000) per false claim as provided by Ga. Code § 49-4-168.1(a), to the extent such multiplied penalties shall fairly compensate the State of Georgia or its political subdivisions for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

K. That judgment be entered in Relator's favor and against Defendants in the amount of the damages sustained by the State of Hawaii, multiplied as provided for in Haw. Rev. Stat. § 661-21(a), plus a civil penalty of not less than the minimum civil penalty and not more than the maximum civil penalty allowed under the federal False Claims Act (31 U.S.C. § 3729(a)(1)) as provided by Haw. Rev. Stat. § 661-21(a), to the extent such multiplied penalties shall fairly compensate the State of Hawaii for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

Filed Under Seal

185

L. That judgment be entered in Relator's favor and against Defendants in the amount of the damages sustained by the State of Illinois, multiplied as provided for in 740 Ill. Comp. Stat. 175/3(a)(1), plus a civil penalty of not less than the minimum civil penalty and not more than the maximum civil penalty allowed under the federal False Claims Act (31 U.S.C. § 3729(a)(1)) for each act, as provided by 740 Ill. Comp. Stat. 175/3(a)(1), and the costs of this civil action, as provided by 740 Ill. Comp. Stat. 175/3(a)(2), to the extent such penalties shall fairly compensate the State of Illinois for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

M. That judgment be entered in Relator's favor and against Defendants in the amount of the damages sustained by the State of Indiana, multiplied as provided for in Ind. Code § 5-11-5.5-2(b), plus a civil penalty of at least five thousand dollars ($5,000) per false claim as provided by Ind. Code § 5-11-5.5-2(b), to the extent such penalties shall fairly compensate the State of Indiana for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

N. That judgment be entered in Relator's favor and against Defendants in the amount of the damages sustained by the State of Iowa, multiplied as provided for in Iowa Code § 685.2(1), plus a civil penalty of not less than the minimum civil penalty and not more than the maximum civil penalty allowed under the federal False Claims Act (31 U.S.C. § 3729(a)(1)) for each act, as provided by Iowa Code § 685.2(1), to the extent such multiplied penalties shall fairly compensate the State of Iowa or its political subdivisions for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

Filed Under Seal

186

O. That judgment be entered in Relator's favor and against Defendants in the amount of the damages sustained by Louisiana's medical assistance programs, multiplied as provided for in La. Rev. Stat. § 46:438.6(B)(2), plus a civil penalty of not less than the minimum civil penalty and not more than the maximum civil penalty allowed under the federal False Claims Act (31 U.S.C. § 3729(a)(1)) per violation, plus payment of interest as provided for in La. Rev. Stat. § 46:438.6(C)(1)-(3), and the costs of this civil action, as provided by La. Rev. Stat. § 46:438.6(D)(1), to the extent such fines and penalties shall fairly compensate the State of Louisiana's medical assistance programs for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

P. That judgment be entered in Relator's favor and against Defendants for restitution to the State of Maryland or its political subdivisions for the value of payments or benefits provided, directly or indirectly, as a result of Defendants' unlawful acts, as provided for in Md. Code, Health-Gen. § 2-602(a), multiplied as provided for in Md. Code, Health-Gen. § 2-602(b)(1)(ii), plus a civil penalty of not more than ten thousand dollars ($10,000) for each false claim, pursuant to Md. Code, Health-Gen. § 2-602(b)(1)(i), to the extent such penalties fairly compensate the State of Maryland or its political subdivisions for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

Q. That judgment be entered in Relator's favor and against Defendants for restitution to the Commonwealth of Massachusetts or its political subdivisions in the amount of a civil penalty of not less than the minimum civil penalty and not more than the maximum civil penalty allowed under the federal False Claims Act (31 U.S.C. § 3729(a)(1)) per false claim, plus three times the amount of damages, including consequential damages, sustained by Massachusetts

as the result of Defendants' actions, plus the expenses of the civil action brought to recover such penalties and damages, as provided by Mass. Gen. Laws ch. 12. § 5B, to the extent such penalties shall fairly compensate the Commonwealth of Massachusetts or its political subdivisions for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

R.  That judgment be entered in Relator's favor and against Defendants for restitution to the State of Michigan or its political subdivisions for the value of payments or benefits provided as a result of Defendants' unlawful acts, plus a civil penalty of triple the amount of damages suffered by Michigan as a result of Defendants' unlawful conduct, as well as not less than five thousand dollars ($5,000) or more than ten thousand dollars ($10,000) per claim, as provided by Mich. Comp. Laws § 400.612(1), as well as the costs incurred by both Michigan and Relator, as provided by §§ 400.610a(9) and 400.610b, in order to fairly compensate the State of Michigan or its political subdivisions for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

S.  That judgment be entered in Relator's favor and against Defendants for restitution to the State of Minnesota or its political subdivisions for the value of payments or benefits provided as a result of Defendants' unlawful acts, plus a civil penalty of triple the amount of damages suffered by Minnesota as a result of Defendants' unlawful conduct, as well as not less than five thousand five hundred dollars ($5,500) or more than eleven thousand dollars ($11,000) per claim, as provided by Minn. Stat. § 15C.02(a), as well as the costs incurred by both Minnesota and Relator, as provided by Minn. Stat. § 15C.12, in order to fairly compensate Minnesota or its political subdivisions for losses resulting from the various schemes undertaken by

Defendants, together with penalties for specific claims to be identified at trial after full discovery;

T. That judgment be entered in Relator's favor and against Defendants for restitution to the State of Montana or its political subdivisions for the value of payments or benefits provided, directly or indirectly, as a result of Defendants' unlawful acts, as provided for in Mont. Code § 17-8-403, multiplied as provided for in Mont. Code § 17-8-403(2), plus a civil penalty of not less than the minimum civil penalty and not more than the maximum civil penalty allowed under the federal False Claims Act (31 U.S.C. § 3729(a)(1)) for each false claim, pursuant to Mont. Code § 17-8-403(2), to the extent such multiplied penalties shall fairly compensate the State of Montana or its political subdivisions for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

U. That judgment be entered in Relator's favor and against Defendants for restitution to the State of Nevada for the value of payments or benefits provided, directly or indirectly, as a result of Defendants' unlawful acts, as provided for in Nev. Rev. Stat. § 357.040, multiplied as provided for in Nev. Rev. Stat. § 357.040(1), plus a civil penalty of not less than the minimum civil penalty and not more than the maximum civil penalty allowed under the federal False Claims Act (31 U.S.C. § 3729(a)(1))for each act, pursuant to Nev. Rev. Stat. § 357.040(2)(c), to the extent such multiplied penalties shall fairly compensate the State of Nevada for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

V. That judgment be entered in Relator's favor and against Defendants in the amount of the damages sustained by the State of New Jersey or its political subdivisions multiplied as provided for in N.J. Stat. § 2A:32C-3, plus a civil penalty of not less than the minimum civil

penalty and not more than the maximum civil penalty allowed under the federal False Claims Act (31 U.S.C. § 3729(a)(1)) for each false or fraudulent claim, to the extent such multiplied penalties shall fairly compensate the State of New Jersey or its political subdivisions for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

W. That judgment be entered in Relator's favor and against Defendants for restitution to the State of New Mexico or its political subdivisions for the value of payments or benefits provided, directly or indirectly, as a result of Defendants' unlawful acts, as provided for in N.M. Stat. § 27-14-4 and N.M. Stat. § 44-9-3(C), multiplied as provided for in N.M. Stat. § 27-14-4 and N.M. Stat. § 44-9-3(C)(1), plus a civil penalty of not less than five thousand dollars ($5,000) and not more than ten thousand dollars ($10,000) for each violation, as provided by N.M. Stat. § 44-9-3(C)(2), to the extent such multiplied penalties shall fairly compensate the State of New Mexico or its political subdivisions for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery, as well as the costs of this action and reasonable attorney fees as provided by N.M. Stat. § 44-9-3(C)(3)-(4);

X. That judgment be entered in Relator's favor and against Defendants for restitution to the State of New York or its political subdivisions for the value of payments or benefits provided, directly or indirectly, as a result of Defendants' unlawful acts, as provided for in N.Y. State Fin. Law § 189(1), multiplied as provided for in N.Y. State Fin. Law § 189(1), plus a civil penalty of not less than the minimum civil penalty and not more than the maximum civil penalty allowed under the federal False Claims Act (31 U.S.C. § 3729(a)(1)) for each false claim, pursuant to N.Y. State Fin. Law § 189(1), to the extent such multiplied penalties shall fairly compensate the State of New York or its political subdivisions for losses resulting from

the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery, as well as the costs of this action and reasonable attorney fees as provided by N.Y. State Fin. Law § 189(3);

Y. That judgment be entered in Relator's favor and against Defendants for restitution to the State of North Carolina for the value of payments or benefits provided, directly or indirectly, as a result of Defendants' unlawful acts, as provided for in N.C. Gen. Stat. § 1-607, multiplied as provided for in N.C. Gen. Stat. § 1-607(a), plus a civil penalty of not less than the minimum civil penalty and not more than the maximum civil penalty allowed under the federal False Claims Act (31 U.S.C. § 3729(a)(1)) for each act, pursuant to N.C. Gen. Stat. § 1-607(a), to the extent such multiplied penalties shall fairly compensate the State of North Carolina for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

Z. That judgment be entered in Relator's favor and against Defendants in the amount of the damages sustained by the State of Oklahoma or its political subdivisions multiplied as provided for in Okla. Stat. tit. 63, § 5053.1(B), plus a civil penalty of not less than five thousand dollars ($5,000) or more than ten thousand dollars ($10,000) as provided by Okla. Stat. tit. 63, § 5053.1(B), to the extent such multiplied penalties shall fairly compensate the State of Oklahoma or its political subdivisions for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery, as well as the costs of this action and reasonable attorney fees as provided by Okla. Stat. tit. 63, § 5053.4(A)(3);

AA. That judgment be entered in Relator's favor and against Defendants in the amount of the damages sustained by the State of Rhode Island or its political subdivisions multiplied as provided for in R.I. Gen. Laws § 9-1.1-3(a), plus a civil penalty of not less than the minimum

civil penalty and not more than the maximum civil penalty allowed under the federal False Claims Act (31 U.S.C. § 3729(a)(1)) for each act, pursuant to R.I. Gen. Laws § 9-1.1-3(a), to the extent such multiplied penalties shall fairly compensate the State of Rhode Island or its political subdivisions for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

BB. That judgment be entered in Relator's favor and against Defendants for restitution to the State of Tennessee for the value of payments or benefits provided, directly or indirectly, as a result of Defendants' unlawful acts, as provided for in Tenn. Code § 71-5-182, multiplied as provided for in Tenn. Code § 71-5-182(a)(1), plus a civil penalty of not less than five thousand dollars ($5,) or more than twenty-five thousand dollars ($25,000) per false claim pursuant to Tenn. Code § 71-5-182(a)(1), to the extent such multiplied penalties shall fairly compensate the State of Tennessee for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery, as well as the costs of this action and reasonable attorney fees as provided by Tenn. Code § 71-5-182(a)(3);

CC. That judgment be entered in Relator's favor and against Defendants for restitution to the State of Texas for the value of payments or benefits provided, directly or indirectly, as a result of Defendants' unlawful acts, as provided for in Tex. Hum. Res. Code § 36.052(a), multiplied as provided for in Tex. Hum. Res. Code § 36.052(a)(4), the interest on the value of such payments or benefits at the prejudgment interest rate in effect on the day the payment or benefit was paid or received, for the period from the date the payment or benefit was paid or received to the date that restitution is made to the State of Texas, pursuant to Tex. Hum. Res. Code § 36.052(a)(2), plus a civil penalty of not less than the minimum civil penalty and not more than the maximum civil penalty allowed under the federal False Claims Act (31 U.S.C. § 3729(a)(1)) for each false claim, as provided by Tex. Hum. Res. Code Ann. §

36.052(a)(3)(A) & (B), to the extent such multiplied penalties shall fairly compensate the State of Texas for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

DD. That judgment be entered in Relator's favor and against Defendants in the amount of the damages sustained by the State of Vermont or its political subdivisions, multiplied as provided for in Vt. Stat. tit. 32, § 631(b)(2), plus a civil penalty of not less than the minimum civil penalty and not more than the maximum civil penalty allowed under the federal False Claims Act (31 U.S.C. § 3729(a)(1)) per claim as provided by Vt. Stat. tit. 32, § 631(b)(1), in order to fairly compensate the State of Vermont or its political subdivisions for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

EE. That judgment be entered in Relator's favor and against Defendants in the amount of the damages sustained by the Commonwealth of Virginia, multiplied as provided for in Va. Code § 8.01-216.3(A), plus a civil penalty of not less than the minimum civil penalty and not more than the maximum civil penalty allowed under the federal False Claims Act (31 U.S.C. § 3729(a)(1)) per claim as provided by Va. Code § 8.01-216.3(A), to the extent such multiplied penalties shall fairly compensate the Commonwealth of Virginia for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

FF. That judgment be entered in Relator's favor and against Defendants in the amount of the damages sustained by the State of Washington or its political subdivisions multiplied as provided for in Wash. Rev. Code § 74.66.020(1), plus a civil penalty of not less than the minimum civil penalty and not more than the maximum civil penalty allowed under the federal False Claims Act (31 U.S.C. § 3729(a)(1)) per claim as provided by Wash. Rev. Code §

74.66.020(1) and Wash. Admin. Code § 44-02-010, to the extent such penalties shall fairly compensate the State of Washington or its political subdivisions for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

GG. That Defendants be ordered to disgorge all sums by which they have been enriched unjustly by their wrongful conduct;

HH. That judgment be granted for Relator against Defendants for all costs, including, but not limited to, court costs, expert fees and all attorneys' fees incurred by Relator in the prosecution of this suit;

II. That judgment be entered in Relator's favor and against Defendants in the amount of the damages sustained by the State of California or its political subdivisions multiplied as provided for in Cal. Ins. Code § 1871.7(b), plus a civil penalty of not less than five thousand dollars ($5,000) or more than ten thousand dollars ($10,000) per claim, pursuant to Cal. Ins. Code § 1871.7(b), for each fraudulent claim that Defendants presented or caused to be presented to an insurance company, to the extent such penalties shall fairly compensate the State of California or its political subdivisions for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery, together with pre- and post-judgment interest, along with reasonable attorneys' fees, costs, and expenses which were necessarily incurred in bringing and pressing this case, pursuant to Cal. Ins. Code § 1871.7(g)(1)(A)(iii)(I);

JJ. That the Court, pursuant to Cal. Ins. Code § 1871.7(b) and 740 Ill. Comp. Stat. 92/5(b), issue an order preventing the Defendants from transferring, concealing, or dissipating the proceeds of its illegal conduct;

KK. That judgment be entered in Relator's favor and against Defendants in the amount of the damages sustained by the State of Illinois or its political subdivisions multiplied as provided for in 740 Ill. Comp. Stat. 92/5(b), plus a civil penalty of not less than five thousand dollars ($5,000) or more than ten thousand dollars ($10,000) per claim as provided by 740 Ill. Comp. Stat. 92/5(b), for each fraudulent claim that Defendants presented or caused to be presented to an insurance company, to the extent such penalties shall fairly compensate the State of Illinois or its political subdivisions for losses resulting from the various schemes undertaken by Defendants;

LL. That the Court issue an order enjoining the Defendants from continuing to engage in the fraudulent conduct alleged herein; and

MM. That this Court award such further relief as it deems just and proper.

## JURY TRIAL DEMAND

Relator demands a trial by jury of all issues so triable.

Respectfully Submitted,

Dated: December 20, 2021

Ann L. Palmieri (Bar No. 388090)
LAW OFFICE OF ANN L. PALMIERI
P.O. Box 1586
Andover, MA 01810
Telephone:  (617) 482-6111

W. Scott Simmer (*pro hac vice*)
Noah M. Rich (*pro hac vice*)
BARON & BUDD, P.C.
600 New Hampshire Ave. NW
10th Floor
Washington, DC 20037
Telephone: (202) 333-4562
Facsimile: (202) 337-1039

John R. Davis (*pro hac vice*)
SLACK DAVIS SANGER, LLP

Filed Under Seal

6001 Bold Ruler Way, Suite 100
Austin TX 78746
Telephone: (512) 795-8686
Facsimile: (512) 795-8787